The **RED LAKE BAND**, Plaintiff,

v.

The **UNITED STATES**, Defendant.

No. 189A.

United States Claims Court.

March 28, 1989.

As Corrected May 12, 1989.

Pamela S. West, with whom were Laura R. Ouverson and Harry H. Kelso, Washington, D.C., for defendant.

Marvin J. Sonosky, Washington, D.C., for plaintiff. Reid P. Chambers, Anne D. Noto, and Rodney J. Edwards, of counsel.

## TABLE OF CONTENTS

| | Page |
|---|---|
| I. BACKGROUND | 370 |
| A. Plaintiff's Motion in Limine | 372 |
| B. Has Defendant Furnished an Accounting? | 373 |
| II. DEFENDANT'S MOTION TO DISMISS BASED ON THE STATUTE OF LIMITATIONS | 374 |
| A. Claims 1 and 2 | 375 |
| B. Claims 3 and 4 | 378 |
| III. THE NON–ACCOUNTING CLAIMS | 378 |
| A. Expenditures From the Principal Fund in Excess of 5% | 378 |
| 1. Statutory Construction | 378 |
| 2. Plenary Power | 383 |
| 3. Fair and Honorable Dealings | 386 |
| B. Per Capita Disbursements—Non-accounting Issues | 390 |
| C. Education Expenses | 392 |
| D. Medical Attention | 402 |
| IV. THE ACCOUNTING CLAIMS | 404 |
| A. Disallowed Categories | 404 |
| B. Plaintiff's Motion for Leave to File Memorandum | 405 |
| C. Use of the Accounting Process and GAO Report as Proof | 407 |
| D. Per Capita Disbursements—Accounting Issues | 409 |
| 1. Objections Dependent on Plaintiff's Motion in Limine | 410 |
| 2. Payments to non-Red Lake Indians | 410 |
| 3. Incomplete Proof | 411 |
| E. Disbursements Presented on Sample Basis | 412 |
| 1. Sample 555 (Code 1, no proof) | 413 |
| 2. Sample 556 (Code 2, failure of proof) | 414 |
| 3. Sample 557 (Code 3, purpose not shown) | 415 |
| 4. Sample 558 (Code 8, duplication) | 416 |
| 5. Sample 559 (Code 11, expenditure for federal purpose) | 416 |
| 6. Sample 560 (Code 12, expenditure for individual benefit) | 418 |
| 7. Sample 561 (Code 99, food, rations, and provisions) | 418 |
| V. ADDITIONAL FACT FINDINGS | 420 |
| A. The Nelson Act | 420 |
| B. 1889 Negotiations with the Red Lake Band | 422 |
| C. Bureau Requests for Annual Appropriations | 425 |
| D. Legislative Consideration of Non–Per Capita Withdrawals | 428 |
| E. Legislative Consideration of Per Capita Payments | 432 |
| F. Appropriations from the Principal Fund | 436 |
| G. The Disbursement and Settlement Process | 443 |
| H. The 1963 GAO Report | 445 |
| I. Indian Policy | 450 |
| J. Education | 451 |
| K. Oliver Breckner | 462 |
| L. Medical Attention | 464 |
| M. Agricultural Expenditures | 472 |
| VI. SUMMARY CONCLUSION | 473 |

OPINION

BRUGGINK, Judge.

This is an action for an accounting brought by the Red Lake Band of the Minnesota Chippewa Tribe pursuant to section 2 of the Indian Claims Commission Act, 25 U.S.C. § 70a (1976) ("ICC Act").[1] The Red Lake Band, along with other bands of the Minnesota Chippewa, have claims pending in five consolidated cases. In a general sense, these claims fall into three categories: disbursement accounting, receipts accounting, and fair market value. The procedural history of this case, related actions, and previous litigation involving the Chippewa is set out in *Minnesota Chippewa Tribe v. United States*, 11 Cl.Ct. 221, 223–34 (1986), and 14 Cl.Ct. 116, 118–20 (1987). Familiarity with that background is presumed. This opinion deals only with plaintiff's challenge to approximately $4,000,000 in disbursements made by defendant from monies held by it in trust for the Red Lake Band pursuant to the Nelson Act, ch. 24, 25 Stat. 642 (1889).

■ Nelson Act monies were primarily generated by the defendant's sale of land and timber ceded by the Red Lake and other Minnesota Chippewa Bands in connection with their agreement to the Nelson Act. These monies were to be held by defendant in trust. It is the Government's duty to account for those disbursements by documenting them, and where challenged, to show that they were for the benefit of the Indians and were appropriated as provided for by the Nelson Act or by subsequent legislation enacted within Congress' plenary power. *See Rogue River Tribe of Indians v. United States*, 105 Ct.Cl. 495, 550–52, 64 F.Supp. 339, 343–44 (1946); *Seminole Nation v. United States*, 102 Ct.Cl. 565, 629–31 (1944), *cert. denied*, 326 U.S. 719, 66 S.Ct. 24, 90 L.Ed. 426 (1945). As part of the relief requested with the

commencement of this action in 1951, defendant has been asked to account for disbursements from certain funds. In response to that request, the General Accounting Office ("GAO") issued a report in 1963 ("1963 GAO Report"), in part building on an earlier 1929 report ("1929 GAO Report"), as part of the Government's fulfillment of its duty to account. The plaintiff's subsequent exceptions to that report are the source of the disbursement claims made by the Red Lake Band here.

This disbursement portion of the case is really part of a three step calculus which must ultimately be made before any liability can be assessed. Although each step can be separately reckoned, ultimate liability, if any, requires all three. In a separate proceeding, the court will undertake what is really the first step in the process—evaluation of plaintiff's claim that the amount defendant generated by sale of land and timber was too small and that defendant must make up the difference. This opinion is in effect the middle step—determination (only as to the Red Lake Band) of whether amounts actually received were properly disbursed. Against whatever is ultimately determined to be the correct amount for which defendant is accountable, it is entitled to a credit for amounts which are both properly disbursed and which may be treated as payments on the claim, including amounts of federal monies which may qualify as gratuities.

The disbursement accounting can be loosely divided into accounting or non-accounting claims, in the sense that the accounting claims turn on an examination of documents in order to evaluate purpose, proof, authorization, etc. Non-accounting claims are those in which whole classes of disbursements are challenged, either as a matter of law or for factual reasons that

---

1. Plaintiff's claims are brought under section 2 of the ICC Act. Clause three of section 2 recognizes "claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable consid-

eration, mutual or unilateral mistake, whether of law or fact, or any other ground cognizable by a court of equity." Clause five recognizes "claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity."

are common to all disbursements of that class. There are five claims which fall into the latter category: 1) all disbursements out of the principal fund in excess of five percent of that fund were in violation of the Nelson Act or otherwise a breach of trust; 2) none of the disbursements for education were for the benefit of the Band because the education was inferior; 3) none of the disbursements for medical attention were for the benefit of the Band because the medical attention was inferior; 4) payments to the State of Minnesota for tuition and for public schools violated state law and the equal protection clause; 5) payments to private sectarian schools were violative of the establishment clause. The latter four claims are the subject of defendant's pending motion to dismiss, addressed *infra* p. 372 *et seq.*

The remaining claims, which the court has characterized as accounting claims, fall into two general categories. First, with respect to annuity payments made to individual Band members (also referred to as "per capita payments"), the Band alleges that such disbursements are not chargeable to trust funds: because they were not made in accordance with applicable rules and regulations, because there is no proof of the expenditure, or because the evidence of a disbursement is otherwise deficient. With respect to other, non-per capita disbursements, the Band alleges generally: (1) that there is no proof or a failure of proof for certain expenditures; (2) that expenditures were for a federal governmental purpose; (3) that disbursements were for individual, rather than tribal benefit; (4) that disbursements were not made in accordance with applicable rules and regulations; (5) that the same documentation was used to support more than one charge; and

(6) that expenditures were for food, rations, or provisions.[2]

Trial was held from April 11 through May 11, 1988. Post-trial briefing is complete. After a thorough examination of the evidence, transcripts, and briefing, the court concludes that the Band may recover in part on both its non-accounting and accounting claims.

## I. BACKGROUND

The issues in the present case are framed by the original petition filed in 1951 before the Indian Claims Commission ("ICC") as amended in 1956, the 1963 GAO Report, and the exceptions filed by the Band in 1969 to that report.[3] By this court's order of July 2, 1984, defendant was directed to prepare supplemental accountings of amounts paid for the benefit of the Indians on a band-by-band basis. That order was vacated in *Minnesota Chippewa Tribe Red Lake Band v. United States*, 768 F.2d 338 (Fed.Cir.1985). In that decision, the court of appeals permitted the band-specific supplemental accounting to proceed only with respect to the Red Lake Band, because it had "clearly set forth in exceptions 1–40 its demand for a separate accounting of Nelson Act Funds...." *Id.* at 342. The supplemental accounting as to other bands (the "Consolidated Chippewa") was to proceed without a band-by-band breakout.

Subsequent to that decision, and in place of a formal supplemental accounting by defendant, the Red Lake Band and the Consolidated Chippewa volunteered to accept from defendant the backup documents that would normally have formed the support for an accounting. *See* Transcript of Proceedings, November 12, 1985 at 26; Plaintiffs' Proposed Schedule of Accounting Tasks, January 8, 1986. The order of

---

**2.** Although normally considered in the context of the offsets portion of an accounting action, the court directed that the determination of whether sampled disbursements were disallowable as offsets, 25 U.S.C. § 70a, should be made during the present trial. *See* Orders of November 25, 1987 at p. 1 n. 2, and December 23, 1987 at pp. 11–13.

**3.** In addition to Nelson Act funds, the GAO reported on disbursements from: (1) funds aris-

ing pursuant to the Act of August 19, 1890; (2) funds arising from the acts of March 1, 1907 and February 12, 1929; (3) funds arising from the Acts of February 14, 1929, February 12, 1929, and June 13, 1930; (4) funds arising from the Acts of March 3, 1883, February 8, 1905, and June 13, 1930; and (5) funds arising from the Acts of February 20, 1904, June 21, 1906, May 18, 1916, and February 12, 1929.

January 22, 1986 provided in part as follows:

1. In Docket No. 189–A, defendant shall, on or before May 1, 1986, produce for inspection and copying, at the office of plaintiffs' accountant, Paul J. Gillis, C.P.A., 11510 Georgia Avenue, Wheaton, Maryland 20902, the "backup data" (including vouchers, invoices, bills, receipts, memoranda, or other documents) relied upon by defendant in preparing the 1963 General Accounting Office report on file in these cases, and listing claimed disbursements from Nelson Act proceeds for the benefit of the Red Lake Band in the amount of $4,000,000, more or less. Such "backup data" shall be assembled by reference to the GAO report classifications in the order in which the disbursements appear in the 1963 GAO report; that is, the documents are to be grouped and labeled by appropriation fund, by year, and by disbursement category; and, within each group of documents, the documents are to appear in the same order as they appear on the GAO work cards from which the 1963 report was prepared. (Footnote omitted.)

The court withheld ruling on whether plaintiff's acceptance of the backup material relieved the Government of its responsibility to produce supplemental accountings of the Nelson Act funds for the Red Lake Band and the Consolidated Chippewa.

The January 22, 1986 order was modified to the extent that "the 'backup data' to be produced pursuant to paragraphs 1 and 2 of that order at the office of Mr. Gillis need not include 'backup data' relating to per capita disbursements...." Order of February 24, 1986. Defendant delivered approximately two-thirds of the backup data, including per capita documentation, by the May 1, 1986 deadline. Most of the balance of the data was delivered by August 1, 1986. This Red Lake backup data has been referred to throughout these proceedings as "the thirty-eight boxes."

After reviewing the thirty-eight boxes, containing approximately 225,000 pages of material, plaintiff filed exceptions on February 25, 1987. In order to distinguish them from the pleading-type exceptions filed in 1969, and to credit the Band's accountant, who was primarily responsible for drafting them, they will be referred to as the "Gillis exceptions."

The Gillis exceptions challenged more than ninety-eight percent of approximately $4,000,000 in disbursements covered by the thirty-eight boxes. The basis for a challenge as to each expenditure was expressed by a numerical code referencing one of twenty-three types of Gillis exceptions. The documentary support for each disbursement was examined by Gillis or a member of his staff. Certain disallowance codes asserted defects arising from the quality of the particular documentation. Others were applied on a categorical basis to certain types of disbursements or documentation.

Plaintiff submitted an explanation of the Gillis exceptions on September 9, 1987. Defendant filed its response to the exceptions on October 23, 1987. In its response, defendant denied liability under any of the Gillis exceptions as a matter of fact and/or law. Defendant did not respond directly to the individual applications of the Gillis codes by way of producing supporting documentation in response to allegations of "no proof," "failure of proof," or "failure to comply with applicable laws and regulations" at that time. Consequently, almost every disbursement remained at issue.

Confronted by the possibility of needing to examine a massive volume of material in order to resolve the Gillis exceptions, the court and the parties developed a methodology for trying samples of the non-categorical codes. These were codes that would require an examination of the accounting documentation. They included: (1) no proof; (2) failure of proof; (3) the purpose of the expenditure not shown either explicitly or by reference to the unit (agency, school, tribal, individual) receiving the expenditure; (8) duplication—same charge more than once; (11) the expenditure was for a federal governmental purpose; (12) the expenditure was for individual benefit; and (99) the expenditure was for

"food, rations and provisions." The parties identified representative samples that would be adjudicated at trial, in the expectation that the parties could later apply the court's rulings to unadjudicated vouchers in dockets 189–A and 19.[4]

Prior to trial defendant conceded that disbursements within several GAO categories[5] were improper, primarily on the grounds that the expenditure was for a governmental purpose. The conceded categories were: Agency Buildings and Repairs; Boats, Docks, etc.; Hardware, Glass, Oils, and Paints; Misc. Agency Expenses; Misc. Building Materials; Misc. Employees; Pay of Indian Police; Pay of Mechanics; Telephone Lines; Transportation of Supplies; and Pay of Interpreters.

## A. *Plaintiff's Motion in Limine*

The Gillis exception of "no proof" was utilized for all disbursements for which there was no backup material. In those instances, defendant would insert in the thirty-eight boxes at the relevant place a "plug sheet," which simply meant that no backup material had been located. Subsequent to the initial exchange, however, additional documentation was located. Some of this material was exchanged immediately prior to trial, but some new material was not clearly identified until trial, when it became apparent that the thirty-six boxes of backup documentation ultimately offered into evidence by defendant contained material not found in the original thirty-eight boxes produced in 1986.

The new information is generally of two types. New material furnished in March 1988 consisted of backup material related to per capita disbursements—annuity rolls and claim settlements. The court denied plaintiff's ensuing motion *in limine* to exclude the newly produced documents, pri-

marily because the court's order of February 24, 1986 (stating that defendant's obligation to produce backup data did not include documents in support of per capita disbursements) was not explicitly modified in subsequent scheduling orders. Order of April 5, 1988. The court denied plaintiff's April 11, 1988 motion to modify, *see* Order of May 12, 1988, although the parties were given the opportunity to readdress the issue in post-trial briefing. That issue is thus once again before the court. After considering the parties' post-trial submissions readdressing the issue insofar as per capita backup data is concerned, the court readopts its earlier ruling. Defendant's understanding that not all the backup data with respect to per capita disbursements had to be furnished is a reasonable one considering the record. The plaintiffs' *motion in limine* is denied in that respect.

It is also denied with respect to non-per capita disbursements, but for a different reason. These materials were apparently generated in response to several of the samples that plaintiff selected for presentation at trial, notably with respect to the "failure of proof" and "duplication" codes. One reason for the delay in production was that the wrong documents had originally been copied and placed in some of the folders in the thirty-eight boxes. Other materials were generated by supplemental responses to research requests.

At trial, defendant's accounting witness, Mr. William E. Anderson, Section Chief of the Indian Trust Accounting Division ("ITAD") in the General Services Administration ("GSA"), testified that he supervised the copying and organization of documents for purposes of trial preparation. These documents consisted of thirty-six boxes of material, and except for the fact that they were fastened, he stated that the material was organized in the same manner

---

4. The sampling of certain Gillis exceptions was not for the purpose of establishing a basis to rule on unsampled vouchers. If it is necessary for the court to rule on the merits of the Gillis exceptions applied to unsampled vouchers, the court will do so on an item-by-item basis.

5. In preparing both the 1963 GAO Report and an earlier 1929 GAO Report, the GAO prepared

workcards that grouped disbursements according to predetermined categories and subcategories. *See infra* pp. 445–50. Although the same subcategories were used in preparing workcards for both reports, the 1929 report utilized more subcategories than the 1963 report.

as that provided to plaintiff in 1986. Anderson instructed his staff not to add documents to the material contained in the original thirty eight boxes. Nevertheless, it became obvious during defendant's rebuttal of the accounting exception samples that significant critical exhibits were not furnished until trial. The extent of additional documentation contained in these boxes has not been determined, but it is clear that many of the expenditures previously referenced by plug sheets now have supporting documentation.

Because trial on the accounting exceptions was done by sample, the extent of the problem of new materials is not clear. Obviously the vast bulk of support materials were produced in the delivery of the thirty-eight backup boxes. Thirty-six boxes of ostensibly the same material were offered at trial. Plaintiff correctly argues that the new material was offered beyond the cut-off date for exchange of exhibits and therefore concludes that *all* the thirty-six boxes of backup materials offered at trial should be rejected as tainted. The court is certainly sympathetic with plaintiff's argument. This matter has been litigated for 38 years, and it is disconcerting at best to have critical documents appear for the first time at trial. Moreover, plaintiff has spent substantial amounts of time and money putting on a case geared to the absence of certain documentary support. Much of this time was wasted because defendant had within its possession documentation which at trial provided a simple answer to some of the Gillis documentary exceptions.

On the other hand, the court is faced with the prospect of either ordering a page-by-page comparison of the materials furnished in the original thirty-eight boxes with the thirty-six boxes produced at trial, or wholesale rejection of documentation supporting approximately half of the $4,000,000 in disbursements. Neither possibility is palatable for the simple reason that plaintiff does not contest the accuracy

or authenticity of most of the later materials. In the one instance, an enormous investment of time would be required to isolate what is probably a relatively small number of offending materials. On the other hand, if all were rejected, plaintiffs would be receiving double payment, once at the time of disbursement, and a second time as a result of the trial, for the sole reason that defendant inadvertently or negligently or for reasons beyond its control did not meet a pretrial document exchange schedule.

Without in any way minimizing the importance of the pretrial orders, or the plaintiff's legitimate expectation of enforcement of those orders, the court finds that either remedy is too harsh. The proper one is to address on the merits those materials offered at trial, and to compensate plaintiff for its expenses incurred because of defendant's action or inaction. Because the court makes a similar ruling with regard to the question of whether there has been an accounting, the rulings are combined in the following discussion.[6]

**B. *Has Defendant Furnished An Accounting?***

■ When a trust relationship between the Government and Indians exists, as it does here, "the Government's actions normally are judged according to standards established in traditional trust law doctrine. The standard of duty as trustee for Indians is not mere reasonableness, but the highest fiduciary standards." *American Indians Residing on Maricopa–Ak Chin v. United States*, 229 Ct.Cl. 167, 182, 667 F.2d 980, 990 (1981) (citing *United States v. Mason*, 412 U.S. 391, 398, 93 S.Ct. 2202, 2207, 37 L.Ed.2d 22 (1973)), *cert. denied*, 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982). It is well settled that a trustee such as defendant is under a duty to the beneficiary "to keep and render clear and accurate accounts with respect to administration of the trust." Restatement (Second)

---

6. Testimony at trial indicated that other documentation, stored in archives, may exist that could clarify the purpose of certain expenditures, *see* Transcript at 4336–44. The court ruled at trial and iterates here that defendant

must rely on documents contained within the thirty-six boxes admitted at trial as proof of the existence and purpose of disbursements from the Nelson Act trust funds charged to the Red Lake Band.

of Trusts § 172 (1959); *see also* W. Fratcher, Scott on Trusts § 172 (1987); G. Bogert, Trusts and Trustees § 963 (rev. 2nd ed. 1983). Clarity and accuracy require that the accounting show what gains have accrued and what losses have occurred, receipts, expenditures, and allocations between principal and interest. Scott on Trusts § 172; *see Blackfeet and Gros Ventre Tribes v. United States*, 32 Ind.Cl. Comm. 65, 87 (1973). Plaintiff has consistently taken the position that defendant has not provided an accounting of Nelson Act funds—specifically, that neither the 1963 GAO Report nor the production of backup documents was an accounting. Although not squarely addressed in previous rulings, the clear import of earlier decisions by both the trial and appellate court has been that the 1963 GAO Report was not a complete accounting.

■ The 1963 GAO Report, which was based in part on the 1929 report's findings, is not sufficiently detailed to be an accounting. It is a critical first step and it provides necessary context, but only in gross. *Cf. American Indians*, 229 Ct.Cl. at 182, 667 F.2d at 990; *Mescalero Apache Tribe v. United States*, 23 Ind.Cl.Comm. 181, 182 (1970). In the absence of a formal accounting, the production of documents, the Gillis exceptions, the defendant's responses to them, and the pretrial and trial process have had the function, in part, of an accounting to supplement the GAO report. With respect to numerous expenditures tried by sample, for instance, it was not until the final exhibit exchanges, or until trial that defendant fully accounted. It required the light of the Gillis exceptions and the examination and cross examination of witnesses, particularly Mr. William Anderson, for the plaintiff and the court to get a satisfactory understanding of numerous accounting issues.

■ The court concludes that the 1963 GAO Report, enhanced by the document production and the trial, constitute an accounting of the *disbursement* of the Red Lake Band's Nelson Act trust funds. Whether a formal accounting would have resulted in as much understanding is not clear. What is clear to the court however is that much of the plaintiff's expense in challenging defendant's documentation or lack of it had the effect of doing defendant's accounting work for it. It has been held elsewhere (*supra* p. 373) that much of plaintiff's trial preparation time, particularly that of its accountants, was wasted due to unnecessary challenges to documentation. For both these reasons, therefore, the court holds that plaintiff is entitled to be reimbursed for a portion of its legal and other expenses beginning February 1, 1986. The court merely proposes that one-fourth of plaintiff's legal costs and one-half of its other expenses associated with the Red Lake disbursement trial be reimbursed by defendant. This proposal is not binding on the court or parties. If the parties cannot agree on a figure on or before June 1, 1989, the plaintiff can seek a particular amount based on its own justifications.

## II. DEFENDANT'S MOTION TO DISMISS BASED ON THE STATUTE OF LIMITATIONS

Two weeks prior to trial, defendant filed a motion to dismiss the following claims, which it asserted were not timely raised: (1) expenditures for public school tuition and construction violated state law and the equal protection clause; (2) expenditures for sectarian school tuition violated the establishment clause and the fifth and fourteenth amendments; (3) all disbursements for education were improper because the education furnished was inferior; and (4) all disbursements for medical care were improper because the medical care was inferior. Solely for purposes of this subsection dealing with the statute of limitations, these claims will be referred to as numbered above.

Because it came on the eve of trial, the court deferred ruling on the motion to dismiss until after trial, and the Band was permitted to introduce evidence to establish the claims or to demonstrate that it could not have become aware of the claims within the limitations period. The matter has been briefed and is ready for resolution.

Although a motion to dismiss was not then pending, defendant had indicated in status conferences that it might challenge several of plaintiff's claims as untimely pleaded, including the claims that are the subject of the present motion. In *Minnesota Chippewa Tribe,* 14 Cl.Ct. 116, the court addressed defendant's assertions in part. With respect to the claims that are the subject of defendant's motion, the court stated:

> [T]he "claims" that defendant characterizes as relating to inferior quality education and medical care, as well as the Gillis exception to goods or services of little or no value, appear to the court at this point to be a logical outgrowth of the request for a disbursement accounting.
>
> Finally, the court notes that the remaining claims (that payments to both sectarian and nonsectarian schools were allegedly improper) do not on their face appear to be covered by a reasonable construction of the pleadings. Plaintiff will have an opportunity, however, to argue either that these matters are specifically raised by existing timely pleadings, or that they were generally raised earlier but could have been pleaded with specificity only after receipt of the backup documents.

*Id.* at 127. The court further directed the parties to be prepared to go to trial on all of the claims defendant asserted were barred, as well as the issue of when plaintiff was or should have been aware of its claims.

■ It is well established that the doctrine of sovereign immunity requires that the United States must consent to suit before any claim will lie against it. *Testan v. United States,* 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976); *see also United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980); *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 769, 85 L.Ed. 1058 (1940). This doctrine incorporates the principle that the sovereign has the power to attach conditions to such suits. The terms of the Government's consent define

the court's jurisdiction to entertain this case. *Sherwood,* 312 U.S. at 586, 61 S.Ct. at 770 (citing *Minnesota v. United States,* 305 U.S. 382, 388, 59 S.Ct. 292, 295, 83 L.Ed. 235 (1939)). In the present case, the sovereign immunity of the United States was waived by section 2 of the ICC Act, which provided five bases for relief against the Government. 25 U.S.C. § 70a. Section 12 required that all claims brought pursuant to the act be filed within the five year period ending August 13, 1951. 25 U.S.C. § 70k.

Two petitions constitute plaintiff's original pleadings: the complaint filed in docket 189 on August 2, 1951 and the complaint filed in docket 189–A pursuant to the ICC's order of Dec. 29, 1955. In addition, the 1969 exceptions to the 1963 GAO Report are treated as amended pleadings that relate back to the original pleadings. *Minnesota Chippewa Tribe,* 768 F.2d at 341.

Other relevant filings were subsequently made. On March 3, 1986, in response to the order of January 22, 1986, plaintiffs in dockets 19 and 189–A filed a pretrial submission defining all Nelson Act accounting claims. On February 25, 1987, after receipt of the backup data, the Red Lake Band filed the Gillis exceptions to individual disbursements. Finally, plaintiff filed its memorandum of fact and law on October 13, 1987, pursuant to the order of October 2, 1987 which required plaintiff to include all theories of recovery to be presented at the Red Lake disbursements accounting trial. Unlike the 1970 exceptions to the 1963 GAO Report, however, these latter filings have not been determined to relate back to the original pleadings.

## A. Claims 1 and 2

As a source for its present claims, plaintiff points to certain paragraphs in the original pleadings. In paragraph 6 of the 1951 complaint, it is alleged that the United States:

> illegally expended the proceeds from the sale of said lands contrary to the provisions of the act of January 14, 1889, and other acts, including education, medical attention, highway and administration,

all of which is more particularly set forth in actions now pending before the Indian Claims Commission brought by the Minnesota Chippewa Tribe as Nos. 19 and 20.[7]

Plaintiff places particular reliance on paragraph 14, which recites:

> 14. Defendant has illegally expended proceeds from the sale of said [Nelson Act] lands contrary to the provisions of the act of January 14, 1889, *and other acts,* using said funds for various purposes including education, medical attention, highway and administration.... (Emphasis added.)

The Band also points to paragraph 24 which charges that defendant used monies:

> for various illegal and unlawful purposes and contrary to law, some of which include the repair and maintenance of agency buildings and for other administrative expense, as well as for education, highway and medical aid.

In its complaint in docket 189–A, the Band alleged that the United States "made expenditures and disbursements out of the proceeds it received from the sale of timber and agricultural lands under the Nelson Act in violation of the provisions of that Act and other acts in violation of its duty and obligation to the Red Lake Band."

Finally, in the docket 189–A exceptions to the 1963 GAO Report, numbers two and thirty are relevant to Nelson Act disbursement claims. Exception two charged that the Government failed to fulfill its duties as trustee to the Band. In its statement of support for this exception, the Band further alleged that

> the United States almost completely disregarded the 1889 Act-agreement with respect to the use and disbursement of the funds, and, in the main, distributed the receipts in violation of the Act and

without the consent of the [Band] except for per capitas as qualified....

Exception thirty was entitled "Failure to furnish adequate information and exception for expenditure in violation of law and standards applicable to the trustee-fiduciary relationship." In its statement of support, plaintiff stated that

> there is nothing to show that the disbursements were for the exclusive benefit of the [Band] ... The report does not show that the goods and services purchased were consumed or used by the tribe exclusively, or for the direct benefit of the [Band]....
>
> The United States used the [Band's] trust money to build and maintain agency headquarters, offices, employees' quarters, storerooms, fences, sidewalks, barns, hospitals, shops ... school buildings, sewer and water systems and other items. All such structures and improvements were treated and used as property of the United States.

Plaintiff's statement of support for exception thirty also included a recitation that monies used to construct hospitals were illegally disbursed because they were built for government use.

■ A court should be guided by whether the factual allegations in the original pleading put the opposing party on notice that the original pleadings might be expanded. *Minnesota Chippewa Tribe,* 768 F.2d at 340–41. Even a liberal construction of the pleadings upon which plaintiff relies however, leads to the inevitable conclusion that defendant had no reason to be on notice of Claims 1 and 2. The court initially observes that the allegations made in these documents do not contain any mention of constitutional amendments, federal civil rights laws, or state education laws, nor do the factual bases for the allegations describe circumstances that would indicate

---

7. Plaintiff's complaint in docket 19 charged that defendant spent the Nelson Act proceeds and failed to account for its disbursements. It specifically objected to expenditures for education because they were allegedly not in accordance with the Nelson Act. The ICC dismissed the docket 20 complaint after the Minnesota Chippewa filed an amended complaint covering the allegations in both dockets 19 and 20. The second amended complaint covering allegations in dockets 19 and 20 was filed on February 11, 1959. None of the allegations in these complaints and amendments included references to the claims that defendant now asserts are barred.

that plaintiff would later assert claims based on these laws. It would be both unfair and contrary to Congress' expectations to allow these generalized contentions to serve, over thirty years later, as a basis for claims which are totally different than those that have heretofore been the subject of discovery and argument, particularly when plaintiff has offered absolutely no reason for delaying until 1987 to make them. It is illuminating in this regard that the March 3, 1986 pretrial statement, which was to contain all claims and legal theories, makes no mention of Claims 1 or 2.

As this court wrote in relation to a similar question concerning the White Earth allotment claim,

> Plaintiffs argue that their request for an accounting is sufficient notice of their current claim.... If that broad similarity were sufficient reason to allow relation back, almost every matter growing out of the hundred year long relationship of the parties could be raised now or in the future as a result of that single complaint. Such a low threshold test would be utterly unworkable in this thirty-five year old litigation.

*Minnesota Chippewa Tribe v. U.S.*, 11 Cl.Ct. 534, 539 (1987).

We are in the centennial anniversary year of the Nelson Act. These related cases have been litigated now for over 38 years based on allegations that Nelson Act funds were spent contrary to the language of the Act, in violation of the Government's role as trustee to the Band, and in ways that were not for the exclusive benefit of the Band. These allegations invoked well-established principles of Indian trust accounting law, but did not put defendant on notice that plaintiff would be claiming that expenditures were in violation of the first, fifth, and fourteenth amendments to the Constitution, or Minnesota law related to free public education.

In *Snoqualmie Tribe of Indians v. United States*, 178 Ct.Cl. 570, 586, 372 F.2d 951, 959–60 (1967), the court held that the doctrine of "relation back" is applicable to claims brought under the ICC Act, even though the statute of limitations is jurisdictional. The statutory directive that all claims be "presented" before August 13, 1951 leaves ample room for operation of this procedural device.

Plaintiff's primary reliance for relation back is on its use in the original pleadings of such phrases as "other acts," or "illegal expenditures." Given the general context of those earlier pleadings—which asserted non-compliance with the Nelson Act and Indian trust accounting principles—the court declines to open these catchall phrases, after thirty-eight years, to specific constitutional or statutory provisions other than those specifically raised, such as the Nelson Act. If it is sufficient that the factual context is the same, i.e., that the claim also arises out of the Government's handling of Indian trust funds, and if the claim merely has to be that the expenditure is "illegal," the requirement that claims be "presented" is rendered meaningless. Virtually any claim could relate back. Because nothing in plaintiff's original pleadings provided notice that these two claims would be later asserted, there can be no relation back. The court concludes that claims 1 and 2 were not raised in the original pleadings.

■ Plaintiff may avoid the bar of limitations, however, if these claims were inherently unknowable until after it had reviewed the backup data provided by defendant, or if defendant concealed information necessary to the claims. *See Japanese War Notes Claimants Association of Philippines, Inc. v. United States*, 178 Ct.Cl. 630, 634, 373 F.2d 356, 358–59 (1967), *cert. denied*, 389 U.S. 971, 88 S.Ct. 466, 19 L.Ed.2d 461 (1967); *Motorola Inc. v. United States*, 13 Cl.Ct. 420, 425 (1987). Plaintiff asserted in its annotation to defendant's proposed findings of fact that it did not know that money was disbursed from Nelson Act funds for sectarian schools until it reviewed the backup data, thus addressing defendant's motion with respect to claims premised on the first amendment. It did not address any other aspects of the two claims at issue, nor was any evidence adduced at trial directed specifically to this question. In any event, the court's review

of the GAO reports and annual appropriations authorizing disbursements from the Nelson Act principal fund illustrates that information related to the claims was neither inherently unknowable nor concealed.

Plaintiff could have become aware that the Government expended Nelson Act trust fund monies for payments to sectarian and public school tuition from several sources. The Band should have been aware of public school tuition payments from both the 1929 and 1963 GAO Reports. *See* 1929 GAO report at 231; 1963 GAO Report at 186. Moreover, annual appropriation acts for fiscal years 1923 through 1944 authorized the withdrawal of monies from the Nelson Act principal fund for public school tuition. Plaintiff could have been aware of the fact that monies were expended for sectarian schools from annual appropriation acts and their legislative history. The annual appropriation acts between fiscal years 1937 and 1943 authorized withdrawal of monies for care of Chippewa children attending private schools. Any investigation, not to mention common knowledge of where Indian children were attending school would have informed plaintiff that these private schools were sectarian. Indeed, representatives of the Band specifically sought appropriations to support private tuition payments.

For example, as part of its justification for fiscal year 1917, the Indian Office asserted that $3995.70 was expended from the principal fund for payments to the Catholic Indian Mission School at Red Lake in fiscal year 1915. *See Indian Appropriation Bill, 1917: Hearings Before a Subcomm. of the House Comm. on Indian Affairs*, 64th Cong., 1st Sess. 66 (1916). Similarly, the Indian Office asserted that $5292 was expended from the principal fund in fiscal year 1919 to the Red Lake Mission School as part of its justification for fiscal year 1922. *See Indian Appropriation Bill, 1922: Hearings Before a Subcomm. of the House Comm. on Appropriations*, 66th Cong., 3rd Sess. 302 (1921). And for fiscal year 1937, the Indian Office requested $15,750 from the interest fund for the care of Chippewa children attending mission schools at Red Lake and

at White Earth. *See Interior Appropriation Bill, 1937: Hearings Before a Subcomm. of the House Comm. on Appropriations*, 74th Cong., 2nd Sess. 962 (1936).

Because the facts supporting these two claims were knowable before plaintiff's review of the backup data, the statute of limitations is not tolled. In conjunction with the court's earlier finding that these claims were not raised either generally or specifically in pleadings, the court grants defendant's motion for their dismissal. Consequently, no disbursements are disallowed on the sole basis that they constitute tuition payments to public or private schools.

### B. *Claims 3 and 4*

In Claims 3 and 4, plaintiff alleges that monies expended for both education and medicine did not benefit the Band because the services provided were of inferior quality. *See* Plaintiff's Proposed Findings of Fact and Conclusions of Law ("PPFF") at 154, 194. In defendant's motion it contends that these claims are time-barred. For reasons discussed in sections III. C and D, *infra* pp. 42–48, 62, the court grants defendant's motion.

### III. THE NON–ACCOUNTING CLAIMS

In its non-accounting claims, the Red Lake Band seeks recovery of significant sums of money disbursed from its interest-earning (principal) funds irrespective of the sufficiency of the 1963 GAO Report as an accounting. Plaintiff alleges that these expenditures occurred in violation of the Nelson Act or were unfair and dishonorable.

### A. *Expenditures From the Principal Fund in Excess of 5%*

#### 1. Statutory Construction

 Section 7 of the Nelson Act details the original manner and purposes under which trust fund monies arising from the sale of ceded land and timber were to be expended. The act required that the proceeds of these sales be deposited in the U.S. Treasury for all of the Minnesota Chippewa "as a permanent fund," and earn

simple interest at the rate of five percent annually. Section 7 provided with respect to the interest fund that

[o]ne-half of said interest shall, during the said period of fifty years be annually paid in cash to the heads of families and guardians of orphan minors for their use; and one-fourth of said interest shall during the said period of fifty years be annually paid in cash in equal shares per capita to ... all other classes of said Indians; and one fourth of said interest shall be devoted exclusively to the establishment and maintenance of a system of free schools among said Indians and for their benefit....

With regard to the principal fund, section 7 provided that

at the expiration of the said fifty years, the said permanent fund shall be divided and paid to all of said Chippewa Indians and their issue then living, in cash, in equal shares. *Provided,* That Congress may, in its discretion, from time to time, during the said period of fifty years, appropriate, for the purpose of promoting civilization and self-support among the said Indians, a portion of said principal sum, not exceeding five per centum thereof.

Consequently, while Congress designated the principal fund as permanent, it also provided for expenditure of five percent "from time to time," for "promoting civilization and self-support."

According to the 1963 GAO Report, in the range of $2,350,000 was disbursed from Nelson Act principal funds for Red Lake between fiscal years 1905 and 1945. Congressional authorization of expenditures from the principal fund for "civilization and

self support" commenced with the Act of Mar. 3, 1911, ch. 210, 36 Stat. 1058, 1065, in which Congress authorized withdrawal of up to $165,000 in fiscal year 1912.[8] Congress also authorized the withdrawal of $2500 to pay the expenses of a delegation from White Earth attending congressional hearings in 1911.[9]

Congress continued to authorize withdrawal of monies from the Nelson Act principal fund through fiscal year 1945. *See infra* pp. 436–43. In these authorizations, Congress provided several purposes for which the Secretary could withdraw monies. The legislation often authorized withdrawals for the general purposes of "promoting civilization and support," or "general support." These authorizations were commonly subdivided into more specific purposes, such as agency expenses, hospitals, relief of indigent Indians, construction and maintenance of public schools, and public school tuition. In other years, these more specific purposes were listed independently of one another, and in addition included other purposes such as care of Chippewa students attending private schools and attorneys' fees.

In addition to authorizing withdrawals from principal for promoting civilization and self-support, Congress also authorized the withdrawal of monies to make payments to individual Chippewa. This was first done by an annual appropriation act, the Act of May 18, 1916, ch. 125, 39 Stat. 123 (1917). This legislation permitted the expenditure of one-fourth of the permanent fund as it then stood to individual Minnesota Chippewa eligible to participate in the distribution of the fund as follows:

That the Secretary of the Interior, under such rules and regulations as he may

8. While the Act of Mar. 3, 1911 was the first legislation authorizing expenditures from the principal fund for promoting civilization and self-support, disbursements from the principal fund began in fiscal year 1905.

9. By the same legislation, Congress also authorized expenditures from "funds" belonging to the White Earth Band for that Band's annual celebration. This might explain, at least partially, the discrepancies that plaintiff asserts exist between the amount authorized for withdrawal from the Nelson Act principal fund by statute,

and the amount that the 1929 GAO Report treats as authorized. By item 1 of the court's order of Feb. 1, 1988, the issue of whether monies were disbursed in excess of the amount authorized by statute was postponed until a future date. For purposes of the present litigation, the court only considers specific references to the Nelson Act in the Indian appropriation acts as authorizing withdrawals from the Nelson Act principal funds. This treatment is without prejudice to any claim or defense with respect to the postponed issue.

prescribe, is hereby authorized to advance to any individual Chippewa Indian in the State of Minnesota entitled to participate in the permanent fund of the Chippewa Indians of Minnesota one-fourth of the amount which would now be coming to said Indian under a pro rata distribution of said permanent fund: *Provided* That the Secretary of the Interior, under such rules and regulations as he may prescribe, may use for or advance to any Chippewa Indian in the State of Minnesota entitled to share in said fund who is incompetent, blind, crippled, decrepit, or helpless from old age, disease or accident, one fourth of the amount which would now be coming to said Indian under a pro rata distribution of said permanent fund: *Provided further,* That any money received hereunder by any member of said tribe or used for his or her benefit shall be deducted from the share of said member in the permanent fund of the said Chippewa Indians of Minnesota to which he or she would be entitled: *Provided further,* That the funds hereunder to be paid to Indians shall not be subject to any lien or claim of attorneys or other third parties.

Because this legislation authorized the distribution of a percentage of the fund, it is said to have authorized "pro rata" payments. Congress also authorized the Secretary of the Interior (the "Secretary") to withdraw money from the principal fund for the purpose of making payments to the individual members of the Chippewa Tribe in later years. Legislation authorizing these payments was enacted in 1921, 1924, 1925, 1926, 1928, 1929, 1931, 1932, 1933, and 1934. *See infra* pp. 437–42. Because these later authorizations stated a particular amount to be paid to each individual, they are referred to as "per capita" payments. For convenience, the court refers to all payments to individual Chippewa as "per capita payments." With the exception of the 1916 legislation, all authorizations contained a prerequisite that the tribe ratify the expenditure before payment could be made. Congress directed the Secretary to develop regulations governing the method of disbursement and tribal ratification.

Until 1939, the primary principal fund ("Chippewa in Minnesota") was jointly maintained for all Minnesota Chippewa bands. Based on the 1963 GAO Report, the amount charged to the Red Lake Band's share of that fund is $1,773,107.61. Of this total, the GAO report asserts that the amount spent for education was $114,442.48, and the amount spent for Red Lake per capita cash payments was $981,099.50.[10] After 1938, the principal for the Red Lake Band was separately held. The total amount charged to the Red Lake Band from the Red Lake principal fund through fiscal year 1945 is $76,592.80. No disbursements from the Red Lake principal fund were charged to education or per capita cash payments. For the purpose of addressing plaintiff's claims that disbursements from the principal were in violation of the Nelson Act and/or fair and honorable dealings, the court considers the figures and categories in the 1963 GAO Report to accurately reflect the actual disbursement of monies. However, this assumption is without prejudice to the Band's particular accounting claims.

Plaintiff interprets the five percent limitation of section 7 as fixing the total amount that could be spent over the life of the trust. In other words, at the end of fifty years, no more than five per cent of the principal amount collected could have been appropriated under this proviso. Since the total amount disbursed and reimbursed from the principal funds for all bands was approximately $18,100,000, it is plaintiff's view that no more than $900,000 could be appropriated for discretionary civi-

---

10. Most of the per capita cash payments from the principal fund were disbursed in the fiscal year that they were authorized. However, Congress also authorized the Secretary to withdraw monies from funds belonging to the Chippewa to make "back payments" to individuals thought to have been erroneously omitted from the annuity rolls, and who therefore did not receive previously made annuity payments from the interest fund or pro-rata and per capita payments from principal.

lization and self-support for all bands over the life of the trust.

In fact, there were so many such appropriations over the years that all Nelson Act funds were eventually eliminated. The principal funds thus did not survive to permit distribution at the end of fifty years, as had been anticipated in the first portion of section 7. Plaintiff concludes that virtually the entire amount of the principal funds must thus be repaid by defendant as if no expenditures in excess of five percent of total principal had ever been made.

Defendant interprets the proviso much differently. It argues that the Congress was permitted to spend up to five percent of then existing principal *each* time it elected to exercise its discretion. In other words, the five percent limitation did not place a total limit on appropriations, only a cap on the size of any one appropriation. Under defendant's view, since Congress was authorized by the Act to make single expenditures, it could make them collectively, despite the fact that the funds were eventually depleted.

While both sides claim to be applying the literal and intended meaning of the statute, the court concludes for the reasons which follow that a careful reading of the statute, as well as a consideration of the understanding of Congress and the Indians at the time, support defendant's position.

The beginning place, of course, is the words of the proviso. Certain words can be eliminated from the present discussion, hopefully without affecting the meaning of the ones critical to the issue: "Congress may ... from time to time ... appropriate ... a portion of the principal sum not exceeding five per centum thereof." In the court's view this is not an unfair distillation. It has the effect, however, of showing that defendant has the better of the argument as to literal meaning. Five per centum clearly modifies or describes "portion." A portion in turn can be appropriated "from time to time." In sum, Congress can appropriate five percent of the principal more than once.

The court recognizes, however, that special considerations come to bear in constru-

ing Indian treaties and statutes, and acknowledges that plaintiff's argument as to ambiguity is not frivolous. It is arguable that the word "portion" means the sum of all appropriations. Consequently, the proviso will be examined in its historical and legislative context.

■■■■ In general, statutes must be interpreted in the context of their enactment. *See Mountain States Telephone & Telegraph Co. v. Santa Ana,* 472 U.S. 237, 252, 105 S.Ct. 2587, 2596, 86 L.Ed.2d 168 (1985). While substantial weight should be given to the interpretation of those charged with applying statutory provisions, *id.* at 254, 105 S.Ct. at 25, special considerations arise for the construction of provisions within agreements between the United States and Indian tribes. It is an established rule that ambiguous provisions in treaties and legislation ratifying agreements between the United States and Indian tribes must be interpreted in favor of the Indians. *See Antoine v. Washington,* 420 U.S. 194, 199–200, 95 S.Ct. 944, 948–948, 43 L.Ed.2d 129 (1975); *Minnesota Chippewa Tribe,* 11 Cl.Ct. at 239. This rule does not permit a construction that contradicts express statutory language or legislative history, however. *DeCoteau v. District Court,* 420 U.S. 425, 445, 95 S.Ct. 1082, 1093, 43 L.Ed.2d 300 (1975). With these principles in mind, the court reviews the legislative history underlying the Nelson Act in general and section 7 in particular.

As reported by the committee, H.R. 7935 provided that after the United States had been reimbursed for advances it made to the Chippewa while the principal fund accumulated, "the Secretary of the Interior may, in his discretion, expend of such excess, not to exceed *ten percent* thereof *annually,* for the benefit of said Indians in the same manner and in like proportion as the interest of said permanent fund." H.R. Report No. 789, 19 Cong.Rec. 1887 (1888) (emphasis added). The bill, with this provision intact, was passed by the House and referred to the Senate. 19 Cong.Rec. 1889 (1888). The original draft therefore con-

templated disbursements of up to ten percent of the corpus annually.

H.R. 7935 was accompanied by H.R. Report No. 789. As discussed *infra,* page 421, H.R. Report No. 789 primarily addressed the committee's reasons for rejecting the 1886 agreements with the Red Lake Band and the Minnesota Chippewa Bands other than Red Lake. The report made little reference to expenditures from the principal fund, stating only that money generated by the sale of ceded land and timber "should form a permanent interest-bearing fund for all the Chippewa Indians in common," and "the bill speaks for itself...."

In the Senate Committee on Indian Affairs, the House version was rewritten and passed in its new form by the Senate. Among other changes, the Senate version replaced the language in the House bill concerning expenditures from the principal fund with the following:

> Provided, That Congress may, in its discretion, *from time to time* appropriate, for the purpose of promoting civilization and self-support among the said Indians, a portion of said principal sum, not exceeding *five* per centum thereof.

(Emphasis added.)

Setting aside differences as to the object of the expenditures, the Senate version thus differed in two ways. Annual invasions of principal were replaced by permission to appropriate "from time to time," and ten percent was replaced by five percent. This was the language eventually adopted. Because the House did not initially concur with the proposed Senate version, it voted for a conference with the Senate. Congressmen Peel, Hudd, and Nelson were

named as House conferees. 20 Cong.Rec. 191 (1888).

The House–Senate conference report recommended that the House agree to the Senate version of the bill, as modified by minor amendments.[11] The House conferees included an additional written statement with the conference report made to the House, noting generally that "[t]he Senate amendment, though in the form of a substitute, is in substance and form really the House Bill, with merely the following amendments and changes...." With respect to section 7, the House conferees stated that it was "the same in both the bill and the substitute, except that the substitute increases the interest on the permanent fund from 3 to 5 percent per annum, conformable to the universal custom with regard to Indian trust funds." 20 Cong. Rec. 336 (1888). The additional statement was not included with the conference report made to the Senate. *Id.* at 273. The Senate concurred with the conference report on Dec. 17, 1888. *Id.* at 274. The House concurred with the conference report on Dec. 20, 1888, 20 Cong.Rec. 400. The conference report does not directly address the five percent and "time to time" phrases.

Little understanding of the five percent and "from time to time" provisions can be gleaned from the full House and Senate debates on the proposed Nelson Act. In fact, there was no debate in the House concerning expenditures from the principal fund. In the Senate, only peripheral comments were made concerning expenditures from the principal fund.[12]

Plaintiff's interpretation of the two phrases is, in retrospect, more consistent with the expectation implicit in the balance of section 7 that the proceeds of land and

---

**11.** These amendments removed the requirement that Congress ratify the agreements, required presidential approval of the agreements with the bands before they became effective, and clarified the appraisal rate for pine lands. 20 Cong. Rec. 336 (1888).

**12.** Senators Platt and Sabin discussed the bill on Oct. 5, 1888:

Platt: Now, I believe that the very worst thing that can be done for these Indians is to sell their land and put the proceeds into a fund

and have them paid interest regularly on that fund for fifty years, and possibly, as the bill provides, 5 per cent. of the principal in an emergency.

Sabin: Make it 3 per cent., then.

Platt: I think the result will be that at the end of fifty years, these Indians will not be a particle more advanced toward civilization than they are today....

20 Cong.Rec. 9132 (1888).

timber would result in a permanent fund that would be disbursed on a per capita basis at the end of fifty years. It cannot be seriously contended that either Congress or the Chippewa expected the principal to be depleted. Rather, the hope was that there would both be a "large sum" to distribute at the end of fifty years *and* a "storehouse" to draw on for emergencies. This is in no way an understanding which is inconsistent with defendant's interpretation, however. As of the late 1880's, it would be perfectly consistent to anticipate both a large distribution at the end, as well as emergency distributions, each no more than five percent of the fund. It is only subsequent events which make it clear that the two desires were incompatible. Subsequent events do not force an assumption that Congress did not, in 1889, intend the five percent proviso to consume the principal fund. Initially, there is the obvious fact that the same entity, within two or three decades, was routinely making appropriations from the principal which, cumulatively, were in excess of five percent of the principal. More important, however, is that while plaintiff emphasizes the expectation of an "immense sum" to be distributed at the end of 50 years,[13] the Chippewa were also aware of the five percent proviso:

there is a clause providing that Congress may in its discretion from time to time during the said fifty years appropriate for the purpose of civilization and self support among the Indians a portion of said principal sum, not exceeding five percentum thereof. In case of the failure of crops or any unforeseen misfortune there is a store-house of money to be drawn upon for your wants.[14]

Events resulted in numerous "emergency" withdrawals. Being justifiable singly, the appropriations should not be disallowed in the aggregate simply because the inev-

itable occurred—the money ran out. In sum, the court concludes that section 7 permitted withdrawals of up to five percent of principal on more than one occasion.

At least one of the appropriations, the Pro Rata Act, ch. 125, 39 Stat. 123, 135 (1916), is not consistent even with defendant's interpretation of section 7, however, since it exceeded five percent of the fund. For that reason, the court must address defendant's alternative argument, that even if section 7 disallows cumulative expenditures out of principal in excess of five percent, each successive appropriation constituted a permissible legislative amendment to the Nelson Act because of Congress' inherent plenary power to make such changes.

2. Plenary Power

■ Defendant argues that even if the Nelson Act as originally enacted did not authorize expenditures from the principal fund, the disbursements from principal that plaintiff now challenges were legally authorized because Congress possessed plenary power to administer the Band's property for the benefit of the Band.[15]

Initially, the court notes that Congress' power to administer tribal property in a manner not contemplated in an original agreement between the United States and an Indian tribe is long recognized. As announced by the Supreme Court, "Congress possesses the plenary authority to administer Indian property, by reason of its exercise of guardianship over their interests, and that such authority might be implied, even though opposed to the strict letter of a treaty with the Indians." *Lone Wolf v. Hitchcock*, 187 U.S. 553, 565, 23 S.Ct. 216, 221, 47 L.Ed. 299 (1903). This principle was followed in several subsequent Indian cases. *See Chippewa Indi-*

13. H.R. No. Doc. 247, 51st Cong., 1st Sess. 76 (1889) (excerpt from negotiations).

14. *Id.* at 86.

15. This court has jurisdiction of Indian breach of trust claims based solely on legislative acts if those claims are brought under the fair and honorable dealings clause of the ICC Act. *Me-*

*nominee Tribe of Indians v. United States,* 221 Ct.Cl. 506, 514–16, 607 F.2d 1335, 1340–42, *cert. denied,* 445 U.S. 950, 100 S.Ct. 1599, 63 L.Ed.2d 786 (1979). Because jurisdiction of plaintiff's claim is based on the fair and honorable dealings clause in the present case, a breach of fiduciary duty may be predicated on an act of Congress itself.

*ans v. United States,* 307 U.S. 1, 59 S.Ct. 687, 83 L.Ed. 1067 (1939); *Turtle Mountain Band of Chippewa Indians v. United States,* 203 Ct.Cl. 426, 444, 490 F.2d 935, 945 (1974); *Choctaw Nation v. United States,* 91 Ct.Cl. 320, 396, *cert. denied,* 312 U.S. 695, 61 S.Ct. 730, 85 L.Ed. 1130 (1941); *Yankton Sioux Tribe v. United States,* 37 Ind.Cl.Comm. 64, 88 (1975), *aff'd,* 222 Ct.Cl. 421, 616 F.2d 485 (1980).

■ Plaintiff concedes the fact that Congress possessed the plenary authority to administer the Nelson Act funds for the Band's benefit. Moreover, in litigation brought pursuant to a 1926 jurisdictional act, the Supreme Court held that the Nelson Act did not constitute a conventional trust, and that as a result Congress retained the plenary authority to administer the Chippewa Tribe's Nelson Act funds in ways not contemplated by the original act. *Chippewa Indians,* 307 U.S. at 1, 59 S.Ct. at 687. Consequently, this court has no difficulty finding that Congress possessed plenary authority to manage the Band's share of Nelson Act principal funds for the Band's benefit in a manner not authorized by the original act.

■ This power is not, however, absolute. "While extending to all appropriate measures for protecting and advancing the tribe, it is subject to limitations inhering in ... a guardianship and to pertinent constitutional restrictions." *United States v. Creek Nation,* 295 U.S. 103, 109–10, 55 S.Ct. 681, 683–84, 79 L.Ed. 1331 (1935); *accord, Menominee Tribe of Indians v. U.S.,* 391 U.S. 404, 413, 88 S.Ct. 1705, 1711, 20 L.Ed.2d 697; *FPC v. Tuscarora Indian Nation,* 362 U.S. 99, 122, 80 S.Ct. 543, 557, 4 L.Ed.2d 584 (1960); *United States v. Shoshone Tribe,* 304 U.S. 111, 113, 58 S.Ct. 794, 796, 82 L.Ed. 1213 (1938). Plenary authority "does not extend so far as to enable the Government 'to give the tribal lands to others, or to appropriate them to its own purposes, without rendering, or assuming an obligation to render, just compensation.'" *Shoshone Tribe v. United States,* 299 U.S. 476, 497, 57 S.Ct. 244, 251, 81 L.Ed. 360 (1937) (*quoting Creek Nation,* 295 U.S. at 110, 55 S.Ct. at 684).

Courts have attempted to harmonize the holdings of *Lone Wolf* and *Creek Nation* by developing a good faith effort test. In *Fort Berthold Reservation v. United States,* 182 Ct.Cl. 543, 390 F.2d 686 (1968), the court recognized that Congress cannot at the same time act both according to its plenary power to administer tribal property for the benefit of the Indians as trustee and according to its power of eminent domain. *Id.* at 553, 390 F.2d at 691. The court stated:

Some guideline must be established so that a court can identify in which capacity Congress is acting. The following guideline would best give recognition to the basic distinction between the two types of congressional action: Where Congress makes a good faith effort to give the Indians the full value of the land and thus merely transmutes the property from land to money, there is no taking. This is a mere substitution of assets or change of form and is a traditional function of the trustee.

Application of the test was addressed in *United States v. Sioux Nation,* 220 Ct.Cl. 442, 451, 601 F.2d 1157, 1162 (1979), *aff'd,* 448 U.S. 371, 100 S.Ct. 2716, 65 L.Ed.2d 844 (1980). There the court elaborated:

In determining whether Congress has made a good faith effort to give the Indians the full value of their lands when the government acquired [them], we therefore look to the objective facts as revealed by Acts of Congress, congressional committee reports, statements submitted to Congress by government officials, reports of special commissions appointed by Congress to treat with the Indians, and similar evidence relating to the acquisition.

The "good faith effort" and "transmutation of property" concepts referred to in *Fort Berthold* are opposite sides of the same coin. They reflect the traditional rule that a trustee may change the form of trust assets as long as he fairly (or in good faith) attempts to provide his ward with property of equivalent value. If he does that, he cannot be faulted if hindsight should demonstrate a lack of

precise equivalence. On the other hand, if a trustee (or the government in its dealings with the Indians) does not attempt to give the ward the fair equivalent of what he acquires from him, the trustee to that extent has taken rather than transmuted the property of the ward. In other words, an essential element of the inquiry under the *Fort Berthold* guideline is determining the adequacy of the consideration the government gave for the Indian lands it acquired. That inquiry cannot be avoided by the government's simple assertion that it acted in good faith in its dealings with the Indians.

This standard was expressly adopted in *United States v. Sioux Nation,* 448 U.S. 371, 416, 100 S.Ct. 2716, 2741, 65 L.Ed.2d 844 (1980).

██ Although the modified good faith effort test was developed in the context of constitutional limitations to the plenary power of Congress in dealing with Indian lands, the court notes that similar limitations stem from the United States' role as trustee of Indian property. *Creek Nation,* 295 U.S. at 110, 55 S.Ct. at 684. Just as Congress cannot simultaneously exercise both its plenary power and its eminent domain power, it cannot act within its plenary power to administer tribal property for the Indians if it does not fulfill its duties as trustee. The inquiry that the good faith effort test necessitates for distinguishing between exercises of plenary power and eminent domain power are relevant for distinguishing between acts of plenary power and acts in violation of the United States' responsibilities as trustee to the Indians. The court therefore examines the legislative history, including committee reports and statements submitted to Congress by government officials underlying congressional authorization to expend monies from the Red Lake Band's share of the Nelson Act funds in order, initially, to determine whether Congress made a good faith effort to act for the benefit of the Band in authorizing these expenditures.

The Bureau of Indian Affairs' ("BIA") annual requests for monies from the principal fund for non-per capita expenses, as well as the legislative history underlying the annual Indian appropriations bills, is discussed *infra,* pp. 425–30. It is clear that BIA either asserted directly or implied that these monies were necessary for the well-being of the Minnesota Chippewa Tribe, including the Red Lake Band. An examination of the congressional response to the BIA's requests reveals that several issues were repeatedly raised in the process of authorizing these expenditures. Among them were the following: (1) whether Congress possessed the legal authority to permit expenditures from the Chippewa principal fund; (2) whether expenditures from the principal fund would deplete the fund; (3) whether Chippewa principal fund monies should be expended for agency administration and salary costs; (4) whether expenditures from the principal fund were for the benefit of the Chippewa.

It is clear that Congress understood its role as trustee of these funds and undertook a meaningful scrutiny of requests made by the BIA to determine that monies from the principal fund would not be wasted or spent for the benefit of anyone other than the Minnesota Chippewa. It attempted to become knowledgeable about conditions on the Chippewa reservations, and it questioned the purposes and amounts of proposed expenditures.

The legislative history underlying congressional authorization of per capita payments from the principal fund demonstrates that Congress believed that these payments were necessary and beneficial to the Chippewa. Moreover, Congress made these authorizations generally only after confronting such issues as its power to authorize these payments, whether the principal fund would be depleted, and whether the money would be wasted if the payments were made. While the Lacey Act, ch. 2523, 34 Stat. 1221 (1907) (which officially encouraged Indian emancipation in part through financial independence) is not applicable here, the Pro Rata Act of 1916 is analogous with respect to the Minnesota Chippewa. It reflects a determination by Congress to change the course of its administration of the trust fund. While

the 1916 act and subsequent per capita payments did not contain the explicit limitation of "demonstrated need," the court finds that Congress made a good faith effort to ensure that the payments would be beneficial to the Chippewa.

An argument similar to plaintiff's here was rejected in litigation involving the Yankton Sioux. While the agreement at issue in that litigation created less of an expectation of a large remaining corpus than did the Nelson Act, it nevertheless is analogous in that it limited per capita payments to $20,000 annually. Before the ICC, the Yankton Sioux had contended that per capita payments in excess of $20,000 had been made annually for several years contrary to the agreement, thereby eliminating the trust corpus. While recognizing the restriction created by the agreement, the ICC rejected that claim:

> It is a well-established principle that Congress in providing for allotment of tribal assets had absolute discretion to administer said tribal assets for the benefit of its Indian wards. *See Lone Wolf v. Hitchcock,* 187 U.S. 553, 566, 568, 23 S.Ct. 216, 221, 222, 47 L.Ed. 299 (1903). Several cases have subsequently held that in dealing with tribal funds Congress possesses authority to direct the use of tribal trust funds for any purpose it deems for the best interests of the tribe even if such use might not be in accordance with the provisions of prior treaties, agreements or acts of Congress.

*Yankton Sioux Tribe,* 37 Ind.Cl.Comm. at 88. The ICC held that the Lacey Act, authorizing allocation of tribal funds to individual members of certain tribes, abrogated the $20,000 limitation. The issue of whether the statutory limitation—demonstrated necessity—on such per capitas was met was subsequently decided by the Court of Claims. The court held that evidence of requests by the Indians based on two years of crop failures and resulting inadequate supplies of food and clothing was adequate to demonstrate need. *Yankton Sioux Tribe v. United States,* 224 Ct.Cl. 62, 103–04, 623 F.2d 159, 180–81 (1980).

■ The court concludes that Congress made a good faith effort to exercise its trust responsibility in authorizing both per capita and non-per capita expenditures. Merely acting in good faith would not be a complete defense, however, if, pursuant to *Sioux Nation,* 220 Ct.Cl. 442, 601 F.2d 1157, the Band did not receive adequate compensation—in the present context, through beneficial disbursements. Nevertheless, the court finds that when considered collectively, the payments out of principal were beneficial to the Band. There is no question that the per capita payments were prompted by real needs. See discussion *infra* pp. 390–91; findings *infra* pp. 432–36. The utility of the medical and educational disbursements are discussed elsewhere. While large amounts of money were improperly spent on expenses that were acknowledged at the time to be for administrative purposes, those and other non-beneficial disbursements can be isolated and separately disallowed. In sum, the court will not disallow on a generic basis all disbursements out of principal in excess of five percent. Plaintiff may not recover for its claim that expenditures were made from the principal fund for per capita payments in violation of the Nelson Act, as originally enacted.

### 3. Fair and Honorable Dealings

Defendant asserts that any issues of fair and honorable dealings are not before the court and it therefore did not specifically address any of plaintiff's proposed findings of fact or conclusions of law raising fair and honorable dealings issues in its own pre-trial filings. In support of its assertion, defendant cites item four of the court's order of February 1, 1988:

> Proposed finding P–8 on page 31, "[t]he 1889 Act dealings of the United States with the Red Lake Band were less than fair and honorable," will not be decided in the April trial. That issue will be later raised with respect to plaintiff's land and timber value claim.

■ At the status conference, defendant took the position that a fair and honorable dealings claim had never been as-

serted with respect to education and health care. Defendant did not object to plaintiff's use of the phrase "fair and honorable dealings" so long as it meant "fairness," but did object to any use of the language as a legally defined concept. The court advised both parties that it would be guided by the previous pleadings in determining whether issues of fair and honorable dealings were properly before the court, but instructed defendant to treat plaintiff's fair and honorable dealings claims as if the legal definition of the phrase was being employed.

Plaintiff's original complaint in docket 189–A, severed from docket 189 on December 23, 1955 by order of the ICC, specifically invoked the fair and honorable dealings clause of the ICC Act. That complaint alleged that the United States expended money from the principal fund "in violation of its duty and obligation to the Red Lake Band." Similarly, plaintiff's explanation of exception no. 2, filed in 1970 for docket 189–A, alleged that "disbursements made from Nelson Act funds must be tested by trustee-beneficiary standards between the United States and the Chippewas." Given the fact that plaintiff's claim was brought under the fair and honorable dealings clause of the ICC Act, it would be unrealistic for defendant to believe that the standards of fair and honorable dealings would not be applied to plaintiff's claims. The Court of Claims has previously said as much, stating that exception 30 issues must be judged according to the standards of fair and honorable dealings. *Minnesota Chippewa Tribe and Red Lake Band v. United States*, 229 Ct.Cl. 667, 673, 686 (1981).

In light of the court's order of February 1, 1988 and the discussion that took place between the court and the parties on January 28, 1988, the court fails to understand the basis for defendant's assertion that no fair and honorable dealings issues are before the court. Item four of the court's February 1 order refers only to plaintiff's claim that the Government's 1889 negotiations with the Red Lake Band concerning the Band's agreement to the Nelson Act were unfair and dishonorable. Moreover,

the court's ruling that that claim would not be adjudicated as part of the disbursements trial did not refer to other "fair and honorable dealings" claims made by the Band.

The Court of Claims has stated on numerous occasions that causes of action brought pursuant to section 2, clause 5 of the ICC Act, "fair and honorable dealings," encompass claims not cognizable at law or equity, i.e. moral claims. *Minnesota Chippewa Tribe*, 11 Cl.Ct. at 237–38. The well established requisites to a claim that the actions of the United States were less than fair and honorable are: (1) the existence of a special relationship between the Federal Government and the Indian tribe; (2) an obligation owed to the tribe by the Government; and (3) the Government's failure to fulfill that obligation, causing damage to the tribe. *Aleut Community of St. Paul Island v. United States*, 202 Ct.Cl. 182, 196, 480 F.2d 831, 839 (1973); *Gila River Pima–Maricopa Indians v. United States*, 9 Cl.Ct. 660, 678 (1986). The ultimate issue in a claim of lack of fair and honorable dealings is "did the Federal Government do whatever it was required to do under the circumstances?" *Aleut Community*, 202 Ct.Cl. at 201, 480 F.2d at 841; *Oneida Tribe of Indians of Wisconsin v. United States*, 165 Ct.Cl. 487, 494, *cert. denied*, 379 U.S. 946, 85 S.Ct. 441, 13 L.Ed.2d 544 (1964); *Gila River Pima–Maricopa Indians*, 9 Cl.Ct. at 679. These guidelines are applicable to all of plaintiff's claims regarding the expenditure of monies from the principal fund.

The court ruled earlier that disbursements from Nelson Act funds had to be for the benefit of the Red Lake Band, the Federal Circuit having previously held that the Band was entitled to an accounting of its funds. *Minnesota Chippewa*, 14 Cl.Ct. at 125. The United States undertook certain fiduciary obligations with respect to the entire Minnesota Chippewa tribe by virtue of its management of the Nelson Act funds, *see U.S. v. Mitchell*, 463 U.S. at 225, 103 S.Ct. at 2972, thus creating a special relationship between it and plaintiff. *See Aleut Community*, 202 Ct.Cl. at 196–97, 480 F.2d at 839. Therefore, authorization

of withdrawals of money from the principal fund for the Red Lake Band must meet the standards of fair and honorable dealings.

Plaintiff takes the position that the primary obligation of the United States was to preserve the trust corpus for fifty years and then distribute the principal fund in equal shares among the Chippewa living at that time. Plaintiff points to two sources of the obligations owed to the Band by the Government concerning disbursements from the principal fund. First, it puts strong emphasis on several references in section 7 of the Nelson Act to the "permanent fund," and the statement that it was to remain intact for fifty years. Second, plaintiff relies on representations made to the Band by the commission that negotiated with the Band concerning the Band's accession to the Nelson Act. In particular, it points to the statement made by Commissioner Rice during negotiations with the Band for its acceptance of the Nelson Act that an "immense sum" would be distributed to the Band at the end of fifty years.[16] Under plaintiff's theory, the obligation to preserve the principal fund for fifty years, except for five percent of the fund, could not be altered without a breach of fair and honorable dealings.

Plaintiff's exclusive reliance on the Government's obligations to the Band as stated in section 7 of the Nelson Act, and as represented to the Band by the 1889 commission, ignores the role of Congress in the management of Indian property. As previously discussed, the plenary power of Congress to administer tribal property in a manner not contemplated in an original agreement between the United States and an Indian tribe is long recognized. *Turtle Mountain Band*, 203 Ct.Cl. at 444, 490 F.2d at 945. *See supra* pp. 383–84. The court has already concluded that these authorizations were made pursuant to Congress' plenary power to manage tribal property for the benefit of the Indians, and that congressional authorizations to permit the Secretary to withdraw monies from the principal fund were made in a good faith

effort to benefit the Chippewa and, in general, had that effect.

Plaintiff does not cite any authority, and the court finds none, for the proposition that plenary power may not be considered in adjudicating a claim that the Government breached its duty of fair and honorable dealings. The central guideline to claims of a breach of fair and honorable dealings states that the court must decide whether the United States did what it was obligated to do, *"in the circumstances."* *Aleut Community*, 202 Ct.Cl. at 201, 480 F.2d at 841 (emphasis added); *Oneida*, 165 Ct.Cl. at 494; *Gila River*, 9 Cl.Ct. at 679. It is unrealistic, and in any event not required by considerations of fair and honorable dealings to ignore conditions subsequent to the initial obligations undertaken in the Nelson Act. The court finds that Congress could modify those obligations, so long as the modification is consistent with the Government's responsibilities as trustee. The court cannot conclude that mere modification of the Government's original Nelson Act obligations requires a finding that the United States breached its duty of fair and honorable dealings.

At the same time, defendant's assertion that modification of the United States' obligations to the Band through proper exercise of plenary power *ipso facto* would absolve the Government of liability on a fair and honorable dealings claim is also incorrect. The fair and honorable dealings' clause of the ICC Act has been interpreted to allow Indian tribes to bring claims of breach of fiduciary duty against the Government predicated upon acts of Congress. *See Menominee Tribe*, 221 Ct.Cl. at 515, 607 F.2d at 1335. While it is obvious that many of the same considerations come into play, the court views the range of factors which may be considered on plaintiff's behalf in a fair and honorable dealings claim as broader than in a defense of "plenary power." And ultimately, the question asked is somewhat different. In both cases, however, Congress' delibera-

---

**16.** The question of whether the 1889 Act negotiations as a whole were less than fair and honor-

able will be decided in a later phase of this litigation.

tions are relevant, as are the apparent benefits to the Red Lake Band. Consequently, the court cannot ignore section 7 or the commission's representations in determining whether there has been a breach of fair and honorable dealings. It must be determined whether modification of the obligation to preserve the principal fund, pursuant to Congress' plenary power, was fair and honorable, under the circumstances.

■■■■ In making this determination, the court is guided by the United States' role as trustee to the Indians. Fiduciary principles normally apply whenever the Government has possession of tribal trust funds. *Navajo Tribe of Indians v. United States*, 224 Ct.Cl. 171, 183, 624 F.2d 981, 987 (1980). In previously addressing the general parameters of this obligation, this court stated:

> In giving flesh to the defendant's duties, the Nelson Act and related treaties and legislation "define the contours of the United States' fiduciary responsibilities." *Mitchell*, 463 U.S. at 224, 103 S.Ct. at 2972; *Pawnee v. United States*, 830 F.2d 187, 192 (Fed Cir.1987). Beyond the guidance given by the terms of those documents, the nature of the Government's duty as trustee has been variously defined. In *Cheyenne–Arapaho Tribes v. United States*, 206 Ct.Cl. 340, 345, 512 F.2d 1390, 1392 (1975) (quoting *Seneca Nation of Indians v. United States*, 173 Ct.Cl. 917, 925 (1965)), the court held that "the United States as trustee has undertaken an obligation 'of the highest responsibility and trust'." *See also Yankton Sioux Tribe. v. United States*, 224 Ct.Cl. 62, 72, 623 F.2d 159, 163 (1980); *Gila River Pima–Maricopa Community v. United States*, 9 Cl.Ct. 660, 678 (1986).

*Minnesota Chippewa Tribe*, 14 Cl.Ct. at 228. Under these principles, the Government has an obligation to manage tribal trust funds in its possession for the benefit of the Indians. This obligation cannot be modified by an exercise of plenary power.

■■■■ Without repeating the discussion concerning plenary power, it is sufficient to say that in terms of the *process* of legislat-

ing, Congress fulfilled its duty to appropriate for the benefit of the Band. Nor does the backdrop of the negotiations concerning the nature of the fund alter the result. While the negotiators were wrong in stating the fund would last 50 years, the court's review of those negotiations suggests no deliberate deception in that respect. Nor has the plaintiff satisfied the court that there was a motive to deceive.

■■■■ As to the substance of the appropriations, however, it can be said that there were broad categories of expenses that, while they may have had some peripheral beneficial impact on the Band, were the responsibility of the United States, or primarily benefitted entities other than the Band. For example, authorizations to withdraw monies for agency expenses and for public school maintenance were inconsistent with the Government's obligation to insure that the Chippewa received the benefit of their trust fund monies. Those can and are, herein, separately disallowed. They do not so taint the balance of disbursements, however, as to dictate rejection of all disbursements from principal outside the Nelson Act scheme or the expectations arguably created by the "permanent fund."

■■■■ By far the greatest authorizations of expenditures from the principal fund were for the purpose of making per capita payments. These payments were requested annually by the Chippewa. Although permitting the Chippewa to receive their trust monies prior to the lapse of the fifty year preservation period was inconsistent with a goal of preserving the maximum principal amount, in responding to the Chippewa requests, Congress gave the Chippewa the use of their own money. Monies spent for relief of indigents, medical care, and public school tuition were consistent with the Government's obligation to insure that the Chippewa received the benefit of their trust funds.

Authorizations made pursuant to the Act of May 14, 1930, ch. 273, 46 Stat. 279, are illustrative. With respect to indigent relief, Congress specified that monies could

be used for "aiding indigent Chippewa Indians." *Id.* at 302. For public school tuition authorizations, Congress specified that payment was to be made for "Chippewa Indian children." *Id.* at 297. For medical care authorizations, Congress specified that such monies support "hospitals maintained for the benefit of the Chippewa." *Id.* at 300. By limiting the purpose of these authorizations from the principal fund, Congress acted consistently with its role as trustee to insure that the Chippewa received the benefit of their trust fund.

Moreover, these authorizations were, on their face, for beneficial purposes. Monies made available for indigent relief and hospitals could contribute directly to the survival of the Chippewa. Monies for public school tuition could enable Chippewa children to attend and receive the benefits of public school education. The court cannot conclude that the use of plenary power to authorize withdrawals from the principal fund to benefit the Chippewa was unfair and dishonorable.

In contrast, however, authorizations for expenditure of Chippewa money for "general agency purposes" and for construction and maintenance of "public schools in connection with, and under the public school system of the State of Minnesota," Act of May 24, 1922, ch. 199, 42 Stat. 552, 569, permitted the Secretary to withdraw Chippewa monies to benefit non-Chippewa. Although expenditures for agency purposes from Indian trust funds were not considered a violation of law at the time, such expenditures have since been determined to be a violation of the Government's duties as trustee. *Sioux Tribe of Indians v. United States,* 105 Ct.Cl. 725, 801, 64 F.Supp. 312, 331, *vacated* and *remanded per curiam,* 329 U.S. 685, 67 S.Ct. 364, 91 L.Ed. 602 (1946), *on remand,* 112 Ct.Cl. 50, 78 F.Supp. 793 (1948) (affirming and reentering 1946 Court of Claims opinion). Ex-

penditures for agency purposes constitute monies used to carry out obligations of the United States, *id.,* and as a result were not for a purpose beneficial to the Chippewa. Such appropriations were unfair and dishonorable.

■ Authorization of expenditures for public school construction and maintenance were also by their nature beneficial to non-Chippewa. Although these expenditures were authorized only with respect to schools located near Indian children, the schools were not limited to Indian children. *See infra* pp. 400–01. Congress thereby permitted the Secretary to withdraw money that could enable non-Chippewa children to receive education. Therefore, authorizations to expend Chippewa money for the construction and maintenance of public schools, available to others in addition to Chippewa children, were unfair and dishonorable.[17]

The court concludes that, with the exception of authorizations to withdraw monies from the Nelson Act principal fund for general agency purposes and for construction and maintenance of public schools, congressional exercises of plenary power allowing the expenditures were fair and honorable. Because exercises of plenary power permitting expenditure of funds for agency purposes and public school tuition were not fair and honorable, monies actually expended pursuant to these two authorizations are disallowed. A more specific application of this general scheme of allowance or disallowance requires a more detailed examination of the accounting claims.

B. *Per Capita Disbursements—Non-accounting Issues*

Plaintiff offers five proposed conclusions of law with respect to per capita expenditures. The first two relate to the foregoing consideration of the "five percent"

---

17. The precise dollar effect of this ruling is not clear to the court. Defendant has stipulated that $89,166.41 of Nelson Act monies were characterized as disbursed for "Payment–Minnesota Public Schools." D. ex. 831. Presumably some of that amount is for tuition, which is not disallowed. If there is no further evidence of record

as to the nature of those expenditures, then that entire amount should be disallowed to the extent that it is not disallowed in particular part *infra* at pp. 400–01. The court will permit the parties initially to attempt to settle that question, however.

proviso, and are denied on the same basis as claims discussed at part III B:

1. The payment of per capitas from the principal fund prior to the expiration of the 50 year period provided by the Nelson Act violated the Act. Accordingly, all expenditures for per capitas from principal are disallowed.

2. Use of interest-earning funds to pay per capitas destroyed the fund, and was less than fair and honorable. Accordingly, all per capita payments from the permanent fund are disallowed.

The Nelson Act contemplated at section 7 that interest earned by the permanent, or interest-bearing fund would be routinely paid out on an annual basis. One half was to be paid out to heads of families, one quarter on a per capita basis to all other Indians, and the remaining quarter to support education. No appropriations were necessary for these disbursements; they could be made directly by the Secretary. As discussed earlier, per capita payments were also made in many years out of the principal fund. The total amount was nearly one million dollars. The pro rata distribution of 1917 alone was one quarter of the then-existing permanent fund, and thus was in excess of five percent. Plaintiff is correct, therefore, that such payments out of principal were only consistent with the Nelson Act to the extent they did not exceed five percent (however construed).

As discussed earlier, Congress' plenary power to act inconsistently with the Nelson Act is well-established. *Chippewa Indians,* 307 U.S. at 5, 59 S.Ct. at 689; *Morrison v. Work,* 266 U.S. 481, 485–86, 45 S.Ct. 149, 151–52, 69 L.Ed. 394 (1925); *Minnesota Chippewa Tribe,* 11 Cl.Ct. at 231. The previous analysis concerning the limitations on Congress' exercise of its plenary power, including the requirement that the overall conduct had to be fair and honorable, applies here as well. The court has carefully reviewed the historical documents surrounding the use of the principal fund to make per capita payments. It is clear that the pro rata payment of 1917 and the initial payments were undertaken at least in part due to a good faith change of philosophy.

Sentiment was that it was better for the Chippewa, as well as other Indians, to be given more control over assets which they beneficially owned, on the understandable theory that this would result in greater economic independence from both the tribe and the Government. Subsequent appropriations seem to have been motivated more by sympathy for the severe deprivation of the Indians. It is also true, however, that subsequent appropriations were occasionally challenged by the BIA on the ground that some of the monies were being wasted, and by legislators concerned about the effect disbursements would have on the permanent fund. There was ample evidence, however, that the needs of great numbers of Indians were extremely pressing. The fact that Congress acted in the face of argument that future generations might challenge this hemorrhaging of the principal funds does not, in the debates, reflect a cavalier attitude. The court is persuaded that Congress perceived that the need was real enough and great enough to take that risk.

It is noteworthy that the question before Congress was not whether the money beneficially belonged to the Indians; clearly it did. The question was when they would get control of the money. The advantage of delay was that the corpus would be protected, and those persons alive at the end of fifty years would get a large sum of money. Presumably the larger the sum, the more economically useful it would be. It is important to note, however, that the Nelson Act did not provide for retaining the interest in an interest-bearing account. In any event, it was fully consistent with the Act to pay out all interest. The court cannot, under these circumstances, conclude that Congress did not act in good faith, or that it was unfair and dishonorable for Congress to attempt to assist individual Indians with legitimate needs by making premature payments of principal.

Other challenges to per capita payments are discussed in connection with the accounting exceptions.

## C. *Education Expenses*

Plaintiff asks the court to make eleven conclusions of law with respect to disbursements for education. They consist of both accounting (expenditure-specific) and non-accounting (generalized) claims. They will generally be considered in the order plaintiff established, except for those which logically must be considered together. As an initial matter, the court notes that it ruled on December 23, 1987 that as to those expenditures which on their face were valid, plaintiff had the burden of going forward with evidence to persuade the court that the expenditure was improper. Although some of the challenged expenditures were questionable at first glance, as to the expenditures addressed in proposed conclusions 1, 2, 3, 6, 7, 10, and 11, plaintiff bore the burden of going forward with evidence or legal argument to persuade the court the disbursements should not have been charged to Red Lake Nelson Act funds.

### 1. Plaintiff's Proposed Conclusions 1, 2, and 11

Proposed Conclusion No. 1 All, or a significant, but undetermined, portion of the Nelson Act funds charged to education were for the benefit of the United States and not for the exclusive benefit of the Red Lake Band and are disallowed.

Proposed Conclusion No. 2 All, or a significant, but undetermined, portion of the Nelson Act funds charged to education were used to create and administer a system that was greatly below the standards of effective education, failed to educate Indian children and are disallowed.[18]

Proposed Conclusion No. 11 None of the expenditures for education may be charged against Nelson Act money since a significant, but undetermined, portion of the expenditures were wasted in terms of results obtained and otherwise.

To the extent proposed Conclusion No. 1 challenges the overall approach to education at Red Lake, and the overall results, it is discussed in connection with conclusions 2 and 11, and is rejected. To the extent specific improper expenditures were identified, Conclusion No. 1 is accepted in connection with conclusions 5, 8, and 9. It is otherwise rejected. Although not expressed in those terms, the court assumes that plaintiff's challenge to education disbursements in proposed conclusions 1, 2 and 11 is, at least in part, that the Government's action or inaction was unfair and dishonorable.

The court has carefully reviewed the specific examples of poor educational results and methods pointed to by plaintiff. Most of these are addressed in the educational fact findings. There are also numerous specific examples of good reports, small successes and competent individuals. Some of these are addressed in the educational findings. Many other favorable references are present in the record.[19] The

---

**18.** Plaintiff puts forward no specific conclusions with respect to the quality of teachers. The court's conclusions on the merits of this proposed conclusion do, however, take into account evidence admitted at trial concerning the quality of teachers and the discharge or rehire of assertedly incompetent teachers. The court did not consider Appendices 4 and 5 to defendant's post-trial response to plaintiff's proposed findings of fact except to the extent the material in those appendices was already in the record in some other form. Plaintiff's motion to strike those appendices is granted.

**19.** "Many of our pupils have made very marked progress. The most of them speak English fluently." Report of Super. of Cross Lake School, September 5, 1906. "During the year the foundations have been laid for correlating our Course Of Study with the Minnesota State Course, and it is expected that before school opens this fall, the course will be completed in detail and thoroughly accord with that of the State." Red Lake Agent Annual Report, 1911. "Graduates of the reservations schools are among the most industrious of our Indians and as a whole make a better class of citizens, more industrious, sober and steady than non-reservation graduates." Red Lake Report, 1912. "Some of the Indian children attend the public at Redby, but the school is small, the term is short and from the point of efficiency and general service to Indian pupils I would say that the Government schools were preferable for Indian children. . . . Very few, if any, of the children during my administration have stopped after finishing at Red Lake. The fact is they are usually transferred before they graduate and those that do finish matriculate with some other school at the beginning of the next school year."

plaintiff persuades the court that the generalizations to be drawn were, on balance, unfavorable. Facilities, on balance, ranged from poor to fair. Personnel ranged from poor to excellent, but the court is satisfied that the boarding school system on the reservation tolerated more incompetence than comparable white schools. Methodologies employed merely had modest success in teaching minimal English language skills and in preparing students for unskilled or semi-skilled jobs. Comparable public schools in rural northern Minnesota, while not on a par with schools in more developed areas, still offered high school and more varied instruction, had greater success, and employed more trained personnel than Red Lake Boarding Schools.

The court has also read substantial portions of the principal treatises or monographs submitted by plaintiff which relate to government policy toward Indians in general for the period in question, and specifically, those which address educational policy, practice, and result. It is a fair summary to conclude that they are generally critical of ways in which the policy of assimilating Indians was implemented in the late 1800's and early 1900's. Beginning in the 1930's, the policy was attacked by reputable persons as paternalistic, underfunded, and unsuccessful. BIA policy was particularly criticized for its low expectations of Indian education, low salaries, antiquated methods, and its heavy reliance on boarding schools. Having made these

general findings, however, the court nevertheless rejects proposed conclusions 1, 2, and 11 for a number of reasons.

First, it has become apparent to the court after the detail provided by trial and post-trial examinations of exhibits and argument, that plaintiff's real argument is with BIA policy as it applied to *all* reservations throughout the United States. Plaintiff relies on the cumulative weight of anecdotal evidence from Red Lake and on extensive documentation of nationwide BIA policy in its efforts to prove its case. Setting aside for a moment the merits of this broadside, it is obvious to the court at this point that defendant's motion to dismiss as to the statute of limitations is well-taken insofar as plaintiff is generically challenging any educational expense on the theory that all such expenses were of inferior quality. The same analysis applies to the Band's claim that disbursements for medical attention were of inferior quality.

■ In order not to be time-barred, plaintiff's present theory had to be sufficiently pleaded in the original complaint or exceptions so as to put defendant on notice. Plaintiff begins its post-trial argument that the specific education and medical claims at issue were pleaded with a reference to paragraph 6 of the original complaint:

6. This action is brought to determine the rights and claims of plaintiffs arising out of the administration of the property

---

Red Lake Report, 1914. "An effort has been made to graduate pupils from the sixth grade. All pupils completing that class are urged to enroll in non-reservation schools." Red Lake Report, 1915. "We have, as a whole, a splendid corps of employees in each school. The Principals are earnest capable men." Red Lake Report, 1917. "The children now are more nearly up to grade, respond much better, and in every respect, the purely school work has been much improved." Letter from Red Lake Supervisor to Commissioner of Indian Affairs, May 9, 1922. Report of H.M. Creel of Feb. 28, 1922 on inspecting the Cross Lake boarding school: Principal Oliver Breckner rated "excellent." "The Red Lake School plant has been greatly improved by the addition of the four room school building and chapel, the gymnasium and the laundry." Red Lake Report, 1928. "With plenty of good, well-cooked food to eat, lots of good milk to drink, and matrons and doctors to look

after any troubles of an ordinary nature, our school health has been very good for the past two years." Red Lake Report, 1933. "We started the year with two new teachers, both of whom proved to be excellent classroom teachers and very desirable additions to our staff." Red Lake Report, 1934. Similar reports can be found in the Annual Reports of the Bureau of Indian Affairs. For example, "A larger number of Indian pupils have been enrolled in the public schools than ever before. It is frequently reported that they rank with the white children in their academic work." Commissioner's Annual Report of 1912 at 37. "Reports of examinations from nearly all of the schools have shown a high percentage of promotions earned to the next higher grade." Report of 1927. "During the preceding administration the academic and technical standards of the teaching personnel had been greatly improved...." Report of 1935.

and affairs of plaintiffs and to recover damages sustained thereby; to recover money illegally and improperly expended by defendant; to obtain an accounting for all property and money coming into the possession of, held/and or administered by defendant and their predecessors.

While this language is, as the Band points out, notice of its claim for an accounting, and can be viewed also as preserving a claim for deficiencies reflected by an accounting, it does not serve as notice of a claim that all education and medical expenses would be challenged as generically without benefit because of poor quality.

■■■ Plaintiff also points to paragraph 14 of the complaint:

14. Defendant has illegally expended the proceeds from the sale of said lands contrary to the provisions of the [Nelson Act], and other acts, using said funds for various purposes, including education, medical attention, highway administration....

This language is discussed elsewhere as not giving rise to claims based on the Constitution and state laws. *See supra* pp. 375–78. *A fortiori* it does not support the claims at issue here. The least strained reading of this paragraph is that there are provisions of the Nelson Act (and other, unspecified statutes) which forbid in some respect expenditures for education, medical attention, etc. To the extent the Nelson Act is the basis for the argument, that claim is properly before the court and is dealt with elsewhere. *See supra* pp. 378–88. However, to suggest that disbursements for medical attention, for example, were "illegal" in that they violated the terms of a statute does not, to the sense of the court, embrace the idea that medical attention disbursements were of inferior quality.

■■■ The only other language upon which plaintiff can rest is the assertion in exception 30: "failure to furnish adequate information and exception for expenditure in violation of law and standards applicable to the trustee-fiduciary relationship." Plaintiff states in support of the exception

that "there is nothing to show that the disbursements were for the exclusive benefit of the Chippewas." The concept of "not for the exclusive benefit of" is a well-known one in Indian law, as plaintiff has amplified in its briefs. The instances in which the criteria has been applied, however, do not include wholesale disqualification because entire classes of expenditures were generically "inferior" as compared with goods and services in the white community. The typical manner in which the concept is applied was described by plaintiff in its statement in support of exception 30: "for example ... there is nothing to show delivery for the exclusive and direct benefit of the Tribes, (a) as distinguished from use by the United States for agency and administrative purposes, and for Federal personnel, (b) as distinguished from delivery for the benefit of individual Indians, or (c) as distinguished from delivery in payment for labor performed or produce sold by individual Indians to the United States." Plaintiff cites *Assiniboine Tribe v. United States*, 77 Ct.Cl. 347, 361 (1933), where the clear context is one of Indian benefit versus some direct benefit of the Government. Likewise, in its pre-trial submission of March 3, 1986, which was to be a comprehensive statement of its claims, plaintiff makes no mention of a claim that educational or medical expenses were, as a class, all inferior, and therefore not for the benefit of plaintiff. Instead, under the category "disbursement claims," it recites that it had to await the results of the document production to determine which expenditures were not allowable as not being "for the exclusive benefit" of the Band. No other detail was given. The court is not suggesting that a claim stated there for the first time would have been timely. Rather, the absence of any mention of plaintiff's current theory 35 years after the case began illustrates that the current claim is indeed new.

Nor does the court find at all persuasive plaintiff's argument that it could not have known of the specifics of the "quality" claims until the document production. Much of the evidence relied on by plaintiff, and particularly those critiques and histori-

cal commentaries upon which it places greatest reliance were not produced as part of the backup documents. Instead they were generally available literature. Plaintiff's lead expert in education (Dr. Clifford Hooker) testified he did not examine, much less rely on, the vouchers, which comprise the bulk of the non-per capita disbursement documents. Plaintiff has provided no factual basis for a conclusion that members of the Band were excusably ignorant of BIA policy, or that they could not evaluate its effects. It is noteworthy in this respect that many of the criticisms leveled by plaintiff were contained in annual evaluations of the BIA itself and in the contemporaneous reports upon which plaintiff relies in part. Indeed the very nature of the claims is such that the Band would have had to be knowledgeable no later than 1951.

For the above reasons, the court grants defendant's motion to dismiss with respect to plaintiff's claims embodied in Conclusion No. 1 (other than specific expenses disallowed in connection with other conclusions), Conclusion No. 2, and Conclusion No. 11. Claims represented by the other conclusions are embraced by exception 30 and are not dismissed.

The conclusion reached above is admittedly a close one, and required an airing of plaintiff's claim. For that reason, the court goes on to analyze other legal and factual reasons why the claim fails.

One of plaintiff's education experts, Dr. Clifford Hooker, placed great emphasis on the conclusions of the Merian Report, *see infra* pp. 452–53, and the NACE Report, *see infra* pp. 453–54. The latter, for example, is quoted at length by Dr. Hooker. An excerpt gives an abbreviated overview:

> That the educational system was not set up developmentally for the Indian was an initial and fundamental mistake. Limited money expended as an inadequate plan was appallingly wasted because it could not give needed results. Additional money spent on an effective plan would have greatly shortened the period of expenditure and in the long run save large amounts of public money....

Insofar as tribal occupations and traditions are still a part of the self-sustaining life of his group, Indian activities, however foreign to our own civilization, should be an appreciated part of the program for Indian training. In the case of the children, one or more generations removed from pure tribal activities and customs, the vocational activities necessary for self-support in the American communities ought to be an essential part of their practical education. For them, skilled trades and occupations must take the place of the unskilled labor which is too generally all the Indians have to sell us.

Boarding schools, which remove children from their homes and tribal connections, should certainly not be maintained for elementary school children.

> \*　　\*　　\*　　\*　　\*　　\*

Adapting education. As local adaption is necessary, the implication is plain that the management of the educational process must be highly decentralized. This is in almost complete contrast to what is now being done. The largely uniform course of study which has been sent out from Washington is the reverse of the end.

NACE Report pp. 50–52.

The Meriam Report also took issue with numerous policies in Indian education, including routinization, too much discipline, lack of involvement of parents, too much time spent on non-educational activities intended primarily to support the schools, and lack of theory. The existing policy at the turn of the century is described in the fact findings and contrasts with the preferred methodology and philosophy set out in the Meriam and NACE Reports. This policy was described in authoritative detail by Dr. Hooker, and by Dr. Helen Hornbeck Tanner, a noted ethno-historian who testified for plaintiff. Two key elements of that earlier policy were an overall goal of assimilation into the prevailing culture and heavy reliance on boarding schools. There is no question that the logic of these two reports and other dialogue generated in the 1920's and 30's resulted in changes in edu-

cational policy. They perhaps accelerated the shift away from boarding schools and reservation day schools to attendance at public schools. Government policy also became less hostile to preservation of aspects of Indian culture previously seen as an impediment to assimilation.

▮ Despite these changes, the court is unwilling to say that policy toward Indian education from the 1880's to the 1930's was "wrong."[20] It is not the function of the court to set policy. Nor can good faith errors of judgment be viewed in retrospect as a basis for disallowing entire classes of expenditures. Nor is the test merely one of comparative results, as plaintiff urges. The court will not insert itself into the role of the trustee to second guess decisions made 60 to 100 years ago in a totally different environment. No doubt many mistakes were made, but they do not rise to the level of unfair and dishonorable dealings, and short of a Congressional determination to expiate those mistakes on a comprehensive, non-legal basis, the court will apply traditional precedent developed in this court and its predecessor court pursuant to the ICC Act. In the court's view, that approach requires an assessment of particular disbursements, and does not permit wholesale rejection of expenditures because the overall results could have been better if different educational theories had been applied.

Moreover, the court specifically rejects plaintiff's contention that the perceived defects in BIA education policy were deliberately contrived to affirmatively benefit the Government. Dr. Hooker asserts, for example, that the real motive behind federal policy was to have Indians assimilated as a "servile underclass." Plaintiff asks the court to find (P–37) that the "conscious intent of federal policy in the decades following 1900 was precisely to train Indian men only for menial, unskilled labor, and Indian women only for domestic service."

In addition to other materials, the court has reviewed every annual report of the Commissioner of Indian Affairs ("Commissioner") beginning with 1890. While there is, to modern ears, a flavor of paternalism and occasionally condescension in these reports, the court is persuaded that the general belief was that the Indian was, if removed from tribal influence, and given sufficient prolonged exposure to the culture prevailing outside the reservation, equally educable as other Americans. Those responsible for educating Indians typically expressed great confidence in the intelligence and teachability of Indians. A few excerpts from the annual reports are illustrative:

If the average of intelligence among the Indians is to be brought up to the level of that of the other peoples which compose our nation, and they are prepared to compete in life's struggles on an equal basis, provision must be made whereby those among them who are specially gifted with talent, ambition, and energy may procure a higher education than is offered to them in the reservation and training schools. Already a very considerable number have shown both the desire and ability to pursue higher studies. Several are now successfully teaching, or fitting themselves to teach, others are practicing medicine, some are preaching, and still others are preparing for the practice of law. The desire for these higher studies is steadily increasing and only needs a little fostering to be productive of the best results. A common school, industrial education for all, a liberal and professional education for the worthy few, with a fair field and free competition, is all that is asked for Indians as for others.

Report of 1890.

It is now universally conceded by every intelligent observer that the Indians can be educated, that the Government schools are eminently successful, and that it is a wise expenditure of money from the point of view of economy, phi-

**20.** In reaching this conclusion, the court places no reliance on the conclusions of Dr. Richard Best, offered by defendant to rebut Dr. Hooker.

Dr. Best was qualified as an expert historian, and as an archival researcher only.

lanthropy, and justice to provide for them suitable educational facilities.

\* \* \* \* \* \*

The rudimentary education supplied in these Government institutions, which are necessarily, as yet, on a low plane, ought to be supplemented in many cases by an enlarged course of study. Many Indians of both sexes are showing marked capacity for scholarship and are evincing an eager desire to acquire that broader culture which will fit them for leadership among their people. One young man thoroughly educated is worth, in many respects, more to his people than a considerable number with only a common-school training.

There is an especial call among the Indians for persons of their own race who are competent physicians and lawyers.

Report of 1892.

Indians are found to develop into apt students as soon as they master the English language....

Report of 1895.

A larger number of Indian pupils have been enrolled in the public schools than ever before. It is frequently reported that they rank with the white children in their academic work.

Report of 1912.

[I]f the Indians of this country are to become productive citizens the educational program must be carefully planned and vigorously carried on. While this is a time when economy in every line is necessary it should be remembered that to allow children to grow up in ignorance and untrained, and therefore to continue to be unproductive, is false economy. Every child of every nationality in this country is entitled to an opportunity to get an education. Of all nationalities, certainly the Indians, the native Americans, are entitled to educational opportu-

nities equal to those of all other nationalities.

Report of 1921.

Nor was there any lack of self-evaluation or self-criticism within the BIA. Many of the conditions criticized by plaintiff now were frequently described in the annual reports:

[I]t is very difficult to secure competent persons able to pass the requisite civil-service examination who are willing to accept positions offered them, by reason of the small salaries, the numerous hardships, and the severity of the labors involved.

Report of 1892.[21]

Much treasure has been expended by the Government in the erection of school buildings, but in most cases these are not only lacking in the simplest requirements of architectural grace, but quite deficient in the provisions made for sewage, lighting, ventilation, and sanitary requirements generally. As a rule schoolrooms and dormitories are wholly without provisions for ventilation except what may be afforded through windows, doors, and seepage. There are many simple and inexpensive ways for correcting such shortcomings, and a circular letter describing such simple expedients, accompanied by a request on the part of the Indian Office to agents and superintendents to give immediate attention to this matter, would do much to improve the sanitary conditions of the buildings and to lessen sickness and death among the Indian children.

In this connection permit me to protest against the not uncommon practice of crowding children into dormitories, placing beds almost in close contact, and putting from two to four children in one bed.

Report of 1894.

[T]he long-continued Government and philanthropist policy on pauperizing the Indians, the conservatism of agents, the incompetency of employees, were ob-

---

**21.** Although the evidence shows that the agency had difficulty recruiting and keeping the better qualified teachers, the evidence also suggests that unsatisfactory teachers were not rehired for succeeding terms. *See infra* p. 458.

stacles which have required time to overcome.

Report of 1904.

It has not always been possible to employ sufficient labor to perform this institutional work, much of which is without value as instruction, but it has been done by Indian pupils who have thus given more of their time to it than is consistent with the best educational results.

Report of 1919.

Such training has been given by the boarding schools, though imperfectly. While results bearing upon the future life and activities of the pupils have been attained in many cases, this has come about through practical training but without competent and systematic instruction because funds have never been available for employment of expert instructors and for the necessary equipment.

Report of 1929.

This latter lament is typical of the constant requests by the BIA for greater funds, suggesting that the administration of the BIA advocated on behalf of the plaintiff.

One of the continuous themes, beginning even in the 1890's, was that boarding schools were an unfortunate interim measure, but that children should be moved to public school with non-Indian students as quickly as possible. While boarding school conditions were sometimes deplorable, the court will not, nearly 100 years later, fault their use. At the end of the last century, according to the great weight of the reports, there was still significant hostility among non-Indians to attendance by Indians in public schools. Distances between Indian families and neighboring public schools were often great. In boarding schools, children would be immersed in an educational setting which minimized the effect of parental suspicion of schools and the effects of camp life. Moreover, lack of fluency in English was seen as one of the greatest impediments to assimilation, and it was reasonably perceived that a residential setting would enable Indians to attain fluency more rapidly.

In sum, the court rejects, on a factual basis, the finding that all education disbursements for plaintiff are to be disallowed as not having been for the benefit of the Indians. On the same analysis the court concludes that the Government's actions and inaction with respect to education were not unfair and dishonorable.

A related but independent reason to reject plaintiff's argument also exists. In its pre-trial filings and through its expert witnesses, plaintiff has taken the position that they would have been better off if *none* of the educational expenses had been made. Plaintiff has hereby undertaken a substantial burden, although one that flows logically from its entire approach to education disbursements as a class. This view was proposed most comprehensively in plaintiff's post-trial proposed findings of fact:

The Red Lake Indians "would have been better had there been no education effort of this kind." Other agencies such as "the public school system ... and various religious missions or organizations" would ultimately have stepped in and provided education of higher quality than the Government offered. Minnesota public schools are one "possibility" of an alternative that might have "stepped in" had the Government provided no education at Red Lake, but there were others.

PPFF at 136 n. 201 (citing Dr. Hooker).

Education is an investment.... When we put money, resources into people, we make an investment that our history has demonstrated produces rather substantial dividends over time.... Had we provided ... [a] strong educational program, say, at the turn of the century for those children who later became the parents ... we would have had a very different set of parents and ... a very different set of children to educate in the 1920s.... So, over a long period of time, we would have saved money in the process and the results would have been substantially different.

PPFF at 141 (quoting Dr. Hooker, Tr. 2337–2339).

Our schools have never been properly equipped or adequately manned. In fact they have done so poorly often that our Indian wards, although not trained themselves as educators, have been able to pick flaws in our planning. This has been unfortunate. We ought not to allow it to recur. The Red Lake school and the Cross Lake school and the Ponsford school and one or two other small ones are the only distinctive Government Indian schools in northern Minnesota. These should be maintained efficiently under all circumstances. Many years ago the mistake was made when some one decided that only Chippewa funds would be used for educational purposes in Minnesota and then only one-fourth interest on the big fund. This fund was never adequate for the needs in the Chippewa country but we have tried to make it do for a period of years.

PPFF at 141–42 (quoting letter from BIA to Red Lake Superintendent, November 8, 1922).

Plaintiff's proposed findings are premised on the unproven assumption that if no money had been taken from the plaintiff's trust funds, then an equal or greater amount would have been better spent by others to fill the vacuum. Plaintiff is notably vague on how that vacuum would have been filled, although Dr. Hooker makes the suggestion that the State of Minnesota or religious groups "would ultimately have stepped in and provided education of higher quality." That assertion is not only unproven, but probably unprovable. First, as the court has found elsewhere, during most of this period, virtually no Red Lake Indians would have qualified for free public education. Second, there is no proof that the State of Minnesota would have been more successful in delivering Indian education services than was BIA. In this connection, two facts are salient. The first is that, at times, over 100 children on the reservation were not attending any school. This was in part due to lack of capacity. Yet if plaintiff's theory held, the State of Minnesota would not have permitted that condition to exist. Second, there is at least

some evidence that the first public school at Redby was so inadequate that Indian children were seen as better off in government schools.

Finally, the court cannot accept the premise that the idea of spending *no* Red Lake funds on education would ever have been realistic, given the Indian's general interest in schools and the undeveloped character of the area surrounding the reservation. Plaintiff's argument, the court concludes, is at best *post facto* speculation.

In sum, plaintiff's proposed education conclusions of law 1, 2, and 11 are rejected.

2. Plaintiff's Proposed Conclusion No. 3

All Nelson Act funds expended from principal and charged to education were not authorized by the Nelson Act.

This proposed conclusion is rejected based on the analysis, *supra*, at pp. 383–86.

3. Plaintiff's Proposed Conclusion No. 4

Nelson Act funds used to pay the salaries and expenses of federal employees performing substantial administrative duties for the United States are disallowed. (*E.g.*, the position of Superintendent of schools at Red Lake and the principal at Cross Lake).

The court's findings *infra* at 454–55 are sufficient to carry plaintiff's burden that a very significant part of the Red Lake and Cross Lake superintendents' salaries between 1907 and 1920 should be charged to agency expense. Since defendant's only response is that the number of examples is not large, it offers no basis for distinguishing between agency and school expense. The court therefore finds that the salary of the Red Lake and Cross Lake superintendents' salaries from creation of the Red Lake agency in 1907 through 1920 is disallowed.

4. Plaintiff's Proposed Conclusion No. 5

Expenditures charged to education disallowed (a) for the defendant's failure to prove that the expenditures were for the exclusive benefit of the Red Lake Band, or (b) where the expenditures were for

mixed use of the Band, the United States, or others.

This conclusion lists four particulars.

*Item 1.* The defendant used a portion of the Red Lake boarding school to house a Minnesota public school for white children of agency employees, during the years 1911–1922.

■ Defendant operated a public school in one room of the Red Lake Boarding School between 1911 and 1922. Defendant's response is that children of Indian employees were allowed to attend. That does not alter the fact that the only purpose of the school was to assist federal employees. In any event, many, if not most of the agency employees were white. The court therefore holds that the setting aside of the one room of the Boarding School for agency purposes did not benefit the Band. Given the relatively minor, and physically isolated effect of this set aside, the court does not extend that disallowance to the entire Boarding School. Because a separation of expenses at this point is not possible, yet because it is persuaded that the amount of funds diverted to agency use is very small, the court disallows one quarter of Red Lake Boarding School expenses for maintenance, supplies, and fuel between 1911 and 1922.[22] The parties are directed to attempt to reach agreement on the amount of the disallowed disbursements.

The court also disallows $3370.88 in Nelson Act monies used to assist in the move of this public school out of the Red Lake School.

*Item 2.* The defendant used a room at the Cross Lake boarding school to house a federal employee, who had no connection with the educational system.

As in Item 1, defendant's only response is that generalizations are not possible from such anecdotes. The court's finding at pages 149–50, however, and its conclusion here are limited to the facts. Therefore, one quarter of all disbursements for maintenance, and fuel expenses (not school supplies) for the Cross Lake Boarding School between 1927 and 1928 are disallowed. The parties are directed to attempt to agree on a figure attributable to the disallowed disbursements.

*Item 3.* The defendant intermixed property purchased with Nelson Act funds for school use with federal (Agency) property and used tribal property as if it were federal property.

This conclusion is not supported by the record.

*Item 4.* The defendant charged to "Education," Nelson Act funds to build, maintain and operate lighting, water and sewer systems that also served the Agency.

The findings, *infra* at p. 455 justify a conclusion that the original cost of installation and maintenance of the Red Lake School lighting, water and sewer systems benefitted the agency to a significant degree. Since the defendant does not offer any means for differentiating the financial benefit to the agency, all such disbursements for the period ending in 1922 are disallowed.

5. Plaintiff's Proposed Conclusions Nos. 6 and 7

These conclusions challenge expenditures for sectarian and public schools, and are dismissed as being untimely raised.

6. Plaintiff's Proposed Conclusion No. 8

All Nelson Act funds paid for the construction, furnishing and equipping of public schools, including such public schools as were donated by the defendant to the State of Minnesota are disallowed.

■ Defendant concedes that $28,398.48 of Nelson Act monies were disbursed to the State of Minnesota for nontuition education expenses, and charged to Red Lake. A reading of the numerous references in the contemporaneous reports leads to the conclusion these monies were spent on constructing a three room public

---

**22.** Total disallowance is inappropriate here and with respect to Item 2, below. There is ample evidence that the vast majority of use of both facilities is not implicated. Disallowance of one-fourth assures no allowed disbursements in fact benefitted the agency.

school in Redby, which became property of the State of Minnesota. Defendant asks the court to find that "[n]othing precluded defendant from providing education on the reservation in public vs. private (Indian) schools." While as a general proposition that is correct, it does not address the use of Indian monies to benefit the public. Moreover, defendant only contends that the public schools were *"largely* filled by Red Lake Chippewa children." The court finds that Red Lake funds were spent to support construction of public schools, and that this expenditure had the effect, to a significant degree, of benefitting the State of Minnesota and not the Red Lake Band. While tuition grants on behalf of Indian children can be directly traced and limited to a benefit to plaintiff, the same cannot be said of monies spent to build the Redby school. For that reason $28,398.48 is disallowed.

### 7. Plaintiff's Proposed Conclusion No. 9

The defendant's employee embezzled and unlawfully disposed of tribal money and other property.

■ Through proposed finding P–44, plaintiff seeks a determination that Oliver Breckner, principal of the Cross Lake School for 26 years, embezzled and unlawfully disposed of money and property under his care. Plaintiff additionally claims that accurate accounts and records of trust fund expenditures were not adequately maintained during Breckner's tenure.

As trustee of plaintiff's monies, the Government must establish its accounts. At part IV K of this opinion, the court sets out the facts relevant to Breckner's tenure. An investigative report conducted by DOI revealed a large number of instances of misappropriated funds and inadequate records. Defendant has offered no rebuttal. Rather, it offers affidavits of Breckner's peers and superiors who laud him as a good principal, and point to the fact that there was no evidence of self-dealing in his

conduct. Neither this praise nor his motivation add soundness to defendant's record-keeping. Breckner may have been a good principal, but any presumption of regularity of his accounts is demolished by the long litany of manipulation and deceit. Nor is the fact that Breckner's conduct involved primarily or exclusively non-Nelson Act funds relevant.

In light of defendant's responsibility to account for Nelson Act funds, which Breckner admittedly did control, plaintiff has shown that his records are unreliable. The court accepts the report as sufficient evidence of poorly-maintained financial records and misappropriation of plaintiff's resources during the 1932–1936 investigation period. Further, as the investigative team concluded, the volume of instances of misappropriated money and poorly-maintained records during the investigation period suggest that such embezzlement and misappropriation was not confined to the years 1932–1936; rather, the problems were likely widespread ones which began sometime after Oliver Breckner became principal at the Cross Lake School: "a complete and extensive audit and investigation would probably disclose other similar situations but a definite ascertainment of the amounts involved would be problematical since ... no definite records are available with respect to the ... irregularities."

Accordingly, Oliver Breckner's salary [23] during his entire tenure is disallowed. In addition, any cash [24] disbursements made directly by him or cash received by him are disallowed, other than amounts for which restitution, if any, has already been made to Nelson Act Funds. No other disallowances are made. This ruling is in the nature of a jury verdict. It is possible that some property or deposits for which Breckner was responsible could have been converted into cash and not accounted for. Rather than disallow every transaction at Cross Lake, however, the court will disallow the two items above, because of its view that substantially less than all the

**23.** Elsewhere Breckner's salary for the period before 1920 has already been disallowed. *See supra* p. 399.

**24.** Cash includes actual money and checks for which there was no verified deposit into an authorized account.

cash transactions are tainted, and that his salary was in part earned as a principal.

### 8. *Plaintiff's Proposed Conclusion 10*

Expenditures of Nelson Act funds charged to education, in excess of one-fourth of the accumulated interest, were not authorized by the Nelson Act and are disallowed.

None of plaintiff's proposed fact findings directly address this conclusion. While the court finds elsewhere that approximately $790,000 of the total of over $1.3 million spent on education came from interest, the breakout of education expenses on an annual basis as compared with annual interest accumulations is not offered. Review of the 1963 GAO Report, however, demonstrates that during most years education expenses paid out of interest to the credit of the Red Lake Band exceeded one-fourth of accumulated annual interest. It is obvious, therefore, that the formula set out in section seven (one-fourth for education, three-fourths to per capita payments) was not adhered to in the appropriations process, if the formula is applied separately to monies credited to the Red Lake Band and disbursements for the Band.

 Defendant contends that the statutory formula applies to all interest accumulations, not just those credited for the plaintiff. It points out that under its construction, slightly less than one quarter of interest disbursed for all the bands went for educational purposes. The court need not resolve the question, however, since even under plaintiff's view, the issue would be resolved in fundamentally the same way as that discussed in connection with expenditures out of the principal fund in excess of five percent. Was it within Congress' plenary power to alter the statutory scheme, and if so, was it fair and honorable to do so? The analysis set out *supra* at 383–89 applies here as well. Moreover, section 7 employed the overall admonition that interest be expended "for the benefit of said Indians." As the plaintiff has argued and the court has found, more money could have been usefully spent on education. Given the record in this case, the court

concludes that Congress' action in diverting monies from per capita expenditures to education in a different proportion than that set up by the Nelson Act was a legitimate exercise of plenary power and was not unfair or dishonorable.

### D. *Medical Attention*

Plaintiff proposes six conclusions of law with respect to medical attention. The court's method of approaching these proposals is fundamentally the same as that used in addressing education claims, and much of the same analysis with respect to the limitations of actions applies here but will not be repeated.

The proposed conclusions of law are:

The expenditure of Nelson Act funds at Red Lake for medical services, hospital structures, equipment, personnel and operating expenses,

a. Did not benefit the Red Lake Band;

b. Were not for the exclusive benefit of the Band;

c. Resulted in severe damage to the Band and to individual members of the Band;

d. Were grossly misused and wasted; the Band did not receive value for the moneys expended;

e. Constituted a breach of trust in that the United States used the Band's trust money to pay for health care that was grievously below:

(i) the standard of health services provided by the United States to veterans, the military and through the Public Health Service;

(ii) the standard of health services provided by medical practitioners serving non-Indian rural Minnesotans; [and]

f. Were not authorized by the Nelson Act.

Plaintiff is, in part, challenging on a generic basis all medical expenses because the *system* of providing medical attention and the policies creating that system were not for the benefit of the Band; were not for the exclusive benefit of the Band; resulted in damage; produced waste or misuse; or were below prevailing standards.

Those contentions are rejected both as a matter of law, and factually.

First, these types of claims are time-barred. The reasons discussed for dismissing analogous education claims will not be readdressed here, but they apply. A fair reading of the relevant pleadings does not disclose claims that the policy of the BIA toward medical attention on reservations were being asserted as a basis for liability. Admittedly, the Band's medical claims are not as comprehensive an attack on policy as are the education claims. Much of the evidence can be the basis of an item-by-item claim based on lack of benefit, exclusive or otherwise, or waste, or damage. Nevertheless, the motion is granted as to arguments that BIA policies and activities affecting all reservations were actionable—for example the conclusions plaintiff seeks to draw from P–49 ("The system established by the Bureau of Indian Affairs precluded effective health and medical services for Indians."), P–52 and 54 (as to the quality of physicians in the Indian service generally due to poor salaries, low entrance requirements, etc.), P–57 (as to the quality of hospitals generally), and P–60 to P–65 (that all sanatoria were inadequate and that tuberculosis and trachoma were ineffectively treated in general).

Comparisons with the quality of medical services provided off the reservation are only relevant to the extent that they show waste of particular Red Lake funds. The court treats as not in issue claims that more money should have been spent, for example on local sanatoria, that diagnostic techniques and services were not as good as those elsewhere, and that there was general inaction on various problems. The gist of these and related claims is that more action should have been taken and more federal money spent.[25] While that may have been true in some cases, state-ments in the complaint, as amended, and exceptions to the effect that Red Lake monies for medical attention were "illegally expended" (¶¶ 6 and 14 of the 1951 complaint), "unlawful" and "contrary to law" (¶ 24), constituted a "failure to fulfill trust duties" (exception 2), or were not for the "benefit of the Band" (exception 30), do not provide notice of the claim that all expenses for medical attention should be disallowed because as a class, they were of inferior quality or wrong as a matter of policy.

A factual basis exists for rejecting this type of claim as well. After carefully reviewing plaintiff's pleadings, the parties' documentary references, other record evidence, and the transcript,[26] it is clear that plaintiff has shown that medical attention on the Red Lake reservation as well as other reservations was not as good as it could have been, or, from a medical standpoint, should have been. Specifically, facilities at Red Lake could have been built sooner, could have been more spacious, and could have been better equipped with then-existing medical equipment such as x-ray machines. The quality of personnel could have been improved by paying higher salaries, which would have had the effect also of reducing turnover and vacancies. Tuberculosis would have been dealt with more effectively at an earlier date if a sanatorium had been built at Red Lake in the second decade of this century. From a medical standpoint, it should have been built. There needed to be better isolation of infected patients at a facility on the reservation. X-ray equipment could and should have been more widely used, as well as other prevailing tests for tuberculosis. With the exception of those particular expenditures which were shown to be of no benefit, or wasted, the court views none of

---

25. Plaintiff recites for instance in its objections to defendant's post-trial proposed findings that

> In the intervening period [early 1900's through the 1920's] several hundred Red Lake Indians died of tuberculosis, chiefly because of the Government's refusal to establish a tuberculosis sanatorium and offer other widely used treatments for tuberculosis on the Reservation. P. 224.

26. The court does not accord any weight to the medical opinions expressed by defendant's expert, Ms. LaMountain. Without in any way discounting her qualifications as an historian and archivist, the court is persuaded that she is not better qualified than the court to draw inferences and conclusions relating to health care from the documentary evidence.

these findings as relevant. The issue is whether monies which *were* spent were for the benefit of the tribe. The question is not whether spending more money would have benefitted the tribe. No doubt it would. Nor is the issue whether, if spent differently, more benefit would have been achieved, unless there was identifiable waste.

■ Plaintiff has not proved that it would have been better to spend nothing—to build no facilities, to hire no staff, to deliver no medical attention, to buy no supplies, to send no Indians off reservation—or to reallocate funds from some clearly wasteful category to some clearly helpful one. The only example of waste was with respect to three physicians. The salaries of Doctors Slattery, Bond and O'Donnell are disallowed. Plaintiff demonstrated that they were incompetent or worse and of no benefit to the Band. No other disallowance is made with respect to physicians, facilities, or treatment. For that reason, all the plaintiff's proposed conclusions of law with respect to medical attention are denied, except that disbursements for the salaries of Doctors Slattery, Bond, and O'Donnell are disallowed as not benefitting the Band.

## IV. THE ACCOUNTING CLAIMS

A. *Disallowed Categories*

■ In addition to challenging disbursements for education and medical purposes on a categorical basis, plaintiff also challenges a number of other expenses within categories used by the GAO reports, generally on the basis that they were primarily for agency benefit and thus were obligations of the United States and cannot be legally charged against plaintiff. It is settled that one element of proof of the propriety of the Government's conduct is that the expenditures were chargeable against the Band; i.e., that they were not obligations of the United States as sovereign, or obligations which it assumed by treaty. *Sioux Tribe v. United States,* 105 Ct.Cl. at 801–03, 806–07, 64 F.Supp. at 331–32, 333. The obligation to establish this propriety rests with the defendant. It is equally well set-

tled that administrative expenses of the agency fall within those costs which should be borne by the Government. *Yankton Sioux Tribe v. United States,* 224 Ct.Cl. at 101, 623 F.2d at 179.

Defendant concedes that expenditures in the following GAO categories were improperly disbursed from Nelson Act funds because the expenditures should have been borne by the Government as administrative expenses of the agency:
—"Hardware, glass, oil and paints"
—"Boats, Docks, etc."
—"Telephone Lines"
—"Transportation of Supplies"
—"Pay of Mechanics"
—"Agency Buildings and Repairs"
—"Miscellaneous Agency Expenses"
—"Miscellaneous Building Materials"
—"Miscellaneous Employees"
—"Pay of Indian Police"
—"Pay of Interpreters"

All expenditures under these categories are disallowed.

■ Other categories remain in dispute. Plaintiff challenges the reported expenditure of $6,260.53 for "Saw and grist mills." There were apparently two saw mills operated at some point on Red Lake Reservation. The newer was known as the Red Lake sawmill and is not relevant here since it was maintained with non-Nelson Act funds. With respect to the other sawmill, plaintiff put on evidence that it produced lumber for "general agency purposes." This evidence was not rebutted by defendant. Instead, defendant points to the disallowance standard articulated in *Sioux Tribe,* i.e., whether the expenditure would "be to the interest of the Indians," and not necessarily to the "exclusive" benefit of the Indians. The court agrees with defendant that plaintiff's attempt to expand the criteria with a rigid requirement of "exclusive benefit" is not supported in the caselaw. Nor is the court persuaded that the phrase used in *Sioux Tribe,* "the interest of the Indians," was an attempt to enshrine a minimum threshold of acceptability. The court reads that decision and the other cases cited by the parties as requiring that,

with respect to those expenditures which are not already disallowed because they were a sovereign obligation of the defendant or were obligations assumed by treaty, the defendant has to prove that the disbursement benefitted the Indians. *See Navajo Tribe v. United States,* 224 Ct.Cl. 171, 190, 624 F.2d 981, 990–91 (1980); *Assiniboine and Sioux Tribes v. United States,* 77 Ct.Cl. 347, 376 (1933). Expenditures which "actually benefitted" the Government or some third party are not allowed as offsets. *Navajo Tribe,* 224 Ct.Cl. at 190, 624 F.2d at 991.

Disallowing every expenditure which carries some benefit to the agency simply because of that taint is an overreading of cases which, fundamentally, are grappling with proof problems. Given defendant's burden of proof, it makes sense, if defendant cannot meaningfully segregate the benefit, to disallow those expenditures which only indirectly benefit the Indians, or are jointly for the benefit of the Indians and defendant. The difficulty comes in applying the test when an expenditure primarily benefits the Indians, but also results in benefit to others. In *Sioux Tribe,* for example, the court found that construction of bridges on public roads using tribal monies was permissible. *Sioux Tribe,* 105 Ct.Cl. at 808, 64 F.Supp. at 334. The legislation leading to the construction of the bridges directed funds to be used for "improvements," which the court found were intended to benefit the Indians. In such circumstances, the result will be affected by the Government's treaty obligations, the extent to which the obligation is a sovereign function, the degree of relative benefit, and the extent to which segregation is possible.

With respect to sawmill expenditures, however, this test does not aid defendant if it cannot show any benefit to the Band in the face of evidence that sawmill expenditures were really for agency purposes. It is not necessary to determine whether expenditures in that category are, on their face, sufficiently linked to a direct benefit to the Band because of the documentary evidence pointed to by plaintiff. While that evidence relates only to the sawmill,

defendant put on no evidence of the existence of a gristmill, what its uses were, or how much of the expenditures were limited to the sawmill. Accordingly, all disbursements in the GAO category of "[s]aw and grist mills" are disallowed. The remaining disputed categories are taken up in connection with challenges to specific samples discussed below.

B. *Plaintiff's Motion for Leave to File Memorandum Bringing to the Court's Judicial Knowledge Legislative History*

██ One further procedural point remains. That concerns plaintiff's January 4, 1989 Motion For Leave to File Memorandum Bringing to the Court's Judicial Knowledge Legislative History, along with accompanying memorandum. That motion was granted on January 5, 1989, and gave defendant the opportunity to respond, which it has. The Band directs the court's attention to section 2 of the ICC Act, 25 U.S.C. § 70a, which limits those gratuitous expenditures by the Government which can be used as offsets. Specifically excluded are monies spent for "agency or other administrative, educational, health or highway purposes." The House Conference Report accompanying the act amplifies that

the tribes should not be charged with expenditures for agency or other administrative expenses because such expenses have been as much to accomplish the purposes of the expanding economy of our white citizenry as for the benefit of the Indians;

also, that since any other citizen of the United States could sue the United States without facing an offset for educational expenses, there was no justification in charging the Indians therefor;

also, that since a substantial part of the hospitalization and other health expenditures have been made to prevent the spread of disease from the Indians to the white population, there was no justification for charging the Indians therefor;

also, that since most of the highways on and through Indian reservatious [sic] are for the benefit of the entire public, they

should not, with propriety, be charged against tribal judgments....

Plaintiff concedes that the monies at issue in the present discussion are tribal trust funds and thus not the subject of section 2 and its accompanying legislative discussion. It argues, however, that the legislative intent to treat such expenditures as for Governmental as opposed to Indian benefit is clear, and that all disbursements in those categories should thus be disallowed as not for the benefit of the Band. Defendant responds that the statute and the related discussion by their terms can only apply to the issue of gratuitous offsets, not disbursement of tribal funds.

At the outset, the court notes that this question should have been raised earlier. If plaintiff is correct, it could have obviated at least half the pre-trial and trial effort. In any event, the court agrees with defendant.

As part of the January 5, 1989 order, the court directed the parties to research whether the cited language had been the subject of judicial consideration. To plaintiff's credit, it obviously undertook that task with zeal. Nevertheless, it candidly admits that of the 39 cases it cites in its reply brief, in none did the tribunal apply section 2 in the way plaintiff advocates. In fairness to the Band, it relates that none of those cases reached the question.

Defendant's response is not directly on point. Plaintiff's contention does not assume defendant is making a claim for gratuitous offsets at the present. Presumably, its real argument is that since *both* gratuities and expenditures of tribal funds had to have been for tribal benefit, and since education, health and roads have been legislatively characterized as for the Government's benefit, the same would be true in the present context. It is noteworthy that even before the adoption of the amendment to section 70a, the ICC suggested that educational expenditures should be disallowed *as gratuitous offsets*. *Kiowa, Comanche and Apache Indians v. United States*, 5 Ind.Cl.Comm. 297, 302–04 (1957). That decision, and others, *see e.g.*, *Navajo Tribe*, 224 Ct.Cl. at 190, 624 F.2d at

991; *Sioux Tribe*, 105 Ct.Cl. at 792–99, 64 F.Supp. at 327–33; *Assiniboine and Sioux Tribes*, 77 Ct.Cl. at 376, persuade the court that the determination of what the Government can claim as an offset is heavily dependent on the wording of the Government's obligation to the Indians. In other words, if, as in *Sioux Tribe*, the Government in effect purchased land from the tribe in exchange for promises to pay cash, to deliver supplies, and to perform services, it is in a poor position to claim performance of those treaty obligations as offsets to disbursements from trust funds.

In that respect, it is important that the Government's obligations in the Nelson Act are of a different character. In the Act, the United States did not purchase for its own purposes Chippewa land. It obtained the land in trust for the purpose of selling the land and timber, placing the proceeds in trust, and managing the trust for the benefit of the Indians. It is clearly contemplated that the "return" to the Bands would come from those proceeds only. The defendant undertook no generalized obligations to provide goods, services, or money. Moreover, the Act permitted expenditure of trust funds for cash payments, education, "civilization and self support," and agricultural purposes. Consequently, the argument which defeated in part the Government's claimed offsets in *Sioux* is simply not present here. Rather, the contrary is true. The Band negotiated a conversion of its land and timber into, for example, schools. Although not specifically mentioned in the Act, the court concludes that medical and highway expenditures are, unless specifically excluded elsewhere in this opinion, within the purposes of the Act.

The legislative history of section 70a is simply not a sufficient basis to find to the contrary. Not only, as defendant points out, does the language on its face not apply, but there are sound reasons not to extend it. Clearly, Congress understood the difference between accounting for disbursements of tribal money on the one hand and claiming affirmative offsets for expenditure of federal monies on the other.

The use of gratuitous offsets is, as far as the court is aware, unique to Indian claims. The legislative history of the amendment to section 70a makes clear that there was some reticence about permitting the Government to reduce its liability on an otherwise valid claim by gratuities. *See United States v. Pueblo de Zia,* 200 Ct.Cl. 601, 617–20, 474 F.2d 639 (1973). In the court's view, therefore, the circumstances under which a gratuitous expenditure is allowed as an offset could be more restric- tive than for similar expenditures of tribal monies which otherwise appear to benefit the Indians and are not treaty obligations of the Government.

In sum, the court rejects plaintiff's contention that merely because education, medical, and highway expenses could not be used as offsets if gratuities, they should not be held to be for the benefit of the Band if they constitute tribal monies.

### C. *Use of the Accounting Process and GAO Report as Proof*

Plaintiff generally challenges the reliability of the Government's accounting trail. The court has set forth findings which generally describe the accounting process. *See infra* pp. 443–45. The parties are in substantial agreement as to what occurred, but they disagree as to the effect the court should give the general process when specific proofs are absent today. Specifically, with respect to per capitas, plaintiff challenges some disbursements for lack of proof because they are reflected only by a Treasury cash card.

Paul Gillis testified that, as an accountant, he would not rely exclusively on Treasury cash cards, but would insist on the original backup materials; i.e., the composite elements of the settlement package. While it is understandable that an accountant would insist on such proof in certifying an account, the court views its role as somewhat different at this point. As plaintiff itself points out, the court cannot sit as an auditor or accountant. It sits as a trier of fact. At this stage of the inquiry, the question is, has defendant established by a preponderance of the evidence the fact that the money was spent for the asserted purpose, and has it shown that applicable regulations were enforced? In making that determination, the court will take account of circumstantial evidence, which, if of sufficient weight, demonstrates the disbursement went for the stated purpose and was properly disbursed. *Accord Creek Nation v. United States,* 43 Ind.Cl.Comm. 352, 355, 360–61 (1978); *cf. Blackfeet and Gros Ventre Tribes,* 32 Ind.Cl.Comm. at 87. The Treasury cash cards are obviously more attenuated proof than the entire claims settlement package would be. However, claim settlements were issued to make funds available for back payments. It was the responsibility of the respective reviewers and auditors to ensure compliance with relevant regulations and the presence of necessary ratifications and signatures prior to settling a claim. These claim settlements in turn are reflected on the cash cards.

Plaintiff's argument that such reliance is inappropriate is not persuasive. It contends that "the record contains evidence of settled accounts approved for payment by Interior and the money released by Treasury, where the underlying annuity rolls did not comply with the regulations." PPFF at 117i. The only support for this statement, however, is Dx 632, an original annuity roll. Plaintiff argues that a "mere glance at the rolls subject to this requirement [a mark by an Indian unable to sign for receipt] indicates that the marks are not those of each individual Indian." *Id.* This asserted defect was not raised as part of the Gillis exceptions. In any event, the court does not sustain plaintiff's challenge to that roll. No expert testimony was adduced to support the assertion that the notations are from the same hand. While many admittedly look identical, others appear somewhat different. The factual record is far from clear enough for the court to judge that forgery was involved.

Plaintiff's more general challenge to reliance on the accounting process is based in part on two documents. The first is a report presented in 1915 by the Bureau of Municipal Research to a Joint Commission of Congress to Investigate Indian Affairs.

The report is a persuasive recommendation for a change in the methodology of handling Indian fiscal affairs and it apparently had that effect. Insofar as relevant here, it points to a number of ways in which Indian trust accounting is inferior to private trust accounting, specifically in the lack of independent review, the need for greater accountability, failure to segregate accounts, and inadequate auditing of actual expenditures. The report leads to the conclusion that the then-existing methodology was flawed and created unnecessary opportunities for fraud and waste. The report, as well as the court's own examination of testimony about the process, as well as the documentary record, suggests that the review by the Indian Office and the Treasury Department was intended primarily to ensure proof of expenditures and compliance with regulations. It was not designed to ensure that expenditures were actually for the benefit of the Indians. The report does no more than that, however. It certainly does not suggest that those procedures which were in place were not followed and that those regulations which did exist were not enforced. There is no reference to specific examples of fraud or failure to enforce procedures or regulations. *A priori* that is the case with respect to Red Lake. The document is simply inadequate, in litigation challenging particular disbursements, to undermine the defendant's presentation of its accounts.

The same is true of the 1929 Report of the Comptroller of the Currency to the United States Senate. While defendant is wrong in stating that the report is not a criticism, it is entirely too generalized to serve as a basis for disallowing specific expenditures. To the extent that the 1929 report suggests that the concept of "benefit of the Indian" was not rigidly enforced, the court views that as raising a different issue. The limited questions raised by plaintiff with respect to the accounting trail relate to the adequacy of the proof of expenditures and proof of compliance with regulations. An expenditure can, however, be documented and still not be allowable because it was not for the benefit of the Band. For this reason, testimony of plaintiff's accountant, Mr. Gillis, to the effect that the same review procedures governed trust funds as governed federal funds, is not a reason to disallow the disbursements. The mere fact that the same procedures were used, and that different types of funding sources were simultaneously audited is not proof that monies were not actually disbursed, or that they were spent on agency purposes. There is ample evidence that tribal funds were in fact used for agency purposes, but the court will only disallow such expenditures for proof deficiencies on a showing beyond the one proposed here.

The court has carefully reviewed the testimony of James Muhn, an historian with the Bureau of Land Management, William Anderson, an accountant with ITAD of GSA, and Ronald Points, formerly an auditor with the GAO, as well as the parties' proposed findings of fact. Based on the testimony, the exhibits, and the presumption of regularity which attaches to the conduct of government employees, *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14–15, 47 S.Ct. 1, 6–6, 71 L.Ed. 131 (1926), the court will presume that if an expenditure went through the claims settlement process, the supporting documentation was present and properly executed.

In sum, the type of evidence presented by plaintiff does not rebut the presumption that the process went according to regulation and that reviewers and auditors were doing their job to require documentation of disbursements. Nor does it furnish a reason for rejecting expenditures wholesale based on a less than perfect accounting system. Consequently the court will accept a cash card as proof that the payment was authorized and the claim properly documented. *See, e.g.,* plaintiff's exhibits 577–1 through 577–11.[27]

---

**27.** The plaintiff is correct that this does not foreclose the question of whether the recipient was a Red Lake Indian, and whether there was compliance with those regulatory requirements which by their nature could not be scrutinized from Washington, such as the presence of liquor agents, etc. The only evidence suggesting disallowance on these other grounds related to

In this connection, the court notes two additional factors which militate in favor of accepting the cash cards as proof the disbursements were authorized. First, there are relatively few instances in which supporting documentation does not exist. It is obvious that most disbursements are fully documented. If the opposite were true, the process would be entitled to less a presumption of regularity. This suggests that the lack of underlying documentation is more likely due to the lapse of time and difficulty of assembling materials than to theft or abuse of trust.

Second, while the 1929 and 1963 GAO reports have been held not to constitute an accounting, the court does view the reports as strong circumstantial evidence with respect to the previous existence of a proper accounting trail. Although defendant's witnesses were less certain concerning the methodology of the 1929 report, it appears that that report, as well as the new work for the 1963 report, was based on original materials. For this same reason, the court will also accept the 1963 GAO Report as some evidence in connection with defendant's proof of its accounting. Specifically, the court will, to the extent that defendant relies directly on work cards reflecting specific settlements or other original materials and to the extent those work cards can be numerically reconciled with the report itself, accept the report as evidence that the disbursement took place and went for the general purpose characterized by the GAO category. The court is aware that the latter conclusion is strongly challenged by plaintiff, which argues that the GAO reviewers had too much discretion in classifying disbursements. A review of the methodology used by the GAO as well as the court's own tracking of dozens of vouchers and settlements between work cards and the GAO categorizations and numerical summaries, convinces the court that the report is entitled to some weight as evidence that the disbursement was for the purpose described. It is noteworthy in this regard that plaintiff does not hesitate to utilize this same scheme to challenge entire receipt by non-Red Lake Indians. That issue is

classifications of disbursements. For the court not to assume that technicians were trying, in good faith, to classify disbursements, there would either have to be more evidence of inadvertent misclassification, or some evidence of deliberate misclassification. To the extent that the work cards for the two reports record original materials and are able to reconcile disbursements, therefore, the court finds that such disbursements took place, were properly settled, and were used for the general purposes described by the GAO classification system.

D. *Per Capita Disbursements—Accounting Issues*

Plaintiff's three remaining proposed conclusions of law with respect to per capita payments are of an accounting nature:

3. Per capitas paid from principal, without the ratification or release of the Band, as required by the per capita statutes commencing with fiscal year 1922, are in violation of law. Accordingly, all sums so paid in per capitas are disallowed.

4. Where the evidence does not establish payment of the per capitas in accordance with the provisions of the governing regulation, the payment is disallowed.

5. Per capitas paid to persons other than members of the Red Lake Band are disallowed.

As abstract principles of law, there is nothing to quarrel with in these statements, and indeed, defendant does not do so directly. Certainly the plaintiff is correct that payments made to ineligible persons should be disallowed. And payments made not in substantial compliance with applicable statutes or regulations should be disallowed. The parties disagree, however, on application of those principles to the facts.

The defendant made eleven per capita disbursements in the total amount of $1,910,356.72. Of this amount, $981,099.50 was taken from the principal fund, along with part of the per capita disbursements initially paid for out of advance interest separately considered.

and later reimbursed out of principal. The pro rata payment of 1917 distributed one quarter of the then-existing principal fund. There was no specific requirement that recipients waive any objection to the distribution. Subsequent appropriations, however, did contain a requirement that recipients express their consent by ratifying the act and accepting payment. The legislative record clearly reflects that one of the purposes of requiring ratification was to preclude one of the challenges presently before the court—that per capita payments should not be made out of principal.

All the per capita payments out of principal were subject to existing BIA regulations affecting per capita payments out of interest. In addition, the ten per capitas from principal made after 1922 were subject to special instructions as to execution of waivers. The purpose of these regulations was to prevent fraud and theft. The regulations were amended from time to time, but in relevant measure, they required a minimum of precautions:

—The field agent was to prepare a roll of each Indian entitled to a per capita payment.

—Each recipient had to acknowledge payment by signature or mark, unless payment were made by check.

—Marks were to be separately witnessed by two persons.

—An interpreter was to be present, unless (after 1907), one could not be found, or if the Indians could sign their own names.

—The interpreter, witnesses, and agent were to sign the roll.

—Intoxicating liquors were barred from the place of payment, as were traders.

—Execution of a waiver in those years it was required.

In finding P–28, the Band contends that disallowances should be made in the following circumstances:

1. Per capita rolls without signature of the agent, as required by the Secretary's signature.

2. No evidence that the per capita was owing, that the purported claimant was entitled to a per capita.

3. Unsupported statements showing per capitas paid to members of the Fond du Lac Band.

1. Objections Dependent on Plaintiff's Motion *in Limine*

■ Adequacy of the defendant's accounting as to per capitas is directly dependent on the previous ruling on plaintiff's motion *in limine*, in which it attempted to prevent admission by defendant of materials not produced as part of the original 38 boxes. In many cases, defendant initially produced virtually all of a document, such as an annuity roll, but left out the critical last pages showing necessary attestations. Plaintiff concedes that the large majority of proof deficiencies it identified in the Gillis exceptions would have been resolved if the later-produced material had been available earlier. The court has previously ruled, however, that those materials will be admitted, and that the appropriate remedy is to reimburse plaintiff for its unnecessary fees and expenses. Consequently, those sample per capita disbursements to which plaintiff would not have objected if it had received complete information as part of the original backup document production, are allowed. *See, e.g.*, Px 591 (with respect to Px 563(3), 563(4), 563(5), and 563(6)).

2. Payments to non-Red Lake Indians

Plaintiff seeks to disallow $130.60 paid to Julia Wolcott, a Chippewa Indian of the Fond du Lac Band. Although this amount was originally objected to for lack of proof, as well as mispayment to a non-Red Lake Indian, proof was later supplied of entitlement and receipt. At trial defendant offered to withdraw this amount from the Red Lake accounting and include it in the forthcoming Minnesota Chippewa accounting. The court agrees with that treatment. The sum of $130.60 is disallowed with respect to the Red Lake accounting. Similarly, plaintiff challenged backpayments from the interest fund of $5.00 and $4.70 to an Ottertail Chippewa Indian. That amount is also disallowed as to the Red Lake accounting. The question of how that amount and

any similar ones involving payments to non-Red Lake Chippewa will be treated in terms of offsets and its effect on recovery of interest is deferred.

### 3. Incomplete proof

It is not entirely clear to the court which exceptions related to per capitas remain after rejection of both plaintiff's motion *in limine* and plaintiff's general criticisms of the accounting process. An examination of plaintiff's trial exhibits 591 through 594 suggests that very few challenges remain. These exhibits cover not only the primary per capita for a given year, but also challenge documentation for succeeding back payments.

### a. The 1934 Annuity Roll

Plaintiff challenges the annuity roll for the 1934 per capita expenditure. This is a duplicate of the original roll. The original had to be signed by the agent. The duplicate did not. The plaintiff asks the court to reject the disbursement because the defendant has not produced the original signed roll. The court rejects the challenge. The record demonstrates that the agent's account with respect to this per capita would not have been settled if the original roll had not been signed. In any event the duplicate roll, schedule of disbursements, and releases for that payment are sufficient circumstantial evidence that the payments were made to the Indians on the duplicate roll.

### b. Ratifications and Releases

■■■ With respect to ratifications and releases, the quality of proof as to only four years is still in dispute. Plaintiff questions whether ratification for the payments authorized by the per capita act of 1921 has been established. The ratifications themselves are not in evidence. Instead, defendant offers Dx 529, a letter from the Assistant Secretary of the Department of Interior to the Superintendent of the Red Lake Agency. It recites that "[a] majority of all adult Chippewa Indians of Minnesota having ratified and accepted the provisions of the Act, authority is here-

by granted you to make per capita payments of $100." Plaintiff's suggestion that this statement is susceptible to a reading that ratification has not yet occurred is rejected. The court accepts the letter as proof that ratification was obtained.

With respect to the per capita act of 1925, the releases are missing. There was evidence that fire had destroyed some of the records for that year. This was borne out by obvious damage to the annuity roll and ratifications for that same payment. Given the fact that the releases were intended to protect the defendant, the circumstances of the fire, and the review which the agent's claim would have received in the settlement process, the defendant's proof of that per capita payment is accepted.

Plaintiff challenges the ratification offered for the per capita act of 1926 because the year and the act of Congress relied upon are not shown, as required. That act authorized a per capita payment of $50. The ratification offered shows consent by several hundred Indians to a per capita payment in the amount of $50. The only other $50 per capita payment was for the act of 1925. A separate ratification exists for that act. The document proffered by defendant otherwise appears to be a genuine ratification. The BIA authorized the payments. Under these circumstances, it is obvious that this ratification can only relate to the act of 1926, and the court will not require the defendant to make the payment a second time for lack of a reference to the act, when it is obvious the payment was made once.

■■■ Plaintiff's final challenge is to the per capita payment based on the 1929 act, which authorized a $25 payment, on condition that the Secretary obtain a ratification. Plaintiff does not contend the payment was not made, rather it contends there was no ratification. Defendant offers Dx 623. This is in the form of other ratifications, but contains no reference to the act involved, and in place of original signatures or marks contains a typed list. Some of the individuals have next to their name "x his/her mark." Dx 623 is not a rat-

ification. The question is whether that exhibit, plus other evidence, allows a conclusion that a ratification did exist at some point. Several pieces of evidence suggest that it did. First, unless the document is a complete forgery, it would have to have been made from the original, otherwise the author would not have known which individuals signed with a mark. Also, the names are not in alphabetical order, but are loosely arranged in family groups. The list is also broken out by administrative divisions within the Red Lake Reservation and is summarized at the end with the conclusion, "Total Signatures ‗‗‗‗‗ 400." There is evidence that the per capita payment was requested by members of the Red Lake Band less than a month before the legislation was passed. While the specific authorizing legislation is not listed on Dx 623, other completed ratifications exist for the five other $25 per capita payments. The Commissioner of Indian Affairs authorized the payments on January 14, 1930, which he should not have done without the ratification, and finally, there is the fact of payment. A comparison of the first twenty-five names on the ratification list shows that twenty-four appear as adults on the January 1930 annuity roll. Although one, Joseph Johnson, does not, that might be the result of a transcription error since there are three Joe or Joseph Johnsons on the annuity rolls, and the name of only one appears on the ratification. The court concludes that the payment authorized by the 1929 per capita act was preceded by a ratification.

c. Proof challenges to per capita disbursements out of interest accounts

Plaintiff challenges the GAO's allowance of $7840.70 for annuities paid to "various" persons and attributed to Disbursement Schedule 2 for fiscal year 1899. Plaintiff's witness Gillis attempted to reconcile the 1963 GAO Report's total of annuities paid out for that period out of that disbursement schedule, with the referenced annuity rolls. He was unable to document $7840.70. Plaintiff's exhibit 596, a spread sheet prepared by the GAO, reflects that for an unspecified date annuities were paid in that amount, but there is no citation to an account number, claim settlement, or voucher. Defendant provided no explanation of the discrepancy and no secondary evidence to prove payment of annuities in that amount to Red Lake Indians. Accordingly, that amount is disallowed.

Plaintiff challenges $6.20 paid for Nancy Dudley on claim settlement 21317, since that amount, as pointed out by the Treasury Department auditors, had already been paid out of a different claim settlement, perhaps to someone else. Defendant was unable to establish the inaccuracy of that comment or to show recoupment. That amount is disallowed.

Other challenges to proof, including those based on lack of signature of the agent on duplicate rolls, are rejected.

E. *Disbursements Presented on Sample Basis*

The findings and conclusions in this section relate to those disbursements challenged by Gillis codes 1, 2, 3, 8, 11, 12, and 99. Order of December 23, 1987. In a general sense, the first six of these exception codes raise issues of proof, specifically whether defendant has either shown that the disbursement actually took place as claimed, or proof that the disbursement benefitted the Band. As to the first issue, as discussed above, *supra* pp. 407–09, the court will accept evidence other than vouchers or claims settlements as circumstantial evidence to establish *the fact of payment and adherence to regulations.* The second test—benefit to the Band—is a legal one that has developed through caselaw over the years.[28] There is no reason to think that that precise issue was addressed in routine examinations by government auditors. For that reason even a voucher or a claim settlement may be inadequate to show benefit to the Band, and indeed, may

---

**28.** Defendant must show that the expenditures were legally chargeable against trust funds, i.e., that they were not obligations of the United States. *Sioux Tribe,* 105 Ct.Cl. at 802, 64 F.Supp. at 332.

establish the contrary. What the court does conclude, however, after hearing the accounting witnesses and examining the documentary evidence, is that between the Indian Office and Treasury/GAO review, an assessment was made that an appropriation fund directly tied to Red Lake or Minnesota Chippewa funds was chargeable and that the review process served as a gross sieve to eliminate disbursements not related in any way to a given tribe, or not related to a particular agency. In addition, the court has explained above that it will assume that the technicians doing the 1929 and 1963 reports accurately characterized expenditures. If a technician categorized an expenditure, for example, as "Fuel and Light" or "Boats and Docks," without more, the court will assume that the disbursement was properly classified. Consequently, those disbursement categories that on their face are for an agency purpose are disallowed. As to other categories, the court will require the plaintiff to make at least a prima facie showing either that the category in fact should be disallowed, or that specific monies charged to the Band did not in fact benefit the Band, or that the supporting materials do not reflect any purpose.[29]

### 1. Sample 555 (Code 1, No proof)

#### a. Sample 555-1

This sample covers a 1901 $150 disbursement characterized in the 1929 GAO Report as "Pay of Mechanics." Defendant concedes that that expenditure was an agency obligation. It, and any other disbursements so characterized are disallowed on that basis.

#### b. Sample 555-2

This sample covers a $3973.74 disbursement in the category "Education" for the year 1924. In the 1929 GAO Report, the amount is specifically credited to the subcategory, "Contract Schools." Gillis took exception to this disbursement, in part, because in the original 38 boxes it was not specifically documented. The court has permitted defendant to introduce subsequently other proof of the expenditure. At trial, defendant offered Dx 846 which consists of (apparently) a 1924 GAO work card showing two settlements in a total amount of $3973.74 and an excerpt from a 1924 Red Lake agent's annual report reflecting the existence of a private contract school at Red Lake. Defendant could not locate the voucher(s). It is not indicated in the report whether tuition or room and board payments were made to the contract school, although based on accounting evidence from proximate years, it is obvious that such payments were routinely made. While the same report indicates that tuition payments were made to public schools, there was a separate GAO subcategory used in preparing the 1929 Report for payments to public schools. While discretion was afforded the GAO technicians doing the 1929 report, the court accepts defendant's exhibit as proof that the expenditure did in fact take place, and that it went for tuition payments to a private contract school. The expenditure is allowed.

#### c. Sample 555-3

Defendant's exhibit 847 provides sufficient proof that $71.30 was in fact spent for "Education."

#### d. Sample 555-4

Dx 856 provides sufficient proof that $300 was in fact spent for "Education— Fuel and Light." This disbursement falls within the definition of "food, rations, or provisions," discussed *infra* pp. 417–19, however, and thus may not be used as an offset.

#### e. Sample 555-5

Dx 848 provides sufficient proof that $11,995.25 was spent for "Payments to Minnesota Public School System." The back up materials also demonstrate, however, that Nelson Act funds were impermissibly used to furnish a public school with

---

**29.** *Three Affiliated Tribes v. United States,* 39 Ind.Cl.Comm. 446, 466 (1977) ("Defendant in its response merely states that it was unable to identify these expenditures. Such being the case, these expenditures are improper.")

supplies and equipment. The entire amount is thus disallowed as not properly chargeable against tribal funds. *See* discussion of education expenses, *supra* pp. 400–01.[30]

### f. Sample 555–6

This disbursement is accepted as proven, but disallowed for the same reason as sample 555–5.

### g. Sample 555–7·

Dx 850 furnishes sufficient proof that $9.30 was in fact spent for "Bridges."

### 2. Sample 556 (Code 2, failure of proof)

Plaintiff challenges 17 disbursements in this sample. Defendant concedes that six should be disallowed since they fall within categories of expenses that should have been incurred by the agency.[31] The remaining are resolved as follows:

### a. Sample 556–1

This sample relates to a voucher for unpaid per capita shares. Plaintiff's accountant witness Anthony Ambrosiano was unable to reconcile from the backup materials a claim for $2.43. At trial, defendant's accountant, William Anderson, conceded that the wrong voucher had been supplied and the court allowed, over objection, Dx 851 to be introduced. That exhibit was the correct voucher, and documents the amount. The court reaffirms its trial ruling to admit the evidence. There is no question the amount can be documented. There is no other challenge to allowance of the amount. Defendant's late production of the correct voucher, under the circumstances here, is excused. It was not the result of deceit or laziness. And, given the tens of thousands of pages of material, it is not surprising that it took the focus of plaintiff's accountants to find simple document production errors. This amount and others like it (Samples 556–3) are allowed.

### b. Sample 556–4

Defendant's witness Anderson was able to trace the contested amount ($3.70) sufficiently, and the court accepts the documentation as proof of delivery. However, this amount is disallowed as "food, rations, or provisions," since it was described as "peppers, spices, etc."

### c. Sample 556–6

Proof sustained for the same reason as sample 556–4.

### d. Samples 556–9, 10

William Morgan testified for defendant concerning the use of Nelson Act funds between 1921 and 1947 for care of old, infirm, or indigent Indians. Such expenditures were specifically approved by Congress, and separate accounting was maintained for such monies. Discretion was given to the Secretary to designate recipients, and in many years, to waive any obligation of repayment. Monies were in fact so distributed to members of the Red Lake Band, and the Secretary invariably waived repayment. Monies were spent for food, clothing, materials to build houses, and for funeral necessities. The number of persons receiving aid was monitored for several years, and reports reflect that in some years, out of approximately 1700 Indians, over 200 received rations or miscellaneous supplies. There is no suggestion that there was any favoritism or theft. While these items went for individual consumption, given the substantial number of persons eligible only on a showing of need, the court finds that they benefitted plaintiff. Elsewhere, however, the court discusses the non-allowability, as an offset, of expenditures for "food, rations, or provisions." Almost by definition, aid to indigent Indians constitutes food, rations, or provisions. Clearly, foodstuffs and clothing are within any construction of "food, rations, or provisions," and thus not offsets. The court also finds that lumber to build or repair houses of indigent Indians

---

**30.** At p. 401, the court disallows $28,398.48 for what appears, in part, to involve the same monies.

**31.** *See supra* pp. 404–05.

as well as coffins to bury indigent Indians are provisions.

With that background, samples 556–9 and 10 are disallowed both for failure of proof and as offsets. While the vouchers are accepted as proof of the disbursement and receipt of the goods, the court finds nothing on the original documents themselves which demonstrates that the monies were spent for burial. Consequently, even if burial expenses were not disallowed as offsets, there is no proof that these expenses were not for food or clothing. Secondly, assuming the expenditures were in fact for burial, they are not allowed as offsets.

e. Sample 556–11

Allowed. Established by the documentation.

f. Sample 556–14

Disallowed for the reasons discussed in paragraph d. above. The court notes that it is satisfied that goods were delivered, and that the indigent Indians fund was properly charged, but defendant provided no documentation of purpose. The court has ruled elsewhere that it will not allow aid to indigent Indians as an offset because it is "food, rations, or provisions." In any event, for aught that appears, the amounts could have been for food, since many food vouchers were attached.

g. Sample 556–15

This reflects an expenditure of $6.75 described by the GAO as "agricultural implements and equipment". Defendant's exhibit 855 reflects that payment was made out of an account for agency expenses. Thus this amount, while proven, is disallowed as an agency expense.

h. Sample 556–16

Although similar expenditures may be readily provable, this particular item is disallowed. The source of the figure for retirement was never explained by defendant through a witness or documentation.

i. Sample 556–17

The figure in question can be documented. The court notes, however, that the amount cannot be used as an offset. $28.12 is disallowed as an agency expense, and the balance is clearly for food and provisions.

3. Sample 557 (Code 3, purpose not shown)

Defendant concedes three of the samples as improper agency expenses. With respect to the rest, the court finds as follows:

a. Sample 557–1

Allowed. The documentation is sufficient to show an educational purpose.

b. Sample 557–2

Disallowed as to proof of purpose. The voucher provides no basis for distinguishing the purpose of the disbursement. Moreover, the three figures on the GAO notation add to $73.39 an amount charged to "Agency Expense."

c. Sample 557–3

Disallowed as to proof of purpose. The voucher gives no clue as to how the gasoline in question was used, and the GAO category is susceptible to agency use.

d. Sample 557–4

Disallowed as to proof of purpose. Witness Anderson conceded this was likely an agency expense.

e. Sample 557–5

Allowed insofar as proof and purpose are concerned. There is no reason to doubt that the $169.75 was spent on the hospital, which was not an agency expense. The figures match, and this is not the type of expenditure in which the court finds more precision is necessary than the appropriation code and the GAO categories, unlike other funds and categories which are more susceptible of an agency use. The court notes, however, that this amount would not be allowed as an offset, due to a lack of breakdown of purpose. There is no way to

distinguish precisely how the $169.75 was spent, but the backup materials include numerous food and clothing items, thus this disbursement is disallowed as "food, rations, and provisions."

### f. Sample 557-6

Same ruling as to proof and purpose as sample 557-5. The amount is subject, however, to the court's ruling, elsewhere, concerning indigent Indians.

### g. Sample 557-7

Same ruling as sample 557-6.

### h. Sample 557-11, 12

Allowed both as to proof and beneficial purpose.

### i. Sample 557-13

Allowed. The court understands plaintiff to be objecting to the lack of clarification of the purpose of travel of the social worker, Ms. Effie Adams. The fact that she is a social worker traveling on business for the agency is sufficient as to proof of purpose. The court does not understand plaintiff to be challenging the allowability in general of the social worker's salary or expenses.

### 4. Sample 558 (code 8, duplication)

In terms of the purpose of this code, to identify what plaintiff understandably assumed were duplicate claims based on the same voucher, defendant's subsequent documentation cleared up the deficiencies. All the samples are allowed as to proof. Samples 1, 4, and 5 were conceded by defendant to be non-allowable as agency expenditures, however.

### 5. Sample 559 (Code 11, expenditure for federal purpose)

Of the 45 samples challenged by plaintiff, defendant concedes 22 as being improper as agency expenses. The court rules as follows as to the remainder:

### a. Sample 559-4

This sample raises in general the question of the allowability of monies spent on agricultural purposes. For the reasons set forth in the background fact findings at pages 179-81, the wagon isolated in sample 559-4 is disallowed.

### b. Sample 559-5

Disallowed. No proof was offered that it was not an agency expense. The voucher refers to gasoline "For Red Lake Agency" and refers to "auto operation, all Govt. owned." In the face of this, the fact that the GAO technician characterized this as an expense for indigent Indians is overcome.

### c. Sample 559-7

Allowed. Although the purpose designation for this threshing machine boiler is "agency" on the voucher, there was other evidence that the threshing machine was used for Indian crops.

### d. Sample 559-9

Disallowed. There is no proof this is an agricultural expense. The voucher states that these posts are for "repairing and rebuilding agency fence."

### e. Sample 559-11

Disallowed. There is a contradiction in the voucher which the defendant has the obligation to clear up. At one point, there is an undisturbed statement that the gasoline in question was to go to the Cross Lake School. At another point, a similar notation is crossed through by typing and the words "Red Lake Agency" appear. The court must assume that the correction came later and had some purpose.

### f. Sample 559-15

Disallowed. The backup data specifically suggests that the coal was used at the agency rather than the school.

### g. Sample 559-16

Allowed as to non-agency purpose, however, it cannot be used as an offset, as it is food, rations, or provisions.

h. Sample 559-18

Allowed. By the terms of the Nelson Act, surveying expenses are to be paid out of the proceeds of the land and timber sales.

i. Sample 559-20

Disallowed. Although drainage of the Clearwater area might ultimately be beneficial to the Indians' agricultural pursuits, the court views this subsistence expense of the agent as properly part of his general administrative and representational responsibilities.

j. Sample 559-22

Allowed. Disbursement sufficiently differentiated at the time of the voucher as to hospital expense.

k. Sample 559-24

Disallowed. The voucher has a blank titled, "School or Agency," obviously reflecting the potential distinction in end use. The voucher in question admittedly shows receipt at Red Lake School, and as originally filled in showed "Red Lake School" as the user. However, it was apparently contemporaneously annotated with "Agency, etc." Without the latter comment, the court would allow the expense; with it it becomes the Government's obligation to differentiate. It did not do so.

l. Sample 559-25

Disallowed. While the voucher cover indicates a school use, the backup material states that the $70 in question went for agency use as specifically distinguished from school use.

m. Sample 559-26

Disallowed. While the court would allow horses specifically referenced for agricultural or school uses, the voucher in question refers to horses for both the school and subagency for "plowing, hauling." Defendant has not provided sufficient proof of a permissible expenditure.

n. Sample 559-27

Disallowed. Despite the allocation of the questioned portion of the invoice to "indigent Indians," the backup materials do not, as defendant argues consist of home repair materials. They appear to be office supplies. To the extent that they are home repair materials, the court in any event would not allow them as an offset.

o. Sample 559-28

Disallowed. Presumably the tire reflected here did not go on an Indian automobile, but on an agency car used to visit Indians. It would thus be for a mixed purpose.

p. Sample 559-29

Disallowed. Telegrams, even to order supplies for the indigent program, are more in the nature of ordinary administrative expenses of the agency.

q. Sample 559-30

Disallowed. The steamboat in question may have facilitated access to Cross Lake School, but its educational purpose is too attenuated for it not to be treated as part of the agency's equipment inventory in operating the reservation.

r. Sample 559-31

Disallowed. There was no proof as to the use of the boilers in question.

s. Sample 559-33

Disallowed. See sample 559-30.

t. Sample 559-36

Disallowed. While the voucher in question was received at the Red Lake School, the equipment in question was designated as "For Agency"; specifically for use in "manufacture of lumber at Agency sawmill."

u. Samples 559-40, 42, and 43

Disallowed. See discussion at pages 472-73.

v. Sample 559–45

Disallowed. The agency farmer's subsistence expenses traveling to a state fair are more properly characterized as general representational and administrative expenses for the agency.

6. Sample 560 (Code 12, expenditure for individual benefit)

a. Samples 560–1, 2, 3, 4, 5, 6, 7, 8

Allowed as to benefit. Disallowed as payments on the claim. *See* discussion as to sample 561 *infra* pp. 418–19.

b. Sample 560–10

Allowed as to benefit.

7. Sample 561 (Code 99, food, rations and provisions)

■ A 1974 amendment to the ICC Act provided that "expenditures for food, rations, or provisions shall not be deemed payments on the claim." Act of Oct. 27, 1974, Pub.L. 93–494, § 2, 88 Stat. 1499 (codified at 25 U.S.C. § 70a (1976)). Consequently, when the total amount for which defendant is responsible to account is ultimately determined by later trial or settlement, and after it is determined as a result of this opinion how much defendant has properly accounted for in terms of allowable disbursements, then those allowable disbursements are treated as payments on the claim, as reduced by amounts which cannot be treated as offsets because of the 1974 amendment.[32]

Although these calculations cannot be made for the present, the court directed the issue of whether the disbursements in question constitute "food, rations, and provisions" in order to take advantage of its examination of original materials in connection with the allowability of disbursements. This became, by agreement of the parties, a question to be presented, at least initially, on a sample basis. For that reason, plain-

tiff's exhibit 561 illustrates use of Gillis Code 99. Before the court can address those samples not conceded by defendant, some effort must be made to define the terms in question.

The court begins with the observation that any disbursements which the GAO reports characterize as food or provisions or rations will be taken at face value. Those are not allowed as offsets, even if part of a larger category which is allowable. On that basis, the following two categories are disallowed: "Education: provisions; Provisions and other rations." However, application to other disbursements, however characterized by the GAO, becomes quite difficult. Plaintiff's accountant applied Code 99 to "any items of subsistence, of a nature that provided food, clothing, or shelter."

A review of BIA regulations and legislative materials provided by defendant suggests that rations were seen as basically food items: beans, coffee, corn, hominy, lard, meal, meat, oatmeal, rice, salt, soda, sugar, and tobacco. The more difficult issue is, what constitutes provisions?

Defendant argues, in substance, that the disallowance for provisions should be limited to those items which were historically treated as subsistence rations in treaties with the various Indian tribes and in contemporaneous regulations. This has the general effect of permitting such things as clothing, household goods, home repair materials, agricultural supplies, and hardware to be used as payments on the claim. In addition, defendant supplies dictionary definitions which suggest a nutritional character for all three terms.

An examination of decisions applying the 1974 amendment suggests a few guiding principles. First, the legislation was prompted by litigation concerning one tribe, and specifically one claim—the Black Hills claim by the Sioux Tribe. The Court of Claims rejected, however, the argument

---

**32.** Section 2 of the ICC Act, 25 U.S.C. § 70a, provides that "in determining the quantum of relief, the Commission shall make appropriate deductions for all payments made by the United States on the claim...." Defendant will thus be ultimately credited with other non-disbursement payments on the claim, such as allowable gratuities. *See Sioux Tribe v. United States,* 7 Cl.Ct. 481 (1985).

that the legislation should be limited to that one circumstance. It was drafted in general terms and thus applies to the present case. *See Prairie Band of the Pottawatomie Tribe v. United States*, 215 Ct.Cl. 1, 12, 564 F.2d 38, 44 (1977). It is unrealistic, nevertheless, to go further and conclude that the circumstances of the Sioux treaty and the government conduct leading to the amendment cannot be taken into account in deciding what Congress intended to exclude. A fair reading of the *Pottawatomie* decision, as well as the underlying decision by the ICC,[33] suggests that the types of items delivered to a tribe under the terms of the particular treaty and legislation are relevant considerations. The ICC points out, for example, that the treaty with the Sioux made specific provision for delivery by the Government of such items as "clothing, agricultural supplies (seed, fertilizer), farming implements or equipment (hoes, plows, fencing), and livestock." *Pottawatomie Tribe*, 38 Ind. Cl.Comm. at 225 (citing 15 Stat. 635). The background to the treaty in the Sioux claim is described by the Court of Claims, in *Pottawatomie*, and by this court in *Sioux Tribe v. United States*, 7 Cl.Ct. at 468. The violence and deprivation which prompted the immediate need for materials and sustenance in that case have not been shown here.

One common thread in the cases is the idea of sustenance. *Pottawatomie Tribe*, 215 Ct.Cl. at 16 (the phrase encompasses "feeding and sustaining"). In *Minnesota Chippewa*, the Commission disallowed the following items, presumably as provisions "related to [the Indians] basic subsistence needs": cloth, thread, blankets, clothing, cooking utensils, guns, powder, shot, files, shovels, axes, knives, fish hooks, and tents. 41 Ind.Cl.Comm. at 259; *see also Bois Forte Band v. United States*, 39 Ind.Cl. Comm. 300, 306 (1977).

The legislation in question here was not as specific in terms of what the Band would receive for "relief and civilization." And although there were ultimately relocations involved, they were considerably different than the post-war forced relocations in the Sioux case. The court concludes that the phrase "food, rations, or provisions" in this action must be construed as basic subsistence items. Specifically, it does not include education expenses, other than food, and it does not include agricultural expenses for the school or the reservation as a whole, such as the grist mill, or combines. It does, however, include individual gardening devices such as hoes and seed as well as related items, clothing, and as discussed later, aid to indigent Indians. This distinction is based on the wording of the Nelson Act itself, which notified the Band that its monies would be used for education, civilization and self support. In light of this discussion, therefore, the following specific rulings are made as to those samples still contested.

a. Sample 561–1

Cooking utensils for Red Lake School. Disallowed. (I.e., food, rations, or provisions.)

b. Sample 561–2

Agricultural equipment for schools. Allowed.

c. Sample 561–3

Medical supplies to school. Allowed.

d. Sample 561–5

Clothing. Disallowed.

e. Sample 561–6

Thread. Disallowed.

f. Sample 561–7

Coal for Red Lake School. Allowed.

---

33. *Prairie Band of the Pottawatomie Tribe v. United States*, 38 Ind.Cl.Comm. 128, 225–29 (1976). See also *Minnesota Chippewa Tribe v. United States*, 41 Ind.Cl.Comm. 249 (1978), where the ICC found that expenditures for clothing and the school farm were "food rations, or provisions," and disallowed them. The treaty obligation of the United States in that case, however, included payment for the land by providing "goods," "provisions," and the implements of agriculture. Treaty of August 2, 1847, 9 Stat. 904.

g. Sample 561–9

Repair to thresher. Allowed.

h. Sample 561–10

Wagon. Allowed.

i. Sample 561–11

Stoves used by Red Lake physician. Allowed.

j. Sample 561–12

Seed for general use. Disallowed.

k. Sample 561–13

Plaster board. Allowed.

l. Sample 561–14

Seed for general use. Disallowed.

m. Sample 561–16

Stoves. Allowed.

n. Sample 561–17

Harnesses. Allowed.

Although not addressed to the court through samples, the court rules, as alluded to earlier, that expenditures for indigent Indians are by their very nature for subsistence. The only possible exception is money spent for burial, but the court finds that burial of persons whose families are too poor to pay for the expense is a necessity of death, if not life.

### V. ADDITIONAL FACT FINDINGS

What follows are fact findings which are of a background nature, rather than findings with respect to the allowability or not of specific expenditures. Many are drawn in part from the proposed fact findings of the parties.

### A. *The Nelson Act*

During the nineteenth century, the several bands of the Minnesota Chippewa Tribe entered into numerous treaties with the United States Government. *See Minnesota Chippewa Tribe v. United States*, 11 Cl.Ct. 221, 224–25 (1986). By the Act of May 15, 1886, ch. 333, 24 Stat. 29, 44, Congress authorized the Secretary to enter into negotiations with the Minnesota Chippewa for the modification of existing treaties, changes in reservations, and the "just and equitable liquidation" of outstanding claims that the Chippewa had against the Government. The Secretary appointed three commissioners to form the Northwest Indian Commission for this purpose. The Commission entered into two agreements. In an agreement negotiated with the Red Lake Band, the Band agreed to cede approximately two million of the three million acres it then possessed in return for the Government's promise to hold this land in trust and sell it for the benefit of the Band. The Government negotiators entered into a similar agreement jointly with all but three of the remaining Minnesota Chippewa Bands other than Red Lake.

The Act of May 15, 1886 required that Congress ratify the negotiated agreements before they became law. Once in Washington, the Commissioner of Indian Affairs recommended ratification of both agreements, although he felt that they were not entirely satisfactory. President Cleveland submitted both agreements to Congress on February 17, 1887. The agreements were printed and referred to the committees on Indian affairs in both the Senate and the House of Representatives.

While the negotiated agreements were in committee, Knute Nelson, a representative from Minnesota, introduced a bill solely concerning the Red Lake Band. This bill called for the Band to cede its entire reservation to the United States in return for a permanent, interest-bearing fund. After the cession, and before any of the land was opened for sale, the Band was entitled to select a tract of land between 160,000 and 300,000 acres that would be used to make allotments for the Indians. If the Band did not select a tract within sixty days after ceding its reservation, the Secretary was entitled to select a section of the former reservation for the Indians. Upon consideration of Nelson's bill and the 1886 agreements, the House Committee on Indian Affairs reported out a substitute bill that

after several amendments became known as the Nelson Act.

Accompanying the bill reported out by the House committee was a report on the 1886 agreements negotiated by the Northwest Indian Commission, H.R.Rep. No. 789, 50th Cong. 1st Sess. (1888). The report completely rejected the 1886 agreements. The report stated that the Red Lake reservation was in actuality common property belonging to all Chippewa. Furthermore, the Commission believed that it would be contrary to policy to give a relatively small group of Indians (the Red Lake population then numbered about 1100) the proceeds generated by the sale of the ceded property, plus allotments on the diminished reservation, plus common ownership among Band members of non-allotted land remaining on the diminished reservation.[34] After the House committee bill was re-written in the Senate Committee on Indian Affairs and a few amendments were made, the bill was passed and signed by the President on January 14, 1889, becoming known as the Nelson Act.

The Nelson Act provided for the cession and relinquishment of Chippewa lands in return for a trust fund generated by the proceeds from sales of land and timber on the ceded territory. Section 1 authorized the President of the United States to appoint three commissioners to negotiate with the different Minnesota Chippewa Bands for the relinquishment of title to all reservations except for those at Red Lake and at White Earth. At these two reservations, the commissioners were to negotiate the relinquishment of all lands except for that amount necessary to make allotments for the Indians. All agreements except with respect to the Red Lake reservation required the written assent of two-thirds of the males over eighteen years of age in that particular Band. The agreement for the cession of the Red Lake reservation required the written assent of two-thirds of the males over eighteen years of age among all the Minnesota Chippewa.

Section 2 provided for the bonding and compensation of the commissioners.

Section three provided for the removal of all Chippewa except those on the Red Lake and White Earth reservations, for the allotment of lands to the Indians on the Red Lake and White Earth reservations, and, for any other Minnesota Chippewa Indian, for an allotment of land in lieu of removal to White Earth. Under this plan, allotments could be made in one of three places: (1) within the portion of the White Earth reservation not ceded under section one; (2) within the portion of the Red Lake Reservation not ceded under section one; and (3) where Chippewa were already situated at the time of the act's passage, instead of undergoing removal to the White Earth reservation. Section 3 provided that allotments for the Chippewa would be in conformity with the Act of February 8, 1887, ch. 119, 24 Stat. 388 ("the Dawes Act"), which authorized the President to allot lands to the Indians residing on reservation lands generally.

Under section 4, the Commissioners of the General Land Office were to survey the ceded lands. The lands were then to be divided into forty-acre lots by examiners appointed by the Secretary to ascertain on which lots pine timber was standing or growing (called "pine lands" in the act), how much pine it contained, and its value, to be measured at not less than $3.00 per thousand feet. The Secretary was given the authority to approve, modify, or reject all such appraisals. All lands other than "pine lands" were to be classified as "agricultural lands." In addition, section 4 provided for the compensation of the examiners.

Section 5 required the advertisement and public auction of pine lands in forty acre parcels for no less than their appraised value. The parcels not sold were subject to private sale at their appraised value.

**34.** The House Committee report's assertion that the Red Lake reservation was owned jointly by all of the Minnesota Chippewa Bands was subsequently found to be erroneous by the Court of Claims and the Supreme Court. *See Chippewa Indians v. United States,* 80 Ct.Cl. 410, 426 (1935), *aff'd,* 301 U.S. 358, 375, 57 S.Ct. 826, 81 L.Ed. 1156 (1937).

Section 6 provided for disposition under the homestead law of the agricultural lands not allotted to the Chippewa. Homesteaders were to be entitled to a patent on their land after five years of residence and payment of $1.25 per acre, divided into five equal, annual installments.

Section 7 detailed the creation of the trust funds that are the subject of the present litigation. It provided in part:

[t]hat all money accruing from the disposal of said lands in conformity with the provisions of this act shall, after deducting all the expenses of making the census, of obtaining the cession and relinquishment, of making the removal and allotments, and of completing the surveys and appraisals, in this act provided, be placed to the credit of all the Chippewa Indians in the State of Minnesota as a permanent fund, which shall draw interest at a rate of five per centum per annum, payable annually for the period of fifty years, after the allotments provided for in this act have been made....

Section 7 also provided that the permanent fund and its interest "be expended for the benefit of said Indians...." In particular, it required that one-half of the interest that would accrue was to be paid in cash in equal shares annually to the heads of families and guardians of orphan minors, one-fourth was to be paid the same way to all others, and the remaining one-fourth was to be used to establish and maintain a system of free schools for the Chippewa. As to the proceeds of the sales, section 7 provided that

[a]t the expiration of the said fifty years, the said permanent fund shall be divided and paid to all of said Chippewa Indians and their issue then living, in cash, in equal shares; *Provided:* That Congress may, in its discretion, from time to time, during the said period of fifty years, appropriate, for the purpose of promoting civilization and self-support among said Indians, a portion of said principal sum, not exceeding five per centum thereof.

Section 7 also recognized that the proceeds from the sale of land and timber would not be generated immediately upon the cession of the Minnesota Chippewa reservations. Some delay would result because of the time necessary to survey the ceded lands and to appraise the ceded land and timber. It would take additional time to make and fill allotments for the Chippewa, both on the unceded portions of the reservations at White Earth and at Red Lake, and in areas where Chippewa decided to take an allotment where situated instead of being removed to White Earth. Finally, section 7 provided that when the permanent fund exceeded three million dollars, the United States would be reimbursed for its advance interest payments by that excess.

Section 8 provided for the appropriation of funds for the tasks and first advance interest payment required by the Act, and for a report to Congress after their expenditure.

B. *1889 Negotiations with the Red Lake Band*

On February 26, 1889 President Benjamin Harrison appointed three commissioners to negotiate cession agreements pursuant to the Nelson Act. The commissioners were former U.S. Senator from Minnesota Henry M. Rice, Bishop Martin Marty, Roman Catholic Bishop of North Dakota, and Joseph B. Whitting of Wisconsin. In preparation for their negotiations, the Commission had printed and distributed five hundred copies of the Nelson Act and several hundred copies of the Dawes Act. The copies were distributed among missionaries, teachers and other government employees, and Indians who read English. The commissioners were accompanied by Reverend E.S. Peake and Father Aloysius, O.S.B., both of whom lived and worked among the Chippewa.

The Commission's first negotiations were with the Red Lake Band. Several councils were held between the commission and members of the Band between June 29 and July 6, 1889. The progress of the councils between the commission and the various bands was recorded in transcripts made of the meetings.

The commissioners found the Red Lake Indians to be "intelligent, dignified, and courteous, but for several days indisposed to give a favorable hearing." The Commission's report stated that reaction to its proposals was "not as favorable as those made three years ago [1886], which did not require the proceeds of the [Red Lake] reservation to be shared with others." The transcripts establish that while members of the Band did initially object to the terms of the Nelson Act, a large majority of the males eighteen years of age and older approved the agreement.

At the first council at Red Lake on June 29, 1889 the Nelson Act was read and translated to members of the Band. This council was then adjourned to allow the Band to deliberate on the proposal. The Band had not finished its deliberations by the time of the second council on July 1, so it was quickly adjourned. At the start of the third council on July 3, Ne-gaun-ah-quod, stating that he was the Band's spokesman, gave its position: "Your mission here is a failure. We never wish hereafter to sign any instrument where anything is blind." This statement was explained to mean that the Indians did not wish to sign because they did not play a role in the drafting of the Nelson Act. Commissioner Rice responded by reminding the Indians that a refusal to sign now would result in a wasting of their land and timber. He also implied that the U.S. President would be displeased by their refusal to sign, stating:

> Your old and young men around here are idle; we wish to ask you, as men, how much longer you think the Great Father will wait.... Is the President going to wait longer, while your pine is being destroyed, and then be compelled to support you?

Rice's mention of "destroyed pine" referred to timber that was burned on the reservation. These fires destroyed timber and other vegetation that comprised the natural habitat of wildlife that the Indians hunted. The Indians blamed the fires on the white settlers who were encroaching on their reservation.

Bishop Marty similarly intimated that should the Indians refuse to agree to the terms of the Nelson Act, such a decision would be tantamount to suicide. According to Marty, this would have serious consequences apart from those concerning the Indians' life:

> I am afraid that you are injuring yourselves. Last winter you had nothing to live upon. If the missionary had not given you work by having you cut logs for school buildings, a good many of you would have starved.... We now have these logs cut, and we are going to put up other buildings this summer, but we were under the supposition that you were willing to help yourselves and go ahead. If however, you do not want to listen to us and do not wish to take advice, but want to remain as you are, there will be no use in putting up any buildings for you, or for your children. These men may be proud and self-willed, and think they can do what they please, but I wish they would remember their women and children who will, in consequence, be suffering.... If you should kill yourselves and your children, the Master of Life will not receive you in the heavens.

It was not until near the conclusion of the third council that a member of the Red Lake Band objected to sharing the proceeds from the sale of their own land and timber. Ah-nuh-ne-ay-ge-shig addressed this issue: "The money that you wish to have as a fund, which will originate the interest, whatever belongs to the Red Lake Indians, we do not want consolidated with the money of any other Band." This council was adjourned shortly thereafter.

Commissioner Rice responded to the Red Lake concern about sharing proceeds at the fourth council on July 4, 1889. Rice recognized that the Red Lake reservation was much larger than the other reservations, but limited the significance of this fact by stating that "it is not always the largest piece of land that is worth the most money." Rice then described the resources of the Fond du Lac, Bois Forte, Grand Portage, and Mille Lac reservations.

Bishop Marty stated that he hoped that it did not become known that the Chippewa did not want to aid each other. He warned them that if they remained against each other they would always be poor. Marty further encouraged them to do what would be pleasing to God, namely ratify the Nelson Act. Again, Marty spoke of the fruits stemming from ratification:

> There is the money in the treasury of the United States under this act, to be spent for your benefit. If you need help, you can get it from this, but if you don't sign this agreement, there is no help for you. For this reason I told you yesterday to think of your women and children.

Commissioner Rice, speaking near the end of the fourth council about the principal fund, stated "[a]t the end of fifty years whatever may be in the Treasury, and it will be an immense sum, will be divided among you."

At the fifth council at Red Lake on July 5, the Indians expressed their refusal to sign any agreement until certain alleged depredations were compensated. The commissioners stated that they would take these concerns back to Washington, D.C. When no agreement was reached with regard to the Nelson Act at this council, Bishop Marty requested that all Indians supporting the agreement come to a council the following morning, and that all others stay away.

Despite Bishop Marty's effort at persuasion, members of the Red Lake Band who came to the sixth council held on the morning of July 6 again expressed their opposition to sharing the proceeds of their property with the other Chippewa. To this effect, May-dway-gon-on-ind stated: "[i]t is our wish that there be no consolidation, but that whatever we get here we alone should get. That we should receive, solely, the profits of our reservation. We want an expression of your views again." Commissioner Rice explained that the Chippewa were at one time consolidated, owning all land in common, and that it wasn't until after 1825 that the Bands had separate territories. He further explained that Indians from other Chippewa Bands would not

have any right upon Red Lake property, nor would Red Lake Indians have any right upon property belonging to other Chippewa Bands.

The Red Lake Indians then became more agreeable to the commission's proposal. Nah-gaun-e-gwon-abe asked that the council "adjourn for a little while so we may come to an understanding among ourselves, which we guarantee we will do." Pus-ne-naus concurred, stating that the Indians had all made a mistake, "but now when we meet the commissioners we find the dish they have to offer us is very sweet, and we will like it."

At the seventh and final council at Red Lake on the afternoon of July 6, the Red Lake Indians presented their proposal for lands that they wanted to maintain as their reservation. They wished to cede "all the land that is worth anything"; the remainder they wished to retain for themselves. The transcript of the meeting indicates that this decision was based on the Red Lake belief that the retained land, although of no value to the white man, was an important source of fish and game. Commissioner Rice said that the commission would make a few corrections in the boundaries outlined by the Red Lake Band. A large majority of the Red Lake males over eighteen years old subsequently signed the agreement.

President Harrison approved the agreements made with the Minnesota Chippewa Bands on March 4, 1890. Under the 1889 Act, the Band ceded in trust 2,905,921 acres and retained a reservation of 663,773 acres. Immediately prior to the Act the Red Lake Reservation was comprised of 3,869,694 acres.

In conformance with the Nelson Act, monies generated by the sales of land and timber from the ceded Chippewa reservations and portions thereof were deposited in the United States Treasury to the credit of the Minnesota Chippewa at five percent simple interest. After the United States was reimbursed for monies it advanced to the Chippewa, the Government began to disburse monies from the principal and interest funds. Allotments were soon made

on the unceded portion of the White Earth Reservation and in areas where the Chippewa decided to remain rather than be removed to White Earth. No allotments were made at Red Lake, although members of the Band continued to live on the unceded portion of the Red Lake Reservation.

### C. *Bureau Requests for Annual Appropriations*

Between fiscal years 1912 and 1945, the BIA made annual requests for authorization to withdraw monies from the principal fund. For fiscal years 1940 through 1945, these requests also applied to the Red Lake principal fund, which was segregated from the Chippewa principal fund by the Act of June 15, 1938, ch. 436, 52 Stat. 697.[35]

The BIA requested monies from the principal fund for a variety of purposes, but generally speaking, these requests fell into one of three categories: (1) civilization and self support, later referred to as general support; (2) public school tuition and care of children at private schools; and (3) hospitals. Depending on the year, requests for civilization and self support money included specific items such as administrative expenses, salaries for agency employees, clothing and subsistence needs, relief of indigent Indians, public school construction, medical supplies, agricultural programs and road construction. For some years, expenditures for Chippewa hospitals were included as part of civilization and self-support. The BIA also requested monies in isolated instances for such purposes as purchasing lands for homeless Indians, bridges, council halls, and attorneys' fees.

The BIA provided justifications for its annual requests for monies from the principal fund, including a list of expenditures made from the principal fund in a recently concluded fiscal year. In some years, these lists provided some detail for administrative expenses, public school expenses, aid to indigent Indians, and hospital sup-

port. *See, e.g., Indian Appropriation Bill: Hearing Before a Subcomm. of the House Comm. on Indian Affairs,* 64th Cong., 1st Sess. 69–71 (1916); *Interior Department Appropriation Bill, 1924: Hearing Before a Subcomm. of the House Comm. on Appropriations, 1924,* 67th Cong., 4th Sess. 323 (1922); *Interior Department Appropriations Bill, 1930: Hearings Before the Subcomm. of the House Comm. on Appropriations,* 70th Cong., 2nd Sess. 1138, 1238 (1928); *Interior Department Appropriations Bill, 1937: Hearings Before the Subcomm. of the House Comm. on Appropriations,* 74th Cong., 1st Sess. 1047, 1085 (1935).

Little variation occurred in the BIA's requests for civilization and self-support monies. Up through fiscal year 1922, the justifications generally provided the following: the number of Minnesota Chippewa Indians that the BIA supervised; the need to use the principal fund because it was the only one available to enable the agency to carry out its work for the Chippewa; that it was established policy to require Indian tribes with large trust funds deposited in the U.S. Treasury to pay their administrative expenses; that this money would pay the cost of administration, salaries, subsistence, clothing, and medical supplies; and that the amount requested was less than five percent of the principal fund.

Beginning in fiscal year 1923, the BIA began to regularly itemize its requests for civilization and support monies. For example, in fiscal year 1923, the civilization and self support request included $42,500 designated for general agency purposes, $20,000 for construction of public schools, $15,000 for indigent Indians, and $17,500 for hospital support.

Again, the BIA's justifications for these items remained consistent from year to year. The administrative expense was necessary for pay of "employees and other

---

**35.** Although the funds were segregated in October 1939 pursuant to the Act of June 15, 1938, the Indian Office did not request monies separately for the Red Lake Band and the other Minnesota Chippewa. Nor did Congress authorize withdrawals particularly from the Red Lake principal fund, even when authorizing withdrawal of monies for Red Lake only. Plaintiff does not assert any claim that Congress never authorized expenditures from the Red Lake principal fund, however.

necessary expenses." *See, e.g., Interior Department Appropriations Bill, 1925: Hearings Before the Subcomm. of the House Comm. on Appropriations*, 68th Cong., 1st Sess. 310 (1924). Money for public school construction would "be used for the construction, equipment, and maintenance of additional public schools located at places contiguous to Chippewa Indian children now without proper facilities." *Id.* Money for indigent Indians was "necessary to provide food and other supplies for old and indigent Chippewas unable to support themselves." *Id.* The expenditure for Indian hospitals was needed for "operation and upkeep of hospitals maintained by the Government for the Chippewas of Minnesota." *Id. See also Interior Department Appropriation Bill, 1923: Hearings Before the Subcomm. of the House Comm. on Appropriations*, 67th Cong., 2nd Sess. 350 (1922); *Interior Department Appropriation Bill, 1924: Hearings Before the Subcomm. of the House Comm. on Appropriations*, 67th Cong., 4th Sess. 324 (1922); *Interior Department Appropriation Bill, 1926: Hearings Before a Subcomm. of the House Comm. on Appropriations*, 68th Cong., 2nd Sess. 975–76 (1924); *Interior Department Appropriation Bill, 1927: Hearings Before the Subcomm. of the House Comm. on Appropriations*, 69th Cong., 1st Sess. 466–67 (1925); *Interior Department Appropriation Bill, 1928: Hearings Before the Subcomm. of the House Comm. on Appropriations*, 69th Cong., 2nd Sess. 389–90 (1926).

Requests for public school construction and hospital support as part of civilization and self-support monies continued through fiscal year 1928. Thereafter, to the extent funds were requested for these programs, the BIA identified the items separately.[36]

With respect to agency expenses and indigent relief, the BIA continued to request monies for these programs as a part of civilization and self support and submit similar justifications through fiscal year

1937. Requests for aid to indigent Indians, however, were augmented by statements to the effect that Minnesota winters were harsh and difficult to survive. It was therefore necessary to expend funds "to prevent hardship and distress." *Interior Department Appropriation Bill, 1930: Hearings Before the Subcomm. of the House Comm. on Appropriations*, 70th Cong., 2nd Sess. 1238 (1928); *see also, Interior Department Appropriation Bill, 1931: Hearings Before the Subcomm. of the House Comm. on Appropriations* 71st Cong., 2nd Sess. 687 (1929); *Interior Department Appropriation Bill, 1932: Hearings Before the Subcomm. of the House Comm. on Appropriations* 71st Cong., 3rd Sess. 1197 (1930); *Interior Department Appropriation Bill, 1933: Hearings Before a Subcomm. of the House Comm. on Appropriations*, 72nd Cong., 1st Sess. 659 (1932); *Interior Department Appropriation Bill, 1934: Hearings Before the Subcomm. of the House Comm. on Appropriations*, 72nd Cong., 2nd Sess. 984 (1932); *Interior Department Appropriation Bill, 1935: Hearings Before the Subcomm. of the House Comm. on Appropriations*, 73rd Cong., 2nd Sess. 682 (1934); *Interior Department Appropriation Bill, 1936: Hearings Before the Subcomm. of the House Comm. on Appropriations*, 74th Cong., 1st Sess. 1086 (1935); *Interior Department Appropriation Bill, 1937: Hearings Before the Subcomm. of the House Comm. on Appropriations*, 74th Cong., 2nd Sess. 1108 (1936).

During the 1930's, the tone of the BIA's requests for monies from the Chippewa principal fund to pay agency expenses began to change. For example, in referring to the BIA's general policy of using tribal funds to pay agency expenses, the Assistant Commissioner of Indian Affairs stated:

The Indians universally resent it. They have a right to do so. It is totally contrary to any right conception of the obligations of a trustee, and I just want to

---

**36.** The parties did not provide any legislative history with respect to the annual appropriation for fiscal year 1929. The actual authorization for fiscal year 1929 provided monies for public

school tuition, hospitals, and road construction separately from that for civilization and self support.

get into the record the fact that we are continuing to do it in this bill ... but that we are not doing it because we think it is right. On the contrary, we think it is wrong. *Interior Department Appropriation Bill, 1935: Hearings Before the Subcomm. of the Comm. on Appropriations,* 73rd Cong., 2nd Sess. 663 (1934).

Similarly in fiscal years 1937 and 1938, the BIA acknowledged that the principal fund had substantially diminished, but nevertheless stated, "unfortunately, it becomes necessary to continue expenditures from Indian funds because of the need to hold expenditures from the Federal Treasury to a minimum." *Interior Department Appropriation Bill, 1936: Hearings Before the Subcomm. of the House Comm. on Appropriations,* 74th Cong., 1st Sess. 1085 (1935); *Interior Department Appropriation Bill, 1937: Hearings Before the Subcomm. of the House Comm. on Appropriations,* 74th Cong., 2nd Sess. 1107 (1936).

While the BIA continued to request monies from the principal fund for indigent relief through fiscal year 1945, if somewhat reluctantly, it took the position in fiscal years 1938 and 1939 that the principal fund should no longer be used to pay for administrative expenses. *Interior Department Appropriation Bill 1938: Hearings Before the Subcomm. of the House Comm. on Appropriations,* 65th Cong., 1st Sess. 1363–64 (1937); *Interior Department Appropriation Bill, 1939: Hearings Before the Subcomm. of the House Comm. on Appropriations,* 75th Cong., 3rd Sess. 379 (1938). The BIA did not request authorization to withdraw monies from the principal fund for agency expenses from fiscal years 1938 through 1945.

The BIA made its initial request for monies to pay public school tuition of Chippewa students in fiscal year 1922. That year the BIA asked for $5200 because the Indian Office had represented to certain school districts that the U.S. Government would help fund Chippewa students in public schools, but the expected funds were un-available. *Indian Appropriation Bill, 1922: Hearings Before the Subcomm. of the House Comm. on Appropriations,* 66th Cong., 3rd Sess. 321 (1921). The following year, the BIA requested $46,500 for public school tuition. In justification, the Commissioner stated:

> The Indians themselves are willing that there shall be this provision; and in accordance with our present policy we are encouraging in every way possible the children going to public schools, and paying to the schools tuition, the Indians in many instances—in most instances—not paying any taxes, and we feel that it would be in the interest of the education of these children.

*Interior Department Appropriation Bill, 1923: Hearings Before the Subcomm. of the Senate Comm. on Appropriations,* 67th Cong., 2nd Sess. 24–25 (1922).

The BIA subsequently requested authorization to withdraw between $35,000 and $48,000 from the principal fund for similar reasons on an annual basis through fiscal year 1937. In fiscal year 1938, the Bureau requested authorization to withdraw $63,-750 for public school tuition and care of children attending private schools. Monies for the care of children in private schools. Monies for the care of children in private schools were required because "[t]he capital fund of the Chippewa Indians has been reduced during the last few years to such an extent that interest thereon is not sufficient to meet these charges. Provision must be made for the children, and the charge has therefore been shifted to the principal fund to the credit of the tribe." *Interior Department Appropriation Bill, 1938; Hearings Before the Subcomm. of the House Comm. on Appropriations,* 75th Cong., 1st Sess. 1187 (1937). The Bureau offered the same justification in fiscal year 1939. *Interior Department Appropriation Bill, 1939: Hearings Before the Subcomm. of the House Comm. on Appropriations,* 75th Cong., 3rd Sess. 379 (1938). Congress continued to authorize withdrawals from the principal fund for public school tuition through fiscal year 1944.

The BIA's first request to withdraw monies from the principal fund for hospitals occurred with respect to fiscal year 1915. *Indian Appropriation Bill: Hearings on H.R. 12579 Before the Senate Comm. on Indian Affairs*, 63rd Cong., 2nd Sess. 452–53 (1914). The BIA initially requested $25,000 for one hospital, a request that the House increased to $50,000 for two hospitals. *Id.* Before the Senate committee, the Bureau requested $75,000 for three hospitals. *Id.* at 455.[37] The following year, the BIA requested $25,000 for an additional hospital to serve a Chippewa Reservation. *Indian Appropriation Bill: Hearings Before the Subcomm. of the House Comm. on Indian Affairs*, 63rd Cong., 3rd Sess. 175 (1914). The BIA's justification stated that there was "an urgent demand for facilities for care and treatment of the sick among the Chippewa Indians of Minnesota." *Id.*

In the following years through fiscal year 1922, the BIA did not make specific appropriations requests for Chippewa hospitals. Instead, such monies were an unitemized part of the authorization for civilization and self-support. *See Indian Appropriation Bill: Hearings Before the House Comm. on Indian Affairs*, 64th Cong., 1st Sess. 42 (1916). Beginning with fiscal year 1923, the BIA began to request specific dollar amounts for hospital support as a portion of the civilization and self-support money. *Interior Department Appropriation Bill, 1923: Hearings Before the Subcomm. of the House Comm. on Appropriations*, 67th Cong., 2nd Sess. 349 (1922). This practice continued through fiscal year 1928. Throughout this period, the BIA justified its requests by stating that these monies were necessary to support up to five hospitals for the Chippewa, including salaries for "physicians, nurses, attendants, other hospital employees, medical supplies, equipment, and miscellaneous expenses connected with the operation of the hospitals." *Interior Department Appropriations Bill, 1928: Hearings Before the Subcomm. of the House Comm. on*

*Appropriations*, 69th Cong., 2nd Sess. 390 (1926).

For fiscal years 1930 through 1937, the BIA requested authorization to withdraw monies from the principal fund for hospital support separately from its request for civilization and self-support. The justifications for hospital support monies during this period remained similar to those in previous years. For fiscal year 1938, the BIA recommended that authorizations for hospital support be transferred to gratuity funds, *i.e.* non-tribal funds, because of the depleted condition of the tribal trust funds. *Interior Department Appropriation Bill for 1938: Hearings Before the Subcomm. of the House Comm. on Appropriations*, 75th Cong., 1st Sess. 1304 (1937).

### D. Legislative Consideration of Non–Per Capita Withdrawals

Although congressional concern with the question of whether it could authorize expenditures from the Chippewa principal fund occurred primarily with respect to per capita payments, *see infra* pp. 432–36, the issue also arose with respect to non per capita expenditures. Several instances where Congress inquired into the propriety of these authorizations can be cited, illustrating its consideration of this fundamental question.

Initial complaints that civilization and self-support authorizations were not permitted by the Nelson Act came to the attention of Congress shortly after it enacted the first legislation allowing such expenditures. Although these first complaints were termed "vague" and not pursued extensively, *Indian Appropriation Bill: Hearings Before the Senate Comm. on Indian Affairs*, 63rd Cong., 1st Sess. 163 (1913); 53 Cong.Rec. 4755 (1916), Congress soon became aware of the full extent of Chippewa objections. *Indian Appropriation Bill: Hearings Before a Subcomm. of the House Comm. on Indian Affairs*, 65th Cong., 2nd Sess. 179–184 (1917). In particular, a Chippewa representative submitted a statement to the House subcommittee asserting that "not a dollar of the principal

---

**37.** Congress authorized the withdrawal of $50,- 000 for two hospitals in fiscal year 1915.

fund can lawfully be appropriated and used except in the event of 'failure of crops' or similar 'unforeseen misfortune,' and no such condition exists." *Id.* at 181–82.

When questioned about this assertion, the Assistant Commissioner replied that the matter was in litigation. *Id.* at 184.[38] The subcommittee did not further address the question. Nevertheless, the issue was again raised and discussed among several congressmen in House debate. 56 Cong. Rec. 1129–32 (1918). Subsequent to this discussion, the House voted to strike a proposed expenditure of $185,000 for civilization and self-support. *Id.* at 1132. The authorization, however, was reinserted by the Senate. S.Rep. No. 272, 65th Cong., 2nd Sess. 11 (1918). The Chippewa continued to object to expenditures for civilization and self-support in 1919. That year the issue was the focus of supplemental hearings. *Indian Appropriation Bill: Supplemental Hearings Before a Subcomm. of the House Comm. on Indian Affairs,* 65th Cong., 3rd Sess. 3–48 (1919). Moreover, the same question was raised in future years. For instance, the following exchange occurred during House debate concerning fiscal year 1923 proposed appropriations:

> Knutson: I want to ask did the gentlemen's committee go into the purpose for which similar moneys have been expended in the past? And did it inquire whether the methods employed in using the moneys appropriated by Congress out of the funds are in violation of treaties entered into with the Chippewa Tribe?
>
> Cramton: I think everyone in the House is familiar with the fact that there has been a controversy for some time as to

the use of the tribal funds of these Indians for the purposes of administration. Not only that general policy, but certain amendments to the text as to certain details were suggested from several sources representing these Minnesota Indians. All these matters had the consideration of the subcommittee, with the result that the text was reported as it appears in the bill.

62 Cong.Rec. 2570 (1922).

Additional examples illustrating congressional inquiry into this legal concern can also be found. *See* 64 Cong.Rec. 1031 (1922) (proposed amendment striking the civilization and self-support authorization on theory that such expenditures were illegal rejected by the House); *Interior Department Appropriation Bill, 1931: Hearings on H.R. 6564 Before a Subcomm. of the Comm. on Appropriations,* 71st Cong., 2nd Sess. 45 (1930) (attorney for Chippewa asserts that expenditures for public school tuition "in violation of the express terms of the trust"); *Interior Department Appropriation Bill, 1933: Hearings Before the Subcomm. of the House Comm. on Appropriations,* 72nd Cong., 1st Sess. 660–61 (1932) (Congressman accepts BIA assertion that Congress' plenary power to administer tribal funds permits departure from original Nelson Act provisions.)

A second issue brought forth in congressional discussion with respect to non-per capita expenditures was whether such disbursements from principal would deplete the fund prior to the fifty year period called for by section 7 of the Nelson Act. Discussion of this issue indicates that Congress considered the impact that these au-

---

**38.** The Supreme Court opinion resolving this litigation was read into the record during the appropriation hearings for fiscal year 1920. *Indian Appropriation Bill: Hearings Before a Subcomm. of the House Comm. on Indian Affairs,* 65th Cong., 3rd Sess. 170 (1918). Although both parties to this early litigation characterized the issue during the hearings to be whether Congress could authorize expenditures from the Nelson Act trust fund, the Court's opinion addressed a different question entirely:

> The only point presented for decision is whether by the language used Congress has

sufficiently indicated an intent to appropriate the money in question. The bill does not challenge its power.

*Lane v. Morrison,* 246 U.S. 214, 218, 38 S.Ct. 252, 253, 62 L.Ed. 674 (1918). The Court's statement of the issue presented referred to the joint resolution employed to renew the appropriations of fiscal year 1915 for fiscal 1916. The fact that the Supreme Court's ruling in *Lane* addressed a limited issue was not voiced in the annual appropriation hearings until 1922. *See* 64 Cong. Rec. 1031 (1922).

thorizations would have on the longevity of the fund.

The depletion question was first raised in subcommittee hearings for fiscal 1912 appropriations:

> Ferris: If we withdraw $185,000 a year for administrative purposes and they have $4,000,000 to their credit, in 20 years they will have nothing to their credit, it being devoured for administrative purposes. Is that not so?
>
> Meritt: The interest will more than cover the cost of administration; besides, they are adding to those funds all the time from the sale of timber.
>
> . . . .

*Indian Appropriation Bill: Hearings Before a Subcomm. of the House Comm. on Indian Affairs,* 62nd Cong., 2nd Sess. 158 (1912). Although Assistant Commissioner Meritt's response might imply that administrative costs were paid from the interest fund, further discussion revealed that representative Ferris understood that the monies at issue would come out of principal.

> Ferris: Would it not be wiser to use the interest for administrative purposes than to withdraw from their trust funds, their principal sum, for administrative purposes?
>
> Meritt: The Indians would protest against that very seriously, because they look forward to receiving these per capita payments on their interest funds.
>
> Ferris: I suppose it does not make any great difference whether you pay it from the interest or the trust funds, so long as it comes out of their money, but it seems to me that six agencies for 11,000 Indians and $185,000 annually for administrative purposes is eating up their estate pretty rapidly.

*Id.*

A similar concern was voiced in the Senate. In response to Senator Clapp's assertion that the principal fund would continue to increase, Senator Lane stated: "It won't if you keep nipping into it at the rate of $215,000 a year." *Indian Appropriation Bill: Hearings on H.R. 12579 Before the Senate Comm. on Indian Affairs,* 63rd Cong., 2nd Sess. 103 (1914). Although Clapp in turn responded erroneously that this money was "interest," he did understand that the Chippewa could receive civilization and support money from tribal funds only through congressional authorization. *Id.*

For several years subsequently, some concern over the issue of depletion of the principal fund due to non-per capita expenditures continued to be expressed. *See* 64 Cong.Rec. 1031 (1922); 72 Cong.Rec. 409 (1929). The BIA did not publicly recognize that non-per capita expenditures were depleting the trust fund until fiscal year 1935, *see Interior Department Appropriation Bill, 1935: Hearings Before the Subcomm. of the House Comm. on Appropriations,* 73rd Cong., 2nd Sess. 662–63 (1934), although it continued to request monies for general support and hospital support until fiscal 1938. *Interior Department Appropriation Bill for 1938: Hearings Before the Subcomm. of the House Comm. on Appropriations,* 75th Cong., 1st Sess. 1304, 1364 (1937). Congress did not authorize withdrawal of money from the principal fund for Chippewa hospitals in fiscal 1938, following the BIA's recommendation, but it did not discontinue authorizing withdrawals for general support until fiscal 1939. The BIA continued to request, and Congress continued to authorize, withdrawal of monies for public school tuition and care of children attending private schools in fiscal 1938 and 1939, and later years.

Although discussion of depletion of the Chippewa principal fund by non-per capita expenditures was limited, Congress addressed the related topic of use of tribal funds for administrative purposes extensively.

Throughout the period when Congress authorized the disbursement of monies from the Chippewa principal fund, complaints regarding expenditure of these funds were consistently lodged. Consequently, the merits of using tribal funds for agency purposes was a topic well discussed among members of Congress. Throughout these discussions, the primary issue was whether the work of the BIA

was of any benefit to the Chippewa. As a result of the debate that occurred, some of the BIA's requests were reduced or eliminated.

The most common complaint made to congressional subcommittees was that expenditures for salaries were of no benefit to the Chippewa because the positions were not needed or the employee did no work. For example, this complaint was directly raised or implied in the appropriations requests for fiscal years 1915, 1917, 1919, 1920, 1922, 1924, 1925, 1928, and 1934. *See Indian Appropriation Bill: Hearings on H.R. 12579 Before the Senate Comm. on Indian Affairs,* 63rd Cong., 2nd Sess. 597 (1914); *Indian Appropriation Bill: Hearings Before a Subcomm. of the House Comm. on Indian Affairs,* 64th Cong., 1st Sess. 4–6, 60–63 (1916); *Indian Appropriation Bill: Hearings Before a Subcomm. of the House Comm. on Indian Affairs,* 65th Cong., 2nd Sess. 182 (1917); *Indian Appropriation Bill: Hearings on H.R. 14746 Before the Senate Comm. on Indian Affairs,* 65th Cong., 3rd Sess. 152–53 (1919); *Indian Appropriation Bill, 1922: Hearings Before the Subcomm. of the House Comm. on Appropriations,* 66th Cong., 3rd Sess. 286, 294, 319 (1921); 64 Cong.Rec. 1030 (1922); *Interior Department Appropriation Bill, 1925: Hearings on H.R. 5078 Before a Subcomm. of the Senate Comm. on Appropriations,* 68th Cong., 1st Sess. 46–48 (1924); *Interior Department Appropriation Bill, 1928: Hearings Before the Subcomm. of the House Comm. on Appropriations,* 69th Cong., 2nd Sess. 390 (1926); 76 Cong.Rec. 650 (1932).

Individual and collective reactions by Congress varied from skepticism and seeming indifference to criticism and rejection of BIA requests. Illustrations of these various responses can be found throughout the legislative history behind the authorizations.

Members of Congress were not always sympathetic to Chippewa complaints. For example, an early complaint concerning salaries paid to agency employees was considered to be "a matter that would go to criticism of the department and not to the terms of the bill." *Indian Appropriation Bill: Hearings on H.R. 12579 Before the Subcomm of the Senate Comm. on Indian Affairs,* 63rd Cong., 2nd Sess. 597 (1914). Another early complaint, that agency employees did not perform the functions for which they were employed, was criticized in hearings and House debate because it was not fact specific. *Indian Appropriation Bill, 1917: Hearings Before the Subcomm. of the House Comm. on Indian Affairs,* 64th Cong., 1st Sess. 61 (1916); 53 Cong.Rec. 2139 (1916). At other times Chippewa complaints apparently received only limited attention. *Indian Appropriation Bill, 1920: Hearings on H.R. 14746 Before the Senate Comm. on Indian Affairs,* 65th Cong., 3rd Sess. 152 (1919); *Interior Department Appropriation Bill, 1925: Hearings on H.R. 5078 Before the Subcomm. of the Senate Comm. on Indian Affairs,* 68th Cong., 1st Sess. 46–48 (1924).

At other instances, however, members of Congress appeared more receptive to complaints that agency expenses should not be paid out of the principal fund. *See Indian Appropriation Bill, 1922: Hearings Before the Subcomm. of the House Comm. on Indian Affairs,* 66th Cong., 3rd Sess. 287, 292 (1921). Moreover, criticism of the BIA's policy of paying agency expenses out of tribal funds at times resulted in proposed amendments to strike the authorization for civilization and self support monies. Such amendments were passed in the House in fiscal year 1919, which would have left the principal fund untouched in those years. 56 Cong.Rec. 1132 (1918) (though a $185,000 authorization was reinserted by the Senate), and fiscal year 1921, 59 Cong.Rec. 1236 (1920) ($100,000 request rejected because of Chippewa opposition, $60,000 reinstated by Senate). At times, the amount requested by the BIA was reduced in the appropriations process, rather than eliminated altogether. *See, e.g.,* 76 Cong.Rec. 650 (1932) (amount reduced because the committee believed that the money "would go largely to the employees of the bureau rather than to the Indians themselves"). And even though amendments to

strike the civilization and self-support appropriation were rejected in fiscal years 1917 and 1924, 53 Cong.Rec. 2140 (1916); 64 Cong.Rec. 1031 (1922), the very consideration of the issue indicates congressional concern the principal fund be used for the benefit of the Chippewa.

Other uses of the Chippewa principal fund besides agency expenses came under congressional scrutiny for determination of whether these expenditures would be for the benefit of the Chippewa. These included: (1) expenditures for agricultural assistance, *see Indian Appropriation . Bill: Hearings on H.R. 12579 Before the Senate Comm. on Indian Affairs,* 63rd Cong., 2nd Sess. 104–05 (1914) (buying land "without making provision for them to improve it or live upon that land is to impoverish them in the worst possible way"); *Indian Appropriation Bill: Hearings on H.R. 18453 Before the Senate Comm. on Indian Affairs,* 64th Cong., 2nd Sess. 297 (1917) (Chippewa representative asserts that "Indians on our reservation know more about farming than those farmers that are employed from other states" in response to questioning); (2) expenses for councils and delegations, *see* 53 Cong.Rec. 4755 (1916) (Senate rejects proposed amendment to strike authorization for councils and delegations, after one Senator speaks of the value of delegation attendance at appropriation hearings); and (3) public school tuition, *see Interior Department Appropriation Bill for 1931: Hearings on H.R. 6564 Before a Subcomm. of the Senate Comm. on Appropriations,* 71st Cong., 2nd Sess. 46–47 (1930) (Senator inquired into whether Chippewa would receive public school education if tuition payments stopped—though at the same time, the Commissioner stated that the payments were "expended for the benefit of some thirty-odd public school districts within the State of Minnesota").

One other area of expenditures that received particular attention was hospitals. One Senator questioned an early request for monies to build hospitals on the Chippewa reservations because it was thought that a hospital would produce an uneven distribution of benefits, when all Chippewa were entitled to participate in the fund

equally. *Indian Appropriation Bill: Hearings on H.R. 12579 Before the Senate Comm. on Indian Affairs,* 63rd Cong., 2nd Sess. 456 (1914). This position was attacked because others believed that individual Chippewa would favor the construction and operation of a hospital that could help insure the continuing existence of the tribe. *Id.* at 457. During these particular hearings, the Senate committee made some effort to distinguish between a hospital, thought to be beneficial to the Indians, and an irrigation system, thought to benefit white settlers. *Id.* This distinction resulted in the alteration of a proposed amendment requiring that the Indians be consulted any time the BIA considered expending more than $5000 from their principal fund, to one that limited consultation to instances when the BIA proposed irrigation projects. *Id.* at 596, 618.

At other times, proposed alterations were scrutinized to determine that Indians would be treated by competent doctors, 52 Cong.Rec. 886–87 (1915); to insure that a substantially increased request for hospital maintenance would support more than one facility, 64 Cong.Rec. 1033 (1922); and to judge whether a proposed facility was in fact needed. *Interior Department Appropriation Bill for 1930; Hearings Before the Subcomm. of the House Comm. on Appropriations,* 70th Cong., 2nd Sess. 1140–42 (1928); *Interior Department Appropriation Bill for 1930: Hearings on H.R. 15089 Before a Subcomm. of the Senate Comm. on Appropriations,* 70th Cong., 2nd Sess. pp. 58–59 (1928).

E. *Legislative Consideration of Per Capita Payments*

The legislative history underlying congressional authorizations for per capita payments from the Nelson Act principal fund mirrors that for the annual appropriations in several ways. As with the annual appropriations, the justifications for the per capita requests generally became standardized, and congressional inquiry into proposed per capita expenditures centered on whether such payments could be legally authorized, whether the payments would

deplete the fund, and whether the payments were beneficial to the tribe.

Over the course of these payments, the justifications presented by the BIA asserted either that these expenditures were needed so that the Indians could become independent of the BIA's supervision, that they were requested by the tribe, that they were necessary to prevent economic hardship and starvation, or all three. For example, in the fiscal year 1917 hearings that led to the first [39] payments to individual Chippewa, the Assistant Commissioner stated that the one-fourth pro rata share, amounting to approximately $148, would enable the Indians to buy tools and equipment allowing them to "become active in industrial pursuits," to make improvements to homes, and to fill the "great need for clothing and subsistence for the aged and the sick." *Indian Appropriation Bill: Hearing Before a Subcomm. of the House Comm. on Indian Affairs*, 64th Cong., 1st Sess. 232 (1916); *see also* S.Rep. No. 1030, 72nd Cong., 1st Sess. 2 (1933); H.R.Rep. 193, 72nd Cong., 1st Sess. 2 (1932); H.R. Rep. No. 2275, 71st Cong., 3rd Sess. 2 (1931); H.R.Rep. No. 70, 71st Cong., 2nd Sess. 2 (1929); H.R.Rep. No. 42, 68th Cong., 1st Sess. 2 (1924).

The BIA did not support a per capita payment from principal in every year that it was authorized by Congress, however. When a $100 per capita payment was requested by the Chippewa in fiscal year 1928, a letter from the Secretary to the Senate committee opposed any per capita payment because "experience had demonstrated that frequent payments do the Indians little, if any good...." S.Rep. No. 330, 70th Cong. 1st Sess. 2 (1928). That year, Congress authorized a $25 per capita payment from the Nelson Act principal fund.

In years that it did endorse such payments, the BIA's support was sometimes reluctant, and it recommended that the amount of the payment be reduced. For example, when a $100 per capita payment was requested by the Chippewa for fiscal year 1926, the Secretary opposed such payment because they were "usually speedily and unwisely expended." H.R.Rep. No. 191, 69th Cong., 1st Sess. 2 (1926). The Secretary also expressed concern over depletion of the principal fund, stating "[i]f per capita payments to the Chippewa Indians of Minnesota are to continue annually, it will only be a short time when the funds of the tribe will be exhausted." Nevertheless, the Secretary concluded by recommending that the payment be reduced to $50, if one was to be authorized. *Id.* In other years, the BIA and Secretary were less than enthusiastic about proposed per capita payments because of the dwindling status of the principal fund, and they never recommended a payment in excess of $25 per person. Payments were recommended, however, because they were thought to be required by conditions on the reservations. *See* H.R.Rep. No. 70, 71st Cong., 2nd Sess. 2 (1929); H.R.Rep. No. 2275, 71st Cong., 3rd Sess. 2 (1931); H.R.Rep. No. 193, 72nd Cong., 1st Sess. 2 (1932); S.Rep. 1030, 72nd Cong., 2nd Sess. 2 (1933).

Concerns voiced by the BIA and the Secretary over the effect of per capita payments on the Indians and on the depletion of the principal fund, as well as the legality of the payments themselves, were not ignored in Congress. As with the annual appropriations, some members of Congress expressed the concern that expenditures from the principal fund for per capita payments were not authorized by the Nelson Act, thus exposing the Government to a future claim by the Chippewa. Although this concern was expressed prior to the fiscal year 1917 payment, *see Indian Appropriation Bill: Hearings Before the House Comm. on Indian Affairs*, 64th Cong., 1st Sess. 40 (1916), it was most clearly stated during House debate when a

---

**39.** Justifications and inquiries were also raised for a proposed per capita payment in fiscal year 1916 to Chippewa considered competent to handle their money and those who were destitute. *See Indian Appropriation Bill: Hearings Before a Subcomm. of the House Comm. on Indian Af-* *fairs,* 63rd Cong., 3rd Sess. 181 (1914); *Indian Appropriation Bill: Hearings on H.R. 20150 Before the Senate Comm. on Indian Affairs,* 63rd Cong., 3rd Sess. 18 (1915). No per capita payment out of principal was authorized for that year, however.

$100 payment was proposed for fiscal year 1922. There, with remarkable prescience, Representative Carter said:

Every Indian born subsequent to this payment will undertake to institute a claim against the Government for this $100 paid to Indians 18 years before it is due and not in accordance with the treaty. History will again repeat itself. The claim will be of sufficient justice that we can not refuse to send it to the court. The Court of Claims will in all likelihood will render a judgment in favor of the Indians, but whether it does or not, it will involve the Government in some character of litigation as certainly as we make this payment. I do not want to deprive the Indians of this money, but I think this statement ought to be made before the bill is passed.

61 Cong.Rec. 5674 (1921).

The initial congressional response to Carter's comments was negative, as congressmen described the conditions of starvation that existed on the reservations, and expressed the belief that this payment was within the plenary power of Congress. *Id.* However, the Senate attached a proviso, agreed to by the House, requiring that a majority of Chippewa ratify the per capita payment out of their principal funds before it was made. S.Rep. No. 297, 67th Cong., 1st Sess. 1 (1921). Congress retained the proviso in subsequent legislation authorizing per capita payments. This proviso was thought by Congress to shift responsibility for any misuse of the principal fund to the Department of the Interior. 65 Cong.Rec. 1271 (1924).

Congress also did not authorize expenditures from the principal fund in ignorance of the possibility that the the fund could thereby be depleted. When this issue was raised in hearings on the proposed payment for fiscal year 1926, House representatives from Minnesota pointed to an imminent increase in the principal fund due to a legislative adjustment and asserted that more timber remained to be cut to support their belief that the fund was not in danger of expiring. *Chippewa Indian Legislation: Hearings Before a Subcomm. of the House Comm. on Indian Affairs,* 69th Cong., 1st Sess. 7 (1926). Concern over depletion of funds was also expressed in House debate with respect to the proposed payment for fiscal year 1928, as illustrated by the dialogue between Representatives Cramton and Leavitt:

Cramton: Generally the payments per capita from funds to the Indians are in a large measure a dissipation of the Indian funds. It is very much better for their funds when available to be used for the construction of homes, the buying of implements, stock, and so forth....

. . . . .

I also understand that in the hearings, I think in the House, there was quite a definite assurance given that this payment would not be followed by any other demand for per capita payment to these Indians in the near future.

Leavitt: That proposal was made in the House committee, and in the discussion it was brought out that there would be cooperation and effort to work out a plan for the future that would set aside sufficient indigent funds so that it would leave the tribal funds themselves intact. That is the situation. It is not in the form of a final pledge that a case might not be presented for another per capita payment.

69 Cong.Rec. 4193 (1928).

Congressional concern over depletion of the fund is also reflected by amendments to proposed legislation effecting a reduction in the amount of the per capita payment. These amendments were often made in accordance with the BIA's recommendation for lower amounts and assertion that the principal fund would expire if the practice continued, and contravened Chippewa requests for higher payments. Reductions occurred for proposed payments in fiscal years 1926, 1928, 1930, 1931, 1932 and 1934.

Evidence of congressional belief that per capita payments from the principal fund were beneficial for the Chippewa is present in several sources. House and Senate reports, *supra,* state that the payments are

justified by destitute conditions. Members of both Houses made numerous speeches and statements on the severe physical conditions on the reservations and the necessity of making these payments to allow the Indians to survive the harsh Minnesota winters. *See, e.g.,* 61 Cong.Rec. 5673 (1921) (comments by Representative Rhodes); 65 Cong.Rec. 1271 (1924) (comments by Representative Larson); 66 Cong. Rec. 2526–29 (1925) (newspaper articles describing conditions of Chippewa read into the record by Representative Wefald); 66 Cong.Rec. 2446 (1925) (comments by Senator Harreld); 67 Cong.Rec. 3452 (1926) (comments by Representative Knutson); 69 Cong.Rec. 3927 (1928) (comments by Senator Frazier); 72 Cong.Rec. 999 (1929); (comments by Senator Wheeler); 75 Cong. Rec. 3045 (1932) (comments by Representative Chiperfield).

Finally, Congress inquired into the Chippewa use of per capita payments to determine the actual effect of these authorizations. Responses to this question varied. One response, put forth for a few years by the BIA, asserted that many Chippewa made poor use of their per capita payments. In opposing the payment for fiscal year 1926, the Commissioner stated that "the effect of this policy has been that many Indians, instead of getting out attempting to help themselves, look ahead in anticipation of a per capita payment being made when Congress convenes...." *Chippewa Indian Legislation: Hearing Before a Subcomm. of the House Comm. on Indian Affairs,* 69th Cong., 1st Sess. 22 (1926), although elderly Chippewa generally made better use of the money than others, *id.* at 24. The Commissioner also read from a report by the superintendent at Red Lake stating that the "per capita payment is a demoralizing factor." *Id.* at 25. The BIA was similarly opposed to the payment proposed for fiscal year 1928. Per capita payments were also criticized by some groups because they believed that the state of Minnesota would have to support the Chippewa if the tribal funds were exhausted. *Id.* at 2, 4. A few congressmen also raised the issue of whether the per capita payments were well spent. *See* 69 Cong.

Rec. 3927 (1928) (comments by Senator Reed); 72 Cong.Rec. 960 (1929) (comments by Representative Cramton).

Those supporting the per capita payments opposed the BIA position that many Chippewa would spend their money foolishly. Chippewa representatives asserted that although there were some who wasted their money, the payments were generally well used. *Chippewa Indian Legislation: Hearing Before a Subcomm. of the House Comm. on Indian Affairs,* 69th Cong., 1st Sess. 12, 17 (1926). Congressmen also asserted that the payments would be well used, *id.* at 2–6, and that expenditures by those not competent to handle their own funds would be supervised, 72 Cong.Rec. 960 (1929) (comments by Representative Knutson). Additional evidence that the per capita payment authorizations were made with the intention of benefitting the Chippewa can be inferred from the frequent stimulus for these statutes, namely the Chippewa themselves. The Chippewa sent numerous petitions requesting per capita payments from their principal fund for purposes of relief. Typical of these petitions was this one from 1921:

We, the undersigned Minnesota Chippewa Indians of the State of Minnesota, do hereby petition and request of you to take immediate steps to assemble the Committee on Indian Affairs to sanction the introduction of a bill securing substantial payments to each member of our tribe. We further represent that all our people are in destitute circumstances; that they have no money available to secure the immediate necessities of life; that they are unable to secure credit from the merchants, owing to the financial conditions of the country; that the blueberry and wild rice crops, upon which crops we have been depending to secure money for the purchase of necessaries, are a total failure; that our gardens and all other crops have been greatly damaged by the hot weather; and that by reason thereof we will be unable to secure food, clothing, and other necessaries; and that there will be great suffering among our people unless immedi-

ate action is taken in the passage of such laws authorizing the department to make substantial payments to our people; and we therefore respectfully petition you to secure the enactment of such laws. H.R.Rep. No. 335, 67th Cong., 1st Sess. 2 (1921); *see also* S.Report No. 330, 70th Cong., 1st Sess. 2 (1928). Even in instances where the petition was not made part of the legislative record, committee reports stated that the proposed payment had the "unanimous consent" of the Chippewa.

In sum, the court finds that Congress carefully considered the need for per capita payments. It did not rubber stamp such requests. To the extent that payments were made, it was based on Congress' considered judgment that they were greatly needed due to the circumstances of the Indians, and that this perception was based on fact.

F. *Appropriations From The Principal Fund*

By the Act of Mar. 3, 1911, ch. 210, 36 Stat. 1058, 1065, Congress authorized the Secretary to withdraw $165,000 to promote civilization and self-support in fiscal year 1912. Congress also authorized the withdrawal of $2500 to pay the expenses of a delegation from White Earth attending congressional hearings in 1911.

The 1963 GAO report asserts that $164,606.39 was disbursed from the principal fund for the Minnesota Chippewa in fiscal year 1912. Of this amount, the report credits $18,879.28 for the Red Lake Band. The GAO further reports that $60,841.10 as disbursed for education, including $10,679.67 for Red Lake education.

For fiscal years 1913 and 1914, Congress enacted similar legislation authorizing the withdrawal of $165,000 from the principal fund. Act of Aug. 24, 1912, ch. 388, 37 Stat. 518, 525 (1913); Act of June 30, 1913, ch. 4, 38 Stat. 77, 88 (1915). The GAO reports that $173,821.06 were expended from the principal fund in fiscal year 1913. Of this amount, the report credits $20,420.55 for Red Lake. The GAO further reports that $1,638.99 was disbursed from the principal fund in fiscal year 1913 for

education. Of this sum, the report credits $5.73 for Red Lake. For fiscal year 1914, GAO reports that $198,720.78 was disbursed for the Minnesota Chippewa. Of this amount, the report credits $26,102.45 for Red Lake. The GAO report also asserts that $55,521.85 was disbursed from the principal fund for education in fiscal year 1914. Of this sum, the report credits $9,861.21 for Red Lake.

In following years, Congress continued to authorize the withdrawal of monies from the principal fund for promoting civilization and self-support and for other purposes. In so doing, Congress began to specify the purposes for which these monies could actually be used. The court sets forth these authorizations below.

Principal fund monies were made available for fiscal year 1915 by the Act of Aug. 1, 1914, ch. 222, 38 Stat. 582, 590–91 (1915). In that legislation, Congress authorized the Secretary to withdraw up to $205,000 to promote civilization and self-support. Of that amount, Congress required that not more than $40,000 could be used for the purchase of lands for homeless Mille Lac Band Chippewa, and not more than $5000 could be withdrawn for the purpose of removing Chippewa bodies from their graves in Wisconsin and their subsequent reinterment in Minnesota. By the same legislation, Congress authorized the Secretary to withdraw $50,000 from the principal fund for the construction of two hospitals, $1000 for a tribal council hall at Sawyer, Minnesota, and $5000 for a bridge near Cass Lake. The 1963 GAO report asserts that a total of $204,477.95 was expended from the principal fund in fiscal year 1915, including $50,446.07 for education. Of the total amount expended from principal, the report credits $13,689.89 to Red Lake, including $2,098.41 for education.

Appropriations for fiscal year 1916 were made by the Act of Mar. 4, 1915, Res. 16, 38 Stat. 1228. There Congress renewed the appropriations made for fiscal year 1915 for fiscal 1916. The 1963 GAO Report asserts that $227,560.09 was expended from the Minnesota Chippewa principal fund in fiscal year 1916, including $55,-

072.89 for education. Of the total amount expended from principal, the report credits $45,426.05 to Red Lake, including $8,854.93 for education.

By the Act of May 18, 1916, ch. 125, 39 Stat. 123 (1917), Congress authorized the Secretary to withdraw $185,000 to promote civilization and self-support in fiscal year 1917. Of this sum, no more than $60,000 (in addition to one-fourth of the interest that year) could be used to pay regular employees of the Indian Service, not less than $10,000 could be used for Chippewa employees to make improvements on the reservations, and up to $10,000 could be expended for an electric plant at White Earth. Congress also authorized the expenditure of $500 from the principal fund for the burial of Indians.

The Act of May 18, 1916 also authorized the distribution of one-fourth of the permanent fund as it then stood to individual Minnesota Chippewa eligible to participate in the distribution of the fund.

The 1963 GAO Report asserts that a total of $1,691,593.98 was expended from the principal fund in fiscal year 1917, including $1,490,668.40 for the one-fourth pro-rata distribution and $64,213.81 for education. Of the total amount expended from principal, the report credits $228,-254.90 for Red Lake, including $192,765.60 in the distribution and $15,706.01 for education.

By the Act of Mar. 2, 1917, ch. 146, 39 Stat. 969, 977–78 (1917), Congress authorized the Secretary to withdraw up to $185,000 from the principal fund to promote civilization and self-support in fiscal year 1918. The 1963 GAO report states that a total of $207,399.70 was expended from the principal fund in fiscal year 1918, including $61,090.52 for education. Of the total amount expended from principal, the report credits $42,564.62 for Red Lake, including $18,119.65 for education.

By the Act of May 25, 1918, ch. 86, 40 Stat. 561, 572 (1919), Congress authorized the Secretary to withdraw up to $175,000 from the principal fund to promote civilization and self-support in fiscal year 1919. Four thousand dollars of this sum was designated for a school at the White Earth reservation. The 1963 GAO Report states that a total of $215,432.80 was expended from the principal fund in fiscal year 1919, including $55,327.74 for education. Of the total amount expended from principal, the report credits $41,351.87 for Red Lake, including $18,967.07 for education.

By the Act of June 30, 1919, ch. 4, 41 Stat. 3, 13, 15 (1921), Congress authorized the Secretary to withdraw up to $100,000 from the principal fund to promote civilization and self support in fiscal year 1920. The 1963 GAO Report asserts that a total of $201,197.63 was expended from the principal fund in fiscal year 1920, including $20,888.58 for education. Of the total amount expended from the principal fund, the report credits $23,311.49 for Red Lake, including $9,025.28 for education.

By the Act of Feb. 14, 1920, ch. 75, 41 Stat. 408, 419–20 (1921), Congress authorized the Secretary to withdraw up to $60,-000 from the principal fund to promote civilization and self-support in fiscal year 1921. Of the amount so authorized, no more that $5000 could be expended to assist public schools in the Chippewa area. The 1963 GAO Report asserts that a total of $107,899.54 was disbursed from the principal fund in fiscal year 1921, including $634.41 for education. Of the total amount expended from principal, the report credits $23,729.78 for Red Lake, including $9.72 for education.

By the Act of Mar. 3, 1921, ch. 119, 41 Stat. 1225, 1235 (1921), Congress authorized the Secretary to withdraw up to $100,000 from the principal fund to promote civilization and self-support in fiscal year 1922. The Act provided that up to $45,000 of this sum could be expended for general agency purposes, $20,000 could be used to construct and maintain public schools, $15,000 was for indigent Indians, and $20,000 was for hospitals. While Congress required that the aid to indigents be reimbursable, the Secretary had discretion to waive reimbursement of aid to the old, infirm or indigent Indian. The discretion to waive reimbursement was maintained in subsequent legislation as well. Finally,

Congress authorized the Secretary to withdraw up to $5200 to pay tuition at Minnesota public schools for Chippewa students.

In addition to authorizing the withdrawal of monies from the principal fund for promoting civilization and self-support and for public school tuition in fiscal year 1922, Congress authorized the Secretary to withdraw from principal an amount of money sufficient to make a per capita payment of $100 to each member of the Minnesota Chippewa Tribe, under such rules and regulations required by the Secretary. Act of Nov. 19, 1921, ch. 133, 42 Stat. 221 (1923). Before making any such expenditure, Congress required that the Chippewa ratify the payment, under rules established by the Secretary.

The 1963 GAO Report asserts that a total of $1,358,712.79 was expended from the principal fund in fiscal year 1922, including $1,270,666.39 for per capita payments and $1,201.64 for education. Of the total amount expended from principal, the GAO credits $185,579.72 for Red Lake, including $156,800 for per capita payments and $997.50 for education.

The Act of May 24, 1922, ch. 199, 42 Stat. 552, 569 (1923) authorized the Secretary to withdraw up to $141,570 from the principal fund for fiscal year 1923. This amount was comprised of $95,000 to promote civilization and self-support, and $46,570 for tuition of Chippewa children attending Minnesota public schools. Congress subdivided the civilization and self-support money as follows: $42,500 for general agency purposes; $20,000 to construct and maintain public schools; $20,000 for indigent Indians; and $17,500 for hospitals. The 1963 GAO Report asserts that a total of $117,870.07 was expended from the principal fund in fiscal year 1923, including $613.65 for education. Of the total amount expended from principal, the report credits $45,902.97 for Red Lake, including $606.77 for education.

By the Act of January 24, 1923, ch. 42, 42 Stat. 1174, 1190 (1923), Congress authorized the Secretary to withdraw $145,000 from the principal fund in fiscal year 1924. This amount was comprised of $110,000 to promote civilization and self-support, and $35,000 for tuition of Chippewa children attending Minnesota public schools. Congress subdivided the civilization and self-support money as follows: $35,000 for general agency purposes; $15,000 to construct and maintain public schools; $15,000 for indigent Indians; and $45,000 for hospitals.

In addition to expenditures for civilization and self-support and public school tuition, Congress authorized the Secretary to withdraw from the principal fund an amount of money sufficient to make a $100.00 per capita payment for each member of the Minnesota Chippewa Tribe. Act of Jan. 25, 1924, ch. 2, 43 Stat. 1 (1925). Congress required that payments be made after the Tribe had ratified the expenditure, in accordance with regulations established by the Secretary.

The 1963 GAO Report asserts that a total of $1,500,930.90 was expended from the principal fund in fiscal year 1924, including $1,353,096.70 for per capita payments and $1,078.00 for education. Of the total amount expended from principal, the report credits $200,470.32 for Red Lake, including $166,569.40 for per capita payments and $1,078.00 for education.

By the Act of June 5, 1924, ch. 264, 43 Stat. 390 (1925), Congress authorized the Secretary to withdraw up to $140,000 from the principal fund in fiscal year 1925. This amount was comprised of $105,000 to promote civilization and self-support, 43 Stat. 411–12, and $35,000 for tuition of Chippewa children attending Minnesota public schools. Congress subdivided the civilization and self-support money as follows: $35,000 for general agency purposes; $10,000 to construct and maintain additional public schools; $15,000 for indigent Indians; and $45,000 for hospitals.

In a supplemental appropriation bill for fiscal year 1925, Act of April 2, 1924, ch. 81, 43 Stat. 33, 42 (1925), Congress authorized the Secretary to withdraw $50,000 in fiscal year 1925 to build a tuberculosis sanatorium at Onigum, Minnesota. Finally, in addition to the expenditures for civilization and self-support, public school tuition, and the Onigum sanatorium, Congress autho-

rized the Secretary to withdraw from the principal fund an amount of money sufficient to make a $50.00 per capita payment to each member of the Minnesota Chippewa Tribe. Act of Jan. 30, 1925, ch. 114, 43 Stat. 798. Congress required that payments were to be made after the Tribe ratified the expenditure, and in accordance with regulations established by the Secretary.

The 1963 GAO Report asserts that a total of $973,392.63 was disbursed from the principal fund in fiscal year 1925, including $774,777.41 for per capita payments and $10,661.19 for education. Of the total amount expended from principal, the report credits $120,028.44 for Red Lake, including $91,869.83 for per capita payments and $7,975.76 for education.

By the Act of March 3, 1925, ch. 462, 43 Stat. 1141, 1158, Congress authorized the Secretary to withdraw $185,330 from the principal fund for fiscal year 1926. This amount was comprised of $150,330 to promote civilization and self-support, and $35,000 for tuition of Chippewa children attending Minnesota public schools. Congress subdivided the money for civilization and self-support as follows: $47,190 for general agency purposes; $10,000 to construct and maintain public schools; $15,000 for indigent Indians; and $78,140 for hospitals.

In addition to expenditures for civilization and self-support and public school tuition, Congress authorized the Secretary to withdraw from principal an amount of money sufficient to make a $50.00 per capita payment to each member of the Minnesota Chippewa Tribe. Act of Feb. 19, 1926, ch. 22, 44 Stat. 7 (1927). Congress required that payments were to be made after the expenditure was ratified by the Tribe, and in accordance with regulations established by the Secretary.

The 1963 GAO Report asserts that a total of $929,190.64 was disbursed from the principal fund in fiscal year 1926, including $768,898.11 for per capita payments and $279.06 for education. Of the total amount expended from principal, the report credits $121,517.67 for Red Lake, including $93,-695.52 for per capita payments and $279.06 for education.

By the Act of May 10, 1926, ch. 277, 44 Stat. 453 (1927), Congress authorized the Secretary to withdraw $188,500 from the principal fund in fiscal year 1927. This amount was comprised of $35,000 for tuition of Chippewa children attending Minnesota public schools, 44 Stat. 471, and $153,-500 to promote civilization and self-support, id., 44 Stat. at 475. Congress subdivided the civilization and self-support money as follows: $50,500 for general agency purposes; $10,000 to construct and maintain public schools; $15,000 for indigent Indians; and $78,000 for hospitals. The 1963 GAO Report asserts that a total of $182,-149.16 was disbursed from the principal fund in fiscal year 1927. Of the total amount expended from principal, the report credits $34,312.20 for Red Lake.

By the Act of Jan. 12, 1927, ch. 27, 44 Stat. 934 (1927), Congress authorized the Secretary to withdraw $185,000 from the principal fund in fiscal year 1928. This amount was comprised of $35,000 for tuition of Chippewa children attending Minnesota public schools, 44 Stat. 950, and $150,-000 to promote civilization and self-support, id., 44 Stat. at 954. Congress subdivided the civilization and self-support money as follows: $47,000 for general agency purposes; $10,000 to construct and maintain public schools; $15,000 for indigent Indians; and $78,000 for hospitals.

In addition to the money for public school tuition and civilization and self-support, Congress authorized the Secretary to withdraw from the principal fund an amount of money sufficient to make a $25.00 per capita payment to each member of the Minnesota Chippewa Tribe. Act of Mar. 15, 1928, ch. 222, 45 Stat. 314 (1929). Congress required that payments were to be made after the Tribe had ratified the expenditure, and in accordance with regulations established by the Secretary.

The 1963 GAO Report asserts that a total of $509,952.93 was disbursed from the principal fund in fiscal year 1928, including $327,305.81 for per capita payments and $1.10 for education. Of the total amount

expended from principal, the report credits $70,336.96 for Red Lake, including $43,025.00 for per capita payments.

By the Act of Mar. 7, 1928, ch. 137, 45 Stat. 200, 216 (1929), Congress authorized the Secretary to withdraw $185,000 from the principal fund in fiscal year 1929. This amount was comprised of $10,000 for construction and maintenance of public schools, $35,000 for tuition of Chippewa children attending Minnesota public schools, $78,000 for hospitals, and $62,000 for general support, administration of property, and promoting self-support ("general support"). Congress subdivided the general support money as follows: $47,000 for general agency purposes and $15,000 for indigent Indians. The 1963 GAO Report asserts that a total of $208,274.39 was disbursed from the principal fund in fiscal year 1929. Of the total amount expended from principal, the report credits $28,395.95 for Red Lake.

By the Act of Mar. 4, 1929, ch. 705, 45 Stat. 1562 (1929), Congress authorized the Secretary to withdraw $325,000 from the principal fund in fiscal year 1930 for the following purposes: $10,000 for construction and maintenance of public schools, id., 45 Stat. at 1577; $70,000 for the operation of the White Earth boarding school, id.; $40,000 for repairs at the White Earth boarding school, id.; $35,000 for tuition of Chippewa children attending Minnesota public schools, id., 45 Stat. at 1580; $90,000 for hospitals, id., 45 Stat. at 1582; and $80,000 for general support, id., 45 Stat. at 1584. Congress subdivided the money for general support, as follows: $50,000 for general agency purposes and $30,000 for indigent Indians. A supplemental appropriation authorized the Secretary to withdraw an additional $400 for public school tuition for fiscal year 1930. Act of Mar. 26, 1930, ch. 92, 46 Stat 90, 104 (1931).

In addition to expenditures for public schools, public school tuition, hospitals, White Earth boarding school, and general support, Congress authorized the Secretary to withdraw from principal an amount of money sufficient to make a $25.00 per capita payment to each member of the Minnesota Chippewa Tribe. Act of Dec. 23, 1929, ch. 16, 46 Stat. 54 (1931). Congress required that payments were to be made after the Tribe had ratified the expenditure.

The 1963 GAO Report asserts that a total of $568,271.53 was disbursed from the principal fund in fiscal year 1930, including $351,204.39 for per capita payments. Of the total amount expended from principal, the report credits $72,688.46 for Red Lake, including $44,130.60 for per capita payments.

By the Act of May 14, 1930, ch. 273, 46 Stat. 279 (1931), Congress authorized the Secretary to withdraw $238,000 from the principal fund in fiscal year 1931 for the following purposes: $10,000 for construction and maintenance of public schools, id., 46 Stat. at 293; $38,000 for tuition of Chippewa children attending Minnesota public schools, id., 46 Stat. at 297; $100,000 for hospitals, id., 46 Stat. at 300; and $90,000 for general support, id., 46 Stat. at 302. Congress subdivided the amount for general support as follows: $50,000 for general agency purposes and $40,000 for indigent Indians.

In addition to the expenditures for public schools, public school tuition, hospitals, and general support, Congress authorized the Secretary to withdraw from the principal fund an amount of money sufficient to make a $25.00 per capita payment to each member of the Tribe. Act of Feb. 14, 1931, ch. 174, 46 Stat. 1107 (1931). Congress required that payments were to be made after the Tribe ratified the expenditure.

The 1963 GAO Report asserts that a total of $616,414.00 was disbursed from the principal fund in fiscal year 1931, including $354,163.97 for per capita payments. Of the total amount expended from principal, the report credits $71,949.19 for Red Lake, including $45,280.60 for per capita payments.

By the Act of Feb. 14, 1931, ch. 187, 46 Stat. 1115, Congress authorized the Secretary to withdraw from the principal fund a total of $238,900 in fiscal year 1932 for the following purposes: $38,000 for tuition of Chippewa children attending Minnesota

public schools, 46 Stat. 1130; $100,000 for hospitals, 46 Stat. 1136; and $100,900 for general support, 46 Stat. 1138–39. Congress subdivided the money for general support as follows: $60,900 for general agency purposes and $40,000 for indigent Indians.

In addition to expenditures for public school tuition, hospitals, and general support, Congress authorized the Secretary to withdraw from the principal fund an amount of money sufficient to make a $25.00 per capita payment to each member of the Minnesota Chippewa Tribe. Act of Feb. 12, 1932, ch. 45, 47 Stat. 49 (1933). Congress required that payments were to be made after the Tribe had ratified the expenditure.

The 1963 GAO Report asserts that a total of $604,615.61 was disbursed from the principal fund in fiscal year 1932, including $352,830.60 for per capita payments and $373.34 for education. Of the total amount expended from principal, the report credits $75,086.15 for Red Lake, including $46,325.00 for per capita payments and $32.90 for education.

By the Act of April 22, 1932, ch. 125, 47 Stat. 91 (1933), Congress authorized the Secretary to withdraw $248,000 from the principal fund in fiscal year 1933 for the following purposes: $48,000 for tuition of Chippewa children attending Minnesota public schools, *id.*, 47 Stat. at 104; $125,000 for hospitals, *id.*, 47 Stat. at 110; and $75,000 for general support, *id.*, 47 Stat. at 111–12. By supplemental appropriation Congress authorized an additional $10,000 payment from the principal fund for tuition for Chippewa children enrolled in public schools in 1937. Act of July 1, 1932, ch. 364, 47 Stat. 525, 534.

In addition to expenditures for public school tuition, hospitals, and general support, Congress authorized the Secretary to withdraw from the principal fund an amount of money sufficient to make a $25.00 per capita payment to each member of the Minnesota Chippewa Tribe. Act of Jan. 20, 1933, ch. 15, 47 Stat. 773 (1933). Payments were to be made after the Tribe ratified the expenditure.

The 1963 GAO Report asserts that a total of $597,072.38 was disbursed from the principal fund in fiscal year 1933, including $364,735.75 for per capita payments, and $1,298.80 for education. Of the total amount expended from principal, the report credits $74,660.60 for Red Lake, including $47,730.60 for per capita payments and $208.80 for education.

By the Act of Feb. 17, 1933, ch. 98, 47 Stat. 820, Congress authorized the Secretary to withdraw from the principal fund $254,550 in fiscal year 1934 for the following purposes: $48,000 for tuition of Chippewa children attending Minnesota public schools, *id.*, 47 Stat. at 832–33; $131,550 for hospitals, including $12,000 for water and sewer systems at Onigum, *id.*, 47 Stat. at 837–38; and $75,000 for general support, *id.*, 47 Stat. at 839. Congress subdivided the money for general support as follows: $45,000 for general agency purposes and $30,000 for indigent Indians.

In addition to expenditures for public school tuition, hospitals, and general support, Congress authorized the Secretary to withdraw from the principal fund an amount of money sufficient to make a $25.00 per capita payment to each member of the Minnesota Chippewa Tribe. Act of May 7, 1934, ch. 223, 48 Stat. 668 (1934). Congress required that payments were to be made after the Tribe ratified the expenditure.

The 1963 GAO Report asserts that a total of $593,162.95 was disbursed from the principal fund in fiscal year 1934, including $366,838.08 for per capita payments and $2,000.00 for education. Of the total amount expended from principal, the report credits $73,933.34 for Red Lake, including $47,985.95 for per capita payments.

By the Act of Mar. 2, 1934, ch. 38, 48 Stat. 362, Congress authorized the Secretary to withdraw from the principal fund $240,590 in fiscal year 1935 for the following purposes: $48,000 for tuition of Chippewa children attending Minnesota public schools, *id.*, 48 Stat. at 372; $121,490 for hospitals, *id.*, 48 Stat at 376; and $71,100 for general support, including not more than $30,000 for indigent Indians, *id.*, 48

Stat. at 377. The 1963 GAO Report asserts that a total of $235,152.51 was disbursed from the principal fund in fiscal year 1935, including $1,978.20 for education. Of the total amount expended from principal, the report credits $25,975.38 for Red Lake.

By the Act of May 9, 1935, ch. 101, 49 Stat. 176 (1936), Congress authorized the Secretary to withdraw $295,000 from the principal fund in fiscal year 1936 for the following purposes: $48,000 for tuition of Chippewa children attending Minnesota public schools, id., 49 Stat. at 190; $162,000 for hospitals, id., 49 Stat. at 193; $85,000 for general support, including no more than $40,000 for indigent Indians. The 1963 GAO Report asserts that a total of $317,771.19 was disbursed from the principal fund in fiscal year 1936, including $1650 for education. Of the total amount expended from principal, the report credits $41,673.71 for Red Lake.

By the Act of June 22, 1936, ch. 691, 49 Stat. 1757 (1936), Congress authorized the Secretary to withdraw $228,750 from the principal fund in fiscal year 1937 for the following purposes: $63,750 for tuition of Chippewa children attending Minnesota public schools and for care of Chippewa children attending private schools, id., 49 Stat. at 1773; $80,000 for hospitals, id., 49 Stat. at 1777; and $85,000 for general support, including not more than $40,000 for indigent Indians, id., 49 Stat. at 1778–79. A supplemental appropriation authorized the additional withdrawal of $9,000 for hospitals in fiscal year 1937. Act of May 28, 1937, ch. 277, 50 Stat. 213, 222 (1937). The 1963 GAO Report asserts that a total of $251,400.10 was disbursed from the principal fund in fiscal year 1937, including $13,-165.09 for education. Of this amount, the report credits $24,338.68 for Red Lake, including $210 for education.

By the Act of Aug. 9, 1937, ch. 570, 50 Stat. 564 (1937), Congress authorized the Secretary to withdraw $107,750 from the principal fund in fiscal year 1938 for the following purposes: $63,750 for tuition of Chippewa children attending Minnesota public schools and for care of Chippewa children attending private schools, id., 50 Stat. at 581, and $44,000 for general support, including not more than $40,000 for indigent Indians, id., 50 Stat. at 587. The 1963 GAO Report asserts that a total of $128,695.72 was disbursed from the principal fund in fiscal year 1938, including $27,-265.92 for education. Of the total amount expended from principal, the report credits $16,800.11 for Red Lake, including $9,501.01 for education.

By the Act of May 9, 1938, ch. 187, 52 Stat. 291 (1938), Congress authorized the Secretary to withdraw $103,750 from the principal fund in fiscal year 1939 for the following purposes: $63,750 for tuition of Chippewa children attending Minnesota public schools, and for care of Chippewa children attending private schools, id., 52 Stat. at 308, and $40,000 for relief of indigent Indians, id., 52 Stat. at 314. The 1963 GAO Report asserts that a total of $101,-348.81 was disbursed from the principal fund in fiscal year 1939, including $14,-850.00 for education. Of the total amount expended from principal, the report credits $4,974.19 for Red Lake, including $225 for education.

By the Act of May 10, 1939, ch. 119, 53 Stat. 685 (1939), Congress authorized the Secretary to withdraw $109,750 from the principal fund in fiscal year 1940 for the following purposes: $63,750 for tuition of Chippewa children attending Minnesota public schools and for care of Chippewa children attending private schools, id., 53 Stat. at 704, $40,000 for relief of indigent Indians, id., 53 Stat. at 709, and $6000 for attorneys' fees, id. The 1963 GAO Report asserts that a total of $7,780.97 was disbursed from the Chippewa principal fund in fiscal year 1940, including $262 for education. Of the total amount expended from the Chippewa principal fund, the report credits $651.91 for Red Lake. The report also asserts that a total of $15,812.23 was disbursed from the Red Lake principal fund in fiscal year 1940.[40]

40. The Act of June 15, 1938 authorized the Secretary of the Treasury to divide the Nelson Act funds, principal and interest, between the Red

By the Act of June 18, 1940, ch. 395, 54 Stat. 406 (1941), Congress authorized the Secretary to withdraw $98,750 from the principal fund in fiscal year 1941 for the following purposes: $58,750 for tuition of Chippewa children attending Minnesota public schools and for care of Chippewa children at private schools, *id.*, 54 Stat. at 423; and $40,000 for relief of indigent Indians, *id.*, 54 Stat. at 428. A supplemental appropriation authorized the Secretary to withdraw an additional $23,400 from the principal fund in fiscal year 1941 for attorneys' fees. Act of Oct. 9, 1940, ch. 780, 54 Stat. 1030, 1041 (1941). The 1963 GAO Report asserts that a total of $1,111.96 was disbursed from the Chippewa principal fund in fiscal year 1941. Of the total amount expended from the Chippewa principal fund, the report credits $8.65 for Red Lake. The GAO Report also asserts that a total of $16,565.56 was disbursed from the Red Lake principal fund in fiscal year 1941.

By the Act of June 28, 1941, ch. 259, 55 Stat. 303 (1942), Congress authorized the Secretary to withdraw $93,750 from the principal fund in fiscal year 1942 for the following purposes: $58,750 for tuition of Chippewa children attending Minnesota public schools and for care of Chippewa children attending private schools, *id.*, 55 Stat. at 321, and $35,000 for relief of indigent Indians, *id.*, 55 Stat. at 326. The 1963 GAO Report asserts that a total of $257.13 was disbursed from the Chippewa principal fund in fiscal year 1942. Of the total amount expended from the Chippewa principal fund, the report credits $7.13 for Red Lake. The report also asserts that $12,-379.15 was disbursed from the Red Lake principal fund in fiscal year 1942.

By the Act of July 2, 1942, ch. 473, 56 Stat. 506 (1943), Congress authorized the Secretary to withdraw $93,750 from the principal fund in fiscal year 1943 for the following purposes: $44,375 for tuition of Chippewa children attending Minnesota public schools and for care of Chippewa children attending private schools, *id.*, 56 Stat. at 522, and $49,375 for relief of indigent Indians, *id.*, 56 Stat. at 527. The 1963

GAO Report states that nothing was disbursed from the Chippewa principal fund in fiscal year 1943. The report also asserts that $20,169.06 was disbursed from the Red Lake principal fund in fiscal year 1943.

By the Act of July 12, 1943, ch. 219, 57 Stat. 451 (1944), Congress authorized the Secretary to withdraw $71,190 from the principal fund in fiscal year 1944 for the following purposes: $22,190 for tuition of Chippewa children attending Minnesota public schools and for care of Chippewa children attending private schools, *id.*, 57 Stat. at 464, and $49,000 for relief of indigent Indians, *id.*, 57 Stat. at 469. In a supplemental appropriation, Congress authorized the Secretary to withdraw an additional $14,000 from the principal fund for attorneys' fees in fiscal year 1944. Act of Dec. 23, 1943, ch. 380, 57 Stat. 611, 622 (1944). The 1963 GAO Report asserts that $25 was disbursed from the Chippewa principal fund in fiscal year 1944, all for Red Lake. The report further asserts that $9,474.66 as disbursed from the Red Lake principal fund in fiscal year 1944.

By the Act of June 28, 1944, ch. 298, 58 Stat. 463, 481 (1945), Congress authorized the Secretary to withdraw $43,375 from the principal fund in fiscal year 1945 for the relief of indigent Indians. The 1963 GAO Report asserts that $100 as disbursed from the Chippewa principal fund in fiscal year 1945. Of the total amount expended from the Chippewa principal fund, nothing was disbursed for Red Lake. The report also asserts that $2,202.24 were disbursed from the Red Lake principal fund in fiscal year 1945.

G. *The Disbursement and Settlement Processes*

Administration of the disbursement and settlement process was handled by the combined efforts of the Indian Office of the Department of the Interior (later known as the BIA) and the Treasury Department (later the GAO). Witnesses for defendant testified to the procedures in effect at various times for disbursement of

Lake Band and the Chippewa Bands other than Red Lake.

Indian trust fund money and settlement of these accounts.

Congress made Nelson Act money available to the BIA by appropriation acts. The Treasury Department credited the appropriated monies to designated accounts. When specific purposes for funds were specified in the legislation, subfunds were created. Whenever monies were deposited or withdrawn from a particular tribal trust fund, the Treasury would concurrently or shortly thereafter make an entry on a "cash card" that corresponded to that fund. A Treasury-maintained cash card thus provided a statement of available monies in a particular trust fund, similar to a bank statement, as well as a general record of changes in that fund. Such cash cards were maintained with respect to Nelson Act funds. The cash cards, however, did not provide a detailed record of monies that were disbursed from the trust funds.

Monies from Indian trust funds, such as those belonging to Red Lake, could be disbursed in two different ways. They could be expended directly by the Treasury to a claimant, or indirectly through a special disbursing agent at the reservation. The special disbursing agent was typically the agency superintendent for the reservation. At Red Lake, the agency superintendent was both the agency administrator and the special disbursing agent for the Treasury Department. The superintendent's responsibilities as a disbursing agent were in addition to his responsibilities arising from the day to day administration of Indian reservations.

Under the direct disbursement method, a claimant would initiate a claim, consisting of a bill or invoice describing the goods or, in the case of back per capita payments, the claimants' entitlement under an earlier annuity roll along with any other supporting materials, to the Department of Interior and to the Treasury, or later, the GAO, for review and approval. It is the court's finding that this review can be relied upon to establish, at least facially, that a claimant was entitled to payment, and the existence of a funding source. Once the review was complete, a certificate of settlement was issued and became part of the claims settlement package. Claim settlements were then posted to the Treasury cash cards. This method was also employed for making back payments to Indians omitted from previous annuity or per capita payments. These claims were submitted through the local agent.

The second method of disbursement and review was indirect. Trust fund monies were advanced to the special disbursing agent pursuant to the agent's requisition for funds. When monies were advanced from Treasury to the agent, the agent would disburse them for goods and services needed on the reservation, for payment of employees on the reservation, and for per capita or annuity payments. All monies advanced were governed by spending authorities that limited the agent's discretion in actually disbursing the money. As a matter of practice, during most of the period in question, the special disbursing agent at the reservation was the same person as the reservation superintendent. The superintendent was responsible for approving purchase orders to buy goods and services, for approving vouchers, for disbursing government and trust funds, and for collecting monies owed to the Red Lake Chippewa or to the United States.

Because the agent was held accountable for the monies advanced to him, the Indian Office required him to submit quarterly reports detailing his use of the funds. Starting in 1927 or 1928 and thereafter, these reports were made monthly. These reports consisted of summary fiscal documentation and supporting vouchers. These reports underwent an administrative audit at the Indian Office, then an official audit at Treasury (before 1921) or the GAO (after 1921).

The superintendent requested monies for disbursement by a Requisition for Disbursement of Funds, which had to be approved by the Assistant Secretary, the Chief Clerk, or the Assistant Commissioner, and finally by the Auditor of the Interior Department within the Treasury Department. The appropriations and funds that would be the source of these monies were

listed as part of the agent's request. Each advance of appropriated funds to the agent was recorded on the Treasury cash card. The agent was also authorized to receive other funds due to the Government or the Band.

The agent was responsible for submitting a quarterly (later monthly) report to BIA on the disposition of funds. This report was known as the agent's account. It consisted of an account current, an abstract of disbursements (a summary listing of disbursements) supported by accompanying vouchers, and a summary of collections. The agent's account current set forth every transaction involving monies advanced to or disbursed by him, thereby serving as a summary of his total accountability. On the top half of his account current sheet, the agent listed by warrant number and date the monies advanced to him for each trust fund or appropriation involved. Because the agent was accountable for these monies, they were listed as "debits." On the bottom half of the account current, the agent listed by date the expenditures from each fund or appropriation for which he was responsible. These are listed as "credits."

The agent's abstract of disbursements summarizes the vouchers prepared during the particular fiscal period. This abstract sets forth the voucher number, date, the persons or company receiving payment, the appropriation to which the money is charged, and in most instances, what was paid for.

The settlement package was first reviewed at the Indian Office where it underwent what was described at trial as an administrative review. This administrative review focused on whether the transactions were authorized and on whether the agent had complied with the applicable rules and regulations and conformed to the applicable spending authorities in disbursing the money. Payroll vouchers would be examined to insure that all individuals paid as employees were in fact personnel of the Indian Office, and that they were paid the appropriate amounts. If the Indian Office review indicated that a disbursement had been made improperly, it would recommend that approval be suspended pending further clarification.

After the Indian Office had completed its review and the Commissioner had signed off, the agent's account went for its final audit. Between 1894 and 1921, this auditing function was performed at the Department of the Treasury pursuant to the Dockery Act, ch. 174, 28 Stat. 162 (1894). From 1921 and thereafter, the final audit was performed by the GAO, pursuant to the Budget Accounting Act, ch. 18, 42 Stat. 20 (1921). Whether performed by Treasury or the GAO, the final audit resulted in the definitive ruling on the propriety of an agent's accounts. The auditor at Treasury or the GAO would again examine the summary documentation and supporting vouchers to insure that the supporting documents were complete, that charges were made to the correct appropriations, and, to the extent possible from review of a paper record, that all applicable rules and regulations were complied with in making disbursements. If the auditor disagreed with a charge, he would suspend it pending clarification. If the clarification was not forthcoming, the auditor would disallow the expenditure. The disbursing agent would be held responsible for all disallowed disbursements. To the extent that the auditor at Treasury or the GAO was satisfied that the agent's account was proper, a certificate of settlement would be added to the settlement package, and the agent would be relieved of responsibility for all finally settled accounts.

## H. *The 1963 GAO Report*

In a report submitted in 1929 pursuant to earlier litigation, the GAO had proposed an analysis of disbursements of both Nelson and non-Nelson Act funds through 1927. As a result of the 1951 petition, that report was replaced by the 1963 report, which constitutes a disbursement analysis for the period 1890 through 1951. The 1963 GAO Report identifies the Nelson Act trust funds by several disbursement schedules developed in response to claims brought by the Red Lake Band and the other Minneso-

ta Chippewa Bands.[41] A disbursement schedule provides, by fiscal year, the total amount of money that the defendant asserts was expended from the Nelson Act funds for goods and services and payments to individual Chippewa. Prior to the segregation of the Red Lake Band's share of the Nelson Act funds in 1939, expenditures that the GAO reported as for the Red Lake Band were from the same funds as disbursements for the other Minnesota Chippewa Bands, and the same disbursement schedules apply to all the Bands. Although Red Lake and the other Bands share common disbursement schedules during this period, the GAO report identifies expenditures within a schedule according to whether it was made for the Red Lake Band, for the Minnesota Chippewa Bands other than Red Lake, or jointly for all the Bands.[42]

The disbursement schedules for the Nelson Act funds are identified by two characteristics: (1) whether the monies originated in the U.S. Treasury or whether they originated directly from the sale of land and timber ceded by the Band; and (2) whether the monies were expended from the principal (interest earning) fund or the interest (non-interest earning) fund. There are a total of eight disbursement schedules relevant to the present litigation.

The 1963 GAO Report captions the schedules as follows: Schedule One—Relief and Civilization of Chippewas in Minnesota (Reimbursable); Schedule Two—Advance Interest to Chippewas in Minnesota (Reimbursable); Schedule Five—Indian Schools, Chippewas in Minnesota: Buildings (Reimbursable); Schedule Six—Indian School, Red Lake, Minnesota: Buildings (Reimbursable); Schedule Ten—Chippewas in Minnesota Fund; Schedule Eleven: Interest on the Chippewas in Minnesota Fund; Schedule Twenty—Red Lake Chippewa in Minnesota Fund; Schedule Twenty-one—Interest on Red Lake Chippewa in Minnesota Fund.

The earliest disbursement schedules are sub-captioned "reimbursable," indicating that expenditures from these schedules were made from monies appropriated by Congress from the U.S. Treasury. These appropriations were necessary during the early years of the Nelson Act period, primarily 1890 through 1910, because it took some time before the proceeds from the sale of land and timber on ceded Chippewa lands were sufficient to carry out the programs and policies set forth in the Nelson Act. GAO reported a total of $4,987,838.47 was made available during this time for disbursement for the Chippewa through congressional appropriations of monies from the U.S. Treasury for Nelson Act purposes. GAO further reported that of this sum, a total of $4,941,029.66 was actually disbursed for the Minnesota Chippewa, and thus had to be reimbursed to the Treasury.

Once the proceeds of the land and timber sales reached a sufficient level, the Government reimbursed itself for the monies previously appropriated and disbursed from the U.S. Treasury. The 1963 GAO Report asserts that the Government reimbursed itself by the amount of $4,941,054.89. Of this amount, $3,967,465.79 was reimbursed from the principal fund, and $973,589.10 was reimbursed from the interest fund.

The first reimbursable schedule was Schedule One—Relief and Civilization of the Chippewas in Minnesota (Reimbursable). The first appropriation charged to Schedule One was contained in the Act of Aug. 19, 1890, ch. 807, 26 Stat. 357:

> To enable the Secretary of the Interior to carry out an act entitled "An act for the relief and civilization of the Chippewa Indians in the State of Minnesota, and for other purposes," approved January fourteenth, eighteen hundred and eighty-nine, as follows:
>
> For the purchase and erection of houses for Indians and of saw and flour mills;

---

**41.** Plaintiff's claim relates only to funds disbursed through August 13, 1946, the cut-off date for accrued claims under the ICC Act.

**42.** According to the 1929 GAO Report, disbursements listed as "joint" indicated either that the expenditures were for all the Bands, or that GAO was unable to determine if the expenditure was for Red Lake or some other Band.

agricultural implements, stocks and seeds, breaking and fencing land; for payment of expenses of delegations of Chippewa Indians to visit the White Earth Reservation; for the erection and maintenance of day and industrial schools; and for subsistence and pay of employees, one hundred thousand dollars.[43]

Appropriation of reimbursable funds for the stated purpose of carrying out the Nelson Act occurred annually, with the exception of 1891, through the Act of April 4, 1910, 36 Stat. 276. In addition to the purposes described in the Nelson Act, money was appropriated for the pay and expenses of commissioners and for the removal and allotment of Indians.[44]

The 1963 GAO Report credits a total of $2,350,559.00 as appropriated for disbursement Schedule One. It further reports that a total of $2,338,625.32 was actually disbursed over fiscal years 1891 through 1913. Of this amount, the GAO reports that $308,561.76 was expended for the Red Lake Chippewa. These expenditures were attributed to most of the GAO categories, although almost two-thirds of the money was credited to education.

The first appropriation of monies for advance interest payable to the Minnesota Chippewa, credited under disbursement Schedule Two, was contained in the Nelson Act itself. Section 7 of the Nelson Act provided in part:

The United States shall, for the benefit of said Indians, advance to them as such interest as aforesaid the sum of ninety thousand dollars annually, counting from the time when the removal and allotments provided for in this act shall have been made ... the payments of such interest to be made yearly in advance, and in the discretion of the Secretary of the Interior, may, as to three-fourths thereof, during the first five years be expended in procuring live-stock, teams, farming implements, and seed for such of the Indians to the extent of their shares as are fit and desire to engage in farming, but as to the rest, in cash; and whenever said permanent fund shall exceed the sum of three million dollars the United States shall be fully reimbursed out of such excess, for all the advances of interest made as herein contemplated and other expenses hereunder.

Following the Nelson Act appropriation, Congress annually appropriated $90,000 ad-

---

**43.** The act also appropriated $100,000 for the cost of surveys, appraisals, removals and allotments. Monies expended for these purposes are listed under disbursement Schedule Four of the 1963 GAO Report, not part of the present litigation. While subsequent acts included expenses for the removal and allotment of Indians under appropriations for civilization and relief purposes, the acts also made special appropriations for surveying and allotments.

**44.** Following the Act of Aug. 19, 1890, the appropriations for expenditures listed under disbursement Schedule One are as follows:

| | |
|---|---|
| Act of July 13, 1892, ch. 164, 27 Stat. 138 | $150,000; |
| Act of March 3, 1893, ch. 209, 27 Stat. 632 | $ 75,000; |
| Act of August 15, 1894, ch. 290, 28 Stat. 290 | $ 50,000; |
| Act of March 2, 1895, ch. 188, 28 Stat. 881 | $ 50,000; |
| Act of June 10, 1896, ch. 398, 29 Stat. 326 | $ 75,000; |
| Act of June 7, 1897, ch. 3., 30 Stat. 67, 90 | $ 75,000; |
| Act of July 1, 1898, ch. 545, 30 Stat. 576 | $ 75,000; |
| Act of March 1, 1899, ch. 324, 30 Stat. 928 | $100,000; |
| Act of May 31, 1900, ch. 598, 31 Stat. 226 | $100,000; |
| Act of March 3, 1901, ch. 832, 31 Stat. 1063 | $150,000; |
| Act of May 27, 1902, ch. 888, 32 Stat. 249 | $150,000; |
| Act of March 3, 1903, ch. 994, 32 Stat. 986 | $150,000; |
| Act of April 21, 1904, ch. 1402, 33 Stat. 194 | $150,000; |
| Act of March 3, 1905, ch. 1479, 33 Stat. 1051 | $150,000; |
| Act of June 21, 1906, ch. 3504, 34 Stat. 350 | $150,000; |
| Act of March 1, 1907, ch. 2285, 34 Stat. 1033 | $150,000; |
| Act of April 30, 1908, ch. 153, 35 Stat. 83 | $150,000; |
| Act of March 3, 1909, ch. 263, 35 Stat. 794 | $150,000; |
| Act of April 4, 1910, ch. 140, 36 Stat. 276 | $150,000. |

While the Act of 1897 authorized an appropriation of $75,000, the 1963 GAO Report credits $75,559 to the fund for disbursement Schedule One for that year.

vance interest to the Chippewas in Minnesota up through 1910, for a total of $1,890,000.[45] The 1963 GAO Report states that a total of $1,869,929.39 was expended under disbursement Schedule Two. Of this amount, $311,614.64 was attributed to Red Lake, primarily for per capita cash payments and education. A small sum ($70.69) was attributed to "boats, docks, etc." and "hardware".

The remaining two reimbursable schedules concern specific appropriations for education. By the Act of March 1, 1899, ch. 324, 30 Stat. 929, Congress appropriated $20,000 "for buildings for additional schools at points on the Chippewa Reservations in Minnesota, to be selected by the Commissioner of Indian Affairs...." The GAO Report states that from this appropriation, $17,974.54 was expended for education over fiscal years 1900 through 1903 under Schedule Five—Indian Schools Chippewas in Minnesota: Buildings (Reimbursable). Of this amount, $5,361.28 was attributed to Red Lake. Finally, by the Act of July 1, 1898, ch. 545, 30 Stat. 576, Congress appropriated $35,000 "[f]or the erection and completion of suitable buildings for an industrial boarding school on the Red Lake Reservation...." The GAO reports under Schedule Six—Indian School, Red Lake, Minnesota: Buildings (Reimbursable) that this sum was expended for education at Red Lake during fiscal year 1901.

The reimbursable appropriations made and expended under disbursement Schedules One, Two, Five, and Six are credited as in fact reimbursed to the United States Treasury. Most of the monies were reimbursed on May 16, 1911, as detailed in the 1963 GAO Report.

In addition to the four reimbursable disbursement schedules discussed above, there are four non-reimbursable schedules relevant to this litigation. They are Schedules Ten, Eleven, Twenty and Twenty-one. The GAO reports that disbursements were first made from disbursement Schedule Ten—Chippewas in Minnesota Fund in fiscal year 1912. Schedule Twenty represented the principal fund comprised of the proceeds from the sale of the ceded Chippewa land and timber. For fiscal year 1912, GAO reports that a total of $164,606.39 was disbursed from the Chippewas in Minnesota Fund, of which $18,879.28 was for Red Lake. The 1963 GAO Report lists the last expenditures for the Red Lake Band as occurring in fiscal year 1945, when disbursement of $25.00 was attributed to per capita cash payments. The GAO reports that a total of $1,773,107.61 was expended for the Red Lake Band under disbursement Schedule Ten between fiscal years 1912 and 1945.

The GAO reports that expenditures were made under disbursement Schedule Eleven—Interest on Chippewas in Minnesota Fund for the Red Lake Band from fiscal year 1911 through fiscal year 1944 in a total amount of $1,410,117.96. This money was expended almost entirely for education and per capita payments. An amount of $714,213.98 was attributed to education, and $695,236.28 for per capita payments. Disbursements were also listed under several other disbursement categories for sums ranging from $1.66 to $236.17 under this schedule.

As mentioned above, the Act of June 15, 1938 directed the Secretary of the Treasury to divide Nelson Act trust monies between the Red Lake Band and the Minnesota

---

**45.** The post-Nelson Act advance interest appropriations were made by the following legislation:

Act of March 3, 1891, ch. 543, 26 Stat. 1003;
Act of July 13, 1892, ch. 164, 27 Stat. 134;
Act of March 3, 1893, ch. 209, 27 Stat. 626;
Act of August 15, 1894, ch. 290, 28 Stat. 289;
Act of March 2, 1895, ch. 188, 28 Stat. 880;
Act of June 10, 1896, ch. 398, 29 Stat. 325;
Act of June 7, 1897, ch. 3, 30 Stat. 67;
Act of July 1, 1898, ch. 545, 30 Stat. 575;
Act of March 1, 1899, ch. 324, 30 Stat. 928;

Act of May 31, 1900, ch. 598, 31 Stat. 226;
Act of March 3, 1901, ch. 832, 31 Stat. 1063;
Act of May 27, 1902, ch. 888, 32 Stat. 249;
Act of March 3, 1903, ch. 994, 32 Stat. 985;
Act of April 21, 1904, ch. 1402, 33 Stat. 193;
Act of March 3, 1905, ch. 1479, 33 Stat. 1051;
Act of June 21, 1906, ch. 3504, 34 Stat. 350;
Act of March 1, 1907, ch. 2285, 34 Stat. 1033;
Act of April 30, 1908, ch. 153, 35 Stat. 82;
Act of March 3, 1909, ch. 263, 35 Stat. 794;
Act of April 4, 1910, ch. 140, 36 Stat. 276.

Chippewa Bands other than Red Lake. Consequently, beginning in fiscal year 1940, most disbursements for Red Lake from principal fund monies were listed under Schedule Twenty—Red Lake Chippewas in Minnesota Fund. Likewise, disbursements for Red Lake from interest fund monies were listed under Schedule Twenty-one—Interest on Red Lake Chippewas in Minnesota Fund. The 1963 GAO Report asserts that a total of $77,326.18 was expended under disbursement Schedule Twenty during fiscal years 1940 through 1947. The GAO further reports that a total of $28,918.91 was expended for Red Lake under disbursement Schedule Twenty-one during fiscal years 1941 through 1943.

As an organizational tool, the GAO created several categories and sub-categories by which to characterize the disbursements. The categories and sub-categories were first created and utilized by GAO in response to litigation spawned by the Act of May 14, 1926, under which Congress granted jurisdiction to the Court of Claims to hear equitable claims of the Chippewa regardless of the statute of limitations, arising under the Nelson Act or subsequent Indian legislation. Ch. 300, 44 Stat. 555 (as amended by the Act of April 11, 1928, ch. 357, 45 Stat. 423, and by the Act of June 18, 1934, ch. 568, 48 Stat. 979). In response to the Chippewa's claim in docket H–155 that the United States breached its duty as a trustee under the Nelson Act by expending funds for purposes other than those specified by the Nelson Act itself, the GAO prepared what has become known as the 1929 GAO Report. The categories and sub-categories utilized in the 1929 report that are relevant to the current accounting are as follows:

Per Capita Cash Payments
Education
 Pay of School Superintendents
 Pay of Teachers
 Pay of Misc. school employees
 Provisions
 Clothing
 Transportation of Supplies
 Transportation of Pupils
 School buildings and grounds (except Hospitals)
 Furniture and Equipment
 Fuel and Light
 Contract Schools (Board and Tuition)
 Medical attention
 Livestock
 Feed and care of livestock
 Manual training supplies
 Pay and expenses of Field Matron
 School Farm (Implements, seeds, etc.)
 Hardware, glass, oils and paints
 Misc. items
 Expenses, higher education
Drainage
Bridges
Roads
Payments to Minnesota School System
 Tuition
 Buildings and grounds
 Salaries
 Miscellaneous items
Surveying, allotting, sale, etc., Lands
Clothing
Provisions and other rations
Agricultural Implements and Equipment
Work and Stock Animals
Feed and Care of Livestock
Hardware, Glass, Oils and Paints
Medical Attention
Indian Houses
Household Equipment
Fuel and Light
Hospitals and Equipment
Pay of Mechanics
Miscellaneous employees
Transportation etc., of supplies
Agricultural aid
Miscellaneous Agency Expenses
 Travel expense of agent and employees
 Telephone and telegraph messages
 Office supplies, oaths, etc.
 Expenses of making cash payments
 Horses, vehicles and repairs
 Costs of land contests
 Expenses, criminal prosecutions
 Administering estates
 Sales and leases, individual allotments

Investigating rolls

Agency Buildings and Repairs (except Hospitals)

 Employees quarters

 Farm buildings

 Workshops

 Laundry

 Administrative buildings

 Sewer and water systems

 Unclassified

Saw and Grist Mills

Miscellaneous Building Materials

Councils and Delegations

Pay of Interpreters

Pay of Farmers

Pay and expenses of Indian Police

Burial of Indians

Care of Indigent Indians

Telephone Lines

Boats, docks, etc.

Technicians at the GAO examined several types of accounting documentation in order to place any single disbursement under one of the devised categories. This accounting documentation consisted of the agent's request for disbursing funds, vouchers, claims settlements, the agent's account current, the agent's abstract of disbursements, and the Treasury (or GAO) Audit Certificate.

For each fiscal year of a particular schedule, the GAO, in preparation of both the 1929 and 1963 reports, created a work card that listed the amount disbursed for a particular category and sub-category of expenditures. The work cards prepared for the 1929 report were later utilized in preparation of the 1963 report. The sub-categories that were detailed in the 1929 GAO Report were not listed in the 1963 report. However, unlike the 1929 report, the 1963 report did provide sub-categories for the "Councils and Delegations" category. Like the work cards for the 1929 report, the work cards for the 1963 report provided a breakout of expenditures by sub-category.

## I. *Indian Policy*

During the period 1880 until about 1934, the policy of the United States was to assimilate the American Indian. The allot-ment of land to the Indians in severalty was seen as a means for civilizing and promoting self-support because it was believed that the farming of individually owned pieces of land would bring Indians into the mainstream of economic life. This was motivated in part by a desire to decrease the role of the tribe as a unit. One of the other effects of allotment was to free up some unallotted lands for sale to whites.

By the Dawes Act, ch. 119, 24 Stat. 388 (1887), Congress adopted the policy of land allotment to Indians in severalty. D–63. Section 3 of the Nelson Act provided for allotment of lands in severalty to the Chippewa Indians in the state of Minnesota. D–64. The Act of June 2, 1924, ch. 233, 43 Stat. 253, conferred citizenship on all Indians who had not otherwise become citizens of the United States.

During the period 1889–1946 there was no Minnesota state criminal or civil jurisdiction over Chippewa Indians on the Indian reservations, including Red Lake Reservation.

By the Lacey Act, ch. 2523, 34 Stat. 1221 (1907), Congress authorized the Secretary to designate individual Indians (not including Chippewa) to be allocated a pro rata distribution of tribal funds. D–70. By the Pro Rata Act, ch. 125, 39 Stat. 123, 135 (1916), Congress authorized the Secretary to advance to individual Chippewa Indians an amount equal to one quarter of their pro rata share in the permanent fund.

In the 1920's, the policy of allotments and assimilation was challenged by critics, in particular by John Collier and the American Indian Defense Association.

By the 1920's it was the policy of the Indian Office to eliminate from the Indian boarding schools all pupils who could pay for their education and who had suitable public school facilities near their homes and eventually to integrate all Indian pupils into public schools.

The Indian Reorganization Act ("IRA"), ch. 576, 48 Stat. 984 (1934) (codified at 25 U.S.C. § 476), encouraged tribal self-government, ended allotment of tribal land,

and fostered Indian culture. D–79. The policy of Indian self-government was applied to the Chippewa Indians in the State of Minnesota, who voted in favor of the IRA, when two tribal entities were organized—the Minnesota Chippewa Tribe (organized under the IRA) and the Red Lake Band (organized under a traditional constitution). The Red Lake Chippewa and some Pembina Band Chippewa are represented by the Red Lake Band.

## J. *Education*

The 1963 GAO Report reflects that during the years 1890 through 1946, Nelson Act funds for educational purposes at Red Lake were disbursed under three categories:

| | Disbursement | | |
|---|---|---|---|
| Category | Principal | Interest | Total |
| 1. Education | $353,165.79 | $812,155.90 | $1,165,322.00 |
| 2. Payment to Minn. public schools | $ 89,166.00 | | $ 89,166.00 |
| 3. Payment to Minn. public school system: tuition | $ 45,500.00 | $ 8,500.00 | $ 54,000.00 |

When ultimately allocated between principal and interest after necessary reimbursement, the same total amount was distributed as follows:

| | | | |
|---|---|---|---|
| 1. Education | $384,678.00 | $780,644.00 | $1,165,322.00 |
| 2. Payment to Minn. public schools | $ 89,166.00 | | $ 89,166.00 |
| 3. Payment to Minn. public school system: tuition | $ 45,000.00 | $ 8,500.00 | $ 54,000.00 |

The category "Education" included expenditures for sectarian schools without identifying them. Of the disbursements under "Education," the defendant reports expenditures of about $158,649 for sectarian schools, $50,659 from principal and $107,990 from interest.

In 1877, the Government built the first Indian boarding school at Red Lake. In 1885, this school and the day school together had four teachers and a capacity of seventy students. In 1889, a Catholic mission at Red Lake opened the St. Mary's Boarding School. As of 1896, a report on the Red Lake Boarding School indicated that "all buildings ... old and in bad order, ... unsafe ... although the school has been maintained for many years, I fail to find any practical good results." The Annual Report of the Commissioner for 1894 reflects that "only two-thirds of the children have been able to write sentences and spelling lessons and one-third to write intelligible letters."

In 1900, the Government constructed two new boarding schools on the Red Lake Reservation, one at Red Lake and one at Cross Lake (Ponemah). These schools continued to operate as Indian boarding schools until 1934 when they became day schools. These schools were essentially the source of all education for Indian children on the Reservation. Between 1912 and 1922 one room of the boarding school at Red Lake was used as a public school for the children of the agency employees. In 1923, the United States built a two-room public school at Red Lake, operated by Minnesota. There were no Government-operated day schools on the Reservation between 1900 and the mid–1930's.

From 1890, when the Government undertook to educate the Chippewa children at

Red Lake, until 1935, the Government offered no high school education on the reservation. In 1935, the United States constructed a high school and turned it over to the State as a public school under the Johnson–O'Malley Act, Act of April 16, 1934, ch. 141, 48 Stat. 596. The boarding schools were the only federal schools available at Red Lake for 44 years (1890–1934).

During the period covered by the 1963 GAO Report (1890–1946), federal policy for Indian education and the instructions for carrying out that policy were developed centrally from Washington, D.C., and were generally uniform throughout the United States.

During the two decades immediately prior to the Nelson Act, the BIA relied heavily on religious groups with which the Government contracted to operate mission schools for Indian children.

In 1889, the Commissioner stated his convictions that the reservation system "must soon cease to exist"; that Indians must be absorbed "into our national life, not as Indians, but as American citizens"; that the "Indian must conform to the white man's ways, peaceably if they will, forcibly if they must. They must adjust themselves to this environment, and conform their mode of living substantially to our civilization"; "the tribal relations should be broken up"; "the paramount duty of the hour is to prepare the rising generations of Indians for the new order of things thus forced upon them."

The Commissioner stated that as of 1890 it was

the settled policy of the Government to break up reservations, destroy tribal relations, settle Indians upon their own homesteads, incorporate them into the national life, and deal with them not as nations or tribes or bands, but as individual citizens. The American Indian is to become the Indian American.

Part of this assimilation was to be accomplished through education. Around this time contracts with sectarian schools were discontinued and contract mission schools were replaced by government boarding schools. The content and goals of Indian education during this period were to provide the "rudiments of an English education" and the elements of an honorable vocation. Emphasis was on teaching Indians to read and write, to farm, and to perform unskilled and domestic labor.

The Commissioner's policy became the federal policy. Congress in 1897, by statute, declared it to be the "settled policy of the Government to make no appropriation whatever out of the Treasury of the United States for education of Indian children in any sectarian school." Act of June 7, 1897, 30 Stat. 62, 79 codified at 25 U.S.C. § 278; see also Act of June 10, 1896, 29 Stat. 321, 345. Appropriation of federal monies for sectarian schools were successively reduced and entirely discontinued by fiscal 1901. The BIA, to fund contracts with the sectarian school at Red Lake, used tribal funds appropriated for "civilization and support" and accrued interest on Nelson Act funds. P–32.

The BIA took an essentially paternalistic approach to Indian education during the first 30 years of this century, viewing schools and particularly boarding schools, as one mechanism for "civilizing" and "Christianizing." There are numerous expressions during this period to the effect that the BIA based its educational policy on the assumed inferiority of the great mass of Indians in terms of religion, morals, and home life. Students were directed primarily in manual occupations, and learning was primarily directed at obtaining minimum skills in reading, writing, and basic commerce.

The Secretary initiated an investigation of the social and economic conditions of Indians throughout the United States through the Brookings Institution, resulting in the 1928 Meriam Report. *Report of the Institute for Government Research, The Problems of Indian Administration (GPO 1928)* pp. 56–57 [hereinafter Meriam Report]. The Senate Committee on Labor and Public Welfare described the report as "[p]robably the most significant investigation ever conducted in the field of Indian affairs...." S.Rep. 501, 91st Cong., 1st Sess. 12,153 (1969) (entitled "Indian Edu-

cation: A National Tragedy—A National Challenge) [hereinafter 1969 Senate Report]. The Committee described the Meriam Report as:

> devastating in its criticism in two major areas which constituted the most serious deficiencies in Indian administration: The exclusion of Indians from the management of their own affairs, and the poor quality of services (especially health and education) rendered by public officials not responsible to the Indian people they serve.

The Meriam Report was highly critical of boarding schools and called them grossly inadequate. Criticisms included overcrowded dormitories, deficient diets, inadequate medical facilities, and a daily schedule of work and study that was overly demanding. The curriculum was called unrealistic and classroom instruction techniques were found ineffective. Low teacher salaries were blamed for low educational standards. Staff personnel were considered inadequately trained.

The report does not focus on any particular Indian reservation and only occasional references are made to the Red Lake reservation, although one member of the survey staff visited Red Lake. The observations of the Meriam Report, unless specifically referenced to a particular locale, relate in a general sense to the BIA's overall policy to all Indians.

The Meriam Report was particularly critical of the heavy reliance on boarding schools. The report notes that for several years, "the general policy of the Indian Service has been directed away from the boarding school for Indian children and toward public schools and Indian day schools. It is still the fact that the boarding school, either reservation or non-reservation, is the dominant characteristic of the school system maintained by the national government for its Indian wards." Meriam Report, *supra* p. 452, at 11. The survey staff concluded "frankly and unequivocally that the provisions for the care of Indian children in boarding schools are grossly inadequate." *Id.*

The Meriam Report's general conclusions are in accord with those of a 1931 Report of the National Advisory Committee on Education [hereinafter NACE Report]. This report characterized the federal government's educational policy for Indians as not "much more than a tragic failure" and states:

> That the educational system was not set-up developmentally for the Indian was an initial and fundamental mistake. Limited money expended on an inadequate plan has been appallingly wasted because it could not give needed results. Additional money spent on an effective plan would have greatly shortened the period of expenditure and in the long run saved large amounts of public money. Ineffective schooling is mere gesture which satisfies no situation.
>
> \* \* \* \* \* \*
>
> Insofar as tribal occupations and traditions are still a part in the self-sustaining life of his group, Indian activities, however foreign to our own civilization, should be an appreciated part of the program for Indian training. In the case of the children, one or more generations removed from pure tribal activities and customs, the vocational activities necessary for self-support in the American communities ought to be an essential part of their practical education. For them, skilled trades and occupations must take the place of the unskilled labor which is too generally all the Indians have to see us.
>
> \* \* \* \* \* \*
>
> Boarding schools, which remove children from their homes and tribal connections, should certainly not be maintained for elementary school children.

NACE Report, *supra* p. 453, at 50–52.

The boarding school policy separated Indian children from parents and family and forced the children to live away from home. One of the purposes of boarding schools was to minimize the effects of traditional Indian culture and language.

Indian parents were not significantly involved in the management and operation of

the schools. School administrators were responsible to the United States. By contrast, during the same period, in non-Indian communities adjacent to the reservation, parents appear to have been considerably more involved in the administration and control of the schools, in part through parent-teacher associations.

To implement the Federal policy of assimilation, the United States discouraged use of Indian language in the schools. Until 1934, the Government directed that all instruction in Indian schools be in the English language. The BIA also sought to replace Chippewa school employees with whites in order to have students influenced by English speaking people.

The Meriam Report strongly criticized the method of instruction in Indian boarding schools as being regimented, routinized, over-formal, too strict, and "old fashioned." Similar criticisms were made by others of schools on the Red Lake Reservation. The report also observes that Indian children in the government schools had to perform productive labor during much of the school day, since without the children's labor, the schools could not be maintained. It reports that the official course of study for Indian schools stated:

> In our Indian schools a large amount of productive work is necessary. They could not possibly be maintained on the amounts appropriated by Congress for their support were it not for the fact that students [ (*i.e.*, children) ] are required to do the washing, ironing, baking, cooking, sewing; to care for the dairy, farm, garden, grounds, buildings, etc.—an amount of labor that has in the aggregate a very appreciable monetary value.

> The term "child labor" is used advisedly. The labor of children as carried on in Indian boarding schools would, it is believed, constitute a violation of child labor laws in most states.

Meriam Report, *supra* p. 452, at 375–76. Such child labor

> has probably become a menace to both health and education.... In nearly every boarding school one will find children of 10, 11, and 12 spending four hours a day in more or less heavy industrial work —dairying, kitchen work, laundry, shop. The work is bad for children of this age, especially children not physically well-nourished; most of it is in no sense educational, since the operations are large scale and bear little relation to either home or industrial life outside....

Standard curricula for the early part of the century recommend up to four hours daily of industrial or occupational work for boarding school children. The expectation or goal of the Red Lake school system was that children should take two years to complete one grade. However, even that was frequently not achieved. Lack of pupil progress was a recurrent problem at the boarding schools at Red Lake.

Meriam Report, *supra* p. 452, at 374–75.

Reports of inspectors sent from Washington report over the 30–year period between 1900 and 1930 reflect a very large number of instances of unsatisfactory performance or inadequate qualifications of teachers and staff at the Red Lake and Cross Lake Schools.

Plaintiff's education expert Dr. Clifford P. Hooker testified that there were an unusually high number of negative evaluations of teachers at the two boarding schools in comparison with the public schools he had evaluated. While there were some favorable comments, the balance was clearly on the negative side.

One reason for the recurrent difficulty with teachers was that the salary levels and relative isolation of the reservation made the position unattractive. The Meriam Report reflects similar problems and reasons for the problems at reservations around the country.

The BIA implemented a uniform course of study for the entire Indian Service, including the Red Lake Reservation. The curriculum included academic subjects, but clearly emphasized obtaining a basic grammar school education and learning unskilled or moderately skilled trades. The course of instruction in the Indian boarding schools was more limited than that usually taught in other schools in the areas.

By letter dated February 26, 1902, the agent at Leech Lake reported to the Commissioner that an "assistant clerk reported for duty February 18, and proceeded at once to Red Lake to relieve the school clerk who had been temporarily performing the clerical duties at the Red Lake sub-agency."

Prior to the creation of an agency at Red Lake in 1907, the Superintendent of schools at Red Lake was the chief federal officer on the Reservation. The Superintendent of schools functioned as a subagent. After the Red Lake Agency was created, the agent for the Red Lake Agency was also the Superintendent of schools at Red Lake. From 1907 to 1920, the defendant charged the Superintendent's entire salary under the category "Education." From 1921 to 1926, the Superintendent's salary was split between the categories "Education" and "Agency Exp."

The BIA Inspector of Schools reported in 1913 that:

> This school [Cross Lake] is twelve miles [by water] from the agency, and the duties of principal also include those of an assistant superintendent, for he largely handles the minor agency affairs at this side of the Lake.

Again in 1915, the BIA Inspector reported that

> Whenever I go and visit schools I find that the tendency on the part of the Superintendents is to give first attention to reservation affairs and if anything must be neglected it is always the school work.

The Chief Supervisor of Education reported in 1921:

> The agency work demands all of the time of the superintendent and therefore it is not possible for him, even if he were strong in educational work, to give that particular phase of the work among the Indians of Red Lake, the supervision that it must necessarily have.

Minnesota operated a public school for the children of the agency employees in the Red Lake Boarding school from 1911 to 1922. There was no evidence of direct expenditure of Nelson Act funds for the operation of this school. Defendant's accounting expert testified that when this school was moved outside the Red Lake School building, $3,370.88 in Nelson Act funds were used to assist with the establishment of that public school. A room in the Cross Lake boarding school was used by a mailman for sleeping quarters for a period including part of 1927 and 1928.

Annual reports of the Red Lake agent for the years 1920, 1921, and 1922 reflect that facilities built for the school, such as lighting, water, and sewer systems and paid for with Nelson Act money also served the agency buildings. Defendant offered no explanation of these reports. Its only response is that the requested conclusions are too general to be based on three reports. The court agrees, but only in part. While plaintiff's requested conclusions of law may be too broadly stated (see discussion *supra* at p. 400), that does not alter the fact that the only conclusion to be reached from the reports by the Red Lake agent are that the benefit of the capital improvements for furnishing utilities was shared by the school and the agency. Although there may have been economies in having a single source for various utilities, there is no evidence that the cost of those improvements was shared. There is no basis in the record for the court to meaningfully divide the beneficial impact of these disbursements, other than the clear impression left from all documentation that there was a significant agency presence on the reservation.

The backup data submitted in support of the 1963 GAO Report indicates that the defendant expended $158,649.32 to pay tuition to sectarian schools, $50,659.45 from principal and $107,989.87 from interest.

The defendant reports expenditures from Red Lake money under two categories, "Payment to Minnesota Public Schools—$89,166," and "Payment to Minnesota Public School Tuition—$54,000." While the state of Minnesota provided free public education to "the children of all actual residents," Minn.Gen.Stats. § 3697 (1894 ed.), or to all "persons" between the ages of five and twenty-one years of age, *id.*, § 2670

(1913), and the Comptroller of the Treasury forbade federal officials from paying for tuition when Indian children could attend public school free, in fact Minnesota did not permit Indian children who were wards of the federal government to attend school free. During the time in question, the Attorney General of Minnesota responded to an inquiry from Assistant Commissioner E.B. Meritt by saying that only "children of Indians who are citizens and voters of the State of Minnesota—are entitled to the same school privileges as are children of other citizens of the State." A response by the state Office of Attorney General in 1922 states:

> As to children of Indian blood living on reservations or in tribal relations, it would seem unquestionable that no right to state school privileges exists, since the exclusive jurisdiction over such children is vested in the United States Government.

During the period in question, most of the members of the Red Lake Band were wards of the federal Government, were living in tribal status, and had not become citizens and voters of the state of Minnesota. *See Opsahl v. Johnson*, 138 Minn. 42, 163 N.W. 988 (1917).

Plaintiff drew the court's attention to numerous appropriations by Congress of monies to fund construction of public schools in a place convenient for Red Lake Indians. *See, e.g.*, Act of March 3, 1921, c. 119, 41 Stat. 1225, 1235; Act of May 24, 1922, ch. 199, 42 Stat. 552, 569; Act of January 24, 1923, ch. 42, 42 Stat. 1174, 1190. There were numerous requests for use of Nelson Act monies for such purposes during this period. However, there was no evidence that monies were actually disbursed from Nelson Act monies attributed to the Red Lake Band, with the exception of a three-room school house built at Redby. That building was apparently built in large measure through Red Lake monies. Defendant concedes that in fiscal years 1923 and 1924, $13,894.16 and $14,504.32 of Red Lake funds were paid to the Minnesota public schools for non-tuition items.

Section 7 Nelson Act monies disbursed for education on the Red Lake Reservation were expended to establish and maintain two schools: the Red Lake School in Red Lake, Minnesota, and the Cross Lake School in Ponemah, Minnesota. After 1940 $54,000 went to the Minnesota public school system for tuition. From 1891 to 1947, $171,040 was disbursed to the reservation's contract schools.

According to the 1963 GAO Report a total of $1,219,321.60 was disbursed for education at the Red Lake Reservation out of both the principal and the interest of the tribe's section 7 monies. Less the amount paid as tuition to the Minnesota public school system after 1940, the total disbursed for education was $1,165,321.69. A total of $995,281.67 was disbursed between 1891 and 1941 for education at the Red Lake and Cross Lake Schools.

A government boarding school was opened at Red Lake in 1877. A new building was constructed in 1900. The school ceased being a boarding school in 1934 and became a day school. The government boarding school at Cross Lake opened in January of 1901. It was changed to a day school, and in the 1936–1937 school year, it came under the Minnesota public school system.

 Section 7 clause 4 of the Nelson Act provides, "[o]ne-fourth of said interest ... shall be devoted exclusively to the establishment and maintenance of a system of free schools among said Indians, in their midst and for their benefit." There is no definition given of either "in their midst" or "for their benefit" in the Act itself or in Congress's debate over the Act. Both schools were located on the reservation, however, and the court finds that the schools were "in their midst."

The Meriam Report stated that the nearness of reservation boarding schools was of some advantage, but the benefits were offset by other problems, including the lack of involvement in the schools by the surrounding communities. On July 1, 1898 Congress appropriated $35,000 for construction of new facilities at the Red Lake School and Cross Lake School. Act of July 1,

1898, ch. 545, 30 Stat. 576. The money was later reimbursed to the Government by the Indians out of their section 7 monies.

The new facilities constructed for the Red Lake School included: two classrooms, office space, living quarters for students and supervisory staff, steam central heating, gas lighting, lavatories and toilets on each floor of the classroom building. These facilities were located on a 100 acre area which included acreage used for agricultural purposes. An inspection report filed in July of 1909 found fault with the facilities at the Red Lake School. The reporting agent found the school's water supply, lighting and boys' wing to be "inadequate" or "unsatisfactory." The main building was found to be heated by a "sectional heater and radiators." The other buildings were heated by stoves. Also while the main building was equipped with gas lighting fixtures most light in the building came from lamps.

The new facilities constructed for the Cross Lake School were smaller and designed to serve Red Lake Chippewa children who lived near that location. Over the years, as enrollments grew and repairs were required, both the Red Lake School and the Cross Lake School were refurbished. For example, in 1914, new lavatories were installed and a dairy barn was added to the Red Lake complex. In 1918, the Cross Lake School was enlarged and furnished with steam central heat and electricity. While school officials were at times slow to correct deficiencies and there were sporadic reports of overcrowding and sanitation problems, over the years problems were identified and usually corrected, although typically after delay.

There is clear evidence of periodic overcrowding at both the Red Lake and the Cross Lake Schools before World War I but this seems to have been temporarily corrected by the pre-WWI building additions. Conditions worsened again though. A report from 1927 states, "[c]onditions are now deplorable [at Red Lake] 80 pupils are sleeping 2 to a bed." After 1928, the overcrowding problem was somewhat relieved. In both 1913 and 1914 the dormitories were

reported to be well aired and exposed to sunlight through ample windows, although the schools were typically at capacity or overcrowded.

Reports on the diet provided students at the Red Lake and Cross Lake Schools were mixed. There were several reports that food was well cooked, well served, in sufficient quantities, and of "good," "adequate," or "satisfactory" quality. But there were also reports that the menu lacked variety, that the supply of dairy products was reported to be low at times, and that undernourishment existed.

The sanitary health conditions at the Red Lake and Cross Lake Schools were the subject of persistent problems, including unsatisfactory lavatories and bathing facilities, overcrowding, and chronic diseases—tuberculosis and trachoma.

In 1927–1928, a renovation program was undertaken at a cost of $58,641.36 to provide a new classroom building, gymnasium, principal's cottage, mess club and cottages for the farmer and the foreman at the Red Lake School. At the Cross Lake School, a kitchen addition and a boys annex were constructed.

A 1927 inspection by Inspector Peyton Carter described the facilities at the Red Lake School in favorable terms and stated that the facilities included a modern four-room school building, assembly hall, gymnasium, two new cottages, and a large addition to the employees' building. In 1928, Special Inspector T.B. Roberts stated, "A wonderful improvement has been made on this Reservation under the direction of Superintendent Burns. A splendid gymnasium has been built, an auditorium annex, four cottages and school buildings themselves thoroughly remodeled and rearranged."

In 1927, Inspector Peyton Carter described the facilities located at the Cross Lake School and labeled them "very much improved" and "quite satisfactory." Carter stated that the lavatory addition to the boys' building of the school made it "one of the best boys' buildings in my [Carter's] district."

In 1931, Inspector Alden Hewitt described the facilities at the Red Lake School and noted that "while the school house at Red Lake is not particularly modern in its construction, the rooms are large and well lighted." Hewitt's report is favorable as to the location of the school near "woods and water". His description of the school's physical plant is generally lukewarm.

In 1931, Inspector Alden Hewitt described the facilities at the Cross Lake School and stated that "the school house at Cross Lake is older and less convenient, but again, its advantages are greater than its disadvantages." Hewitt once again was pleased with the location of the school but not its physical plant.

At times the facilities and conditions for the students at the Red Lake and Cross Lake Schools were of satisfactory quality. Before WWI the facilities, especially the boys' wing and the lavatories, were reported to be unsatisfactory. The physical plant was reported to be "old [and] worn-out" at the Red Lake School while the building at the Cross Lake School was described as "unsatisfactory." In the late 1920's after the building program the facilities were described as either "satisfactory" (Red Lake) or "one of the best" (Cross Lake).

After 1891, teachers hired for assignment in the Indian Service were appointed on the basis of a Civil Service Examination. The test covered the subjects of spelling, penmanship, pedagogy, literature, arithmetic, elementary algebra, U.S. history, and geography. The test in 1893 was to be taken in eight consecutive hours, but by 1906 the time limit had been increased to two days (seven and one-half hours the first day and six hours the second day).

Civil Service rules required that Indian Service teachers be at least twenty years of age, unless the applicant was the wife of the Indian School Superintendent. In 1893, Indian Service teachers (other than school principals) were paid $480–$800 per year with the average salary being $600 per year.

In 1925, the three teachers at the Red Lake School received salaries of $1,200 per year. In 1930, elementary school teachers in the Indian Service received salaries of $1,500–$1,740 per year. Teachers at the Red Lake and Cross Lake Schools were regularly evaluated. Ineffective teachers were given opportunities to improve. There is no evidence of prompt, outright dismissal of any incompetent teacher but defendant established that at least three teachers who received unsatisfactory ratings did not appear on the Red Lake payroll for the school year immediately succeeding the unfavorable rating.

Both Red Lake and Cross Lake Schools sometimes employed Indians as support personnel, to be matrons, seamstresses, laundresses, cooks, engineers, laborers, night watchmen, bakers and blacksmiths. Over the years, there was continuing employment of Indians as support personnel. There was no stated policy of replacing Indians with whites. There was a policy of preferring to hire Indians for support jobs in particular laborer positions.

The subjects taught at the Red Lake and Cross Lake Schools were part of a curriculum designed for use at Indian educational institutions throughout the United States. Inspector reports show that in some cases the curriculum was not followed correctly and in other areas it was not followed at all (particularly in the areas of music and vocational training).

The curriculum was intended to prepare Indian children to assimilate in the political, social and economic life of the country with all the rights and duties of American citizenship. The recommended curriculum at the Red Lake and Cross Lake Schools included instruction in reading, writing, penmanship, arithmetic, spelling, U.S. history, and civics, as well as vocational training with an emphasis for boys on agriculture and animal husbandry through maintenance of a school farm, the use of school farmers and course instruction in farm-related themes, and with an emphasis for girls on homemaking skills such as baking, cooking, gardening, housekeeping, laundry and sewing. The vocational training included very little theoretical classroom instruction, consisting mostly of doing the

chores needed for the upkeep of the schools. It was stated that education was not to be neglected, "but rather subordinated to the practical needs of the child's environment."

The curriculum for both boys and girls at the Red Lake and Cross Lake Schools was in keeping with contemporaneous policies of Indian education and was directed to the kind of work students would do when leaving school as farmers and farmers' wives. The recommended curriculum provided for physical training (sometimes military drill) and daily play time which was to add up to three hours per day.

During the afternoon session, the curriculum included performance of chores by students to teach the older boys skills in agriculture and animal husbandry and the girls skills in homemaking. There was little instruction. The students were expected to "learn by doing." After 1922 the first three grades did school work all day. Small children were not supposed to work.

At Indian Service Schools it was expected that a non-English speaking student who entered school at seven years of age, would progress at the rate of one grade every two school years. This expectation was rarely fulfilled. Rates of attendance among children enrolled at Red Lake and Cross Lake Schools were high compared to the Minnesota public schools because these were boarding schools and students did not have to walk to school. Minnesota public school attendance in turn was considered high in comparison to the rest of the nation according to the Educational Testing Service.

Over the years, it was apparent that there were more Red Lake Chippewa children than spaces for enrollment at the Red Lake and Cross Lake Schools. There was an attempt to alleviate this by permitting some overenrollment at the two schools, the use of Nelson Act funds to provide for public school buildings and tuition, and contracts with St. Mary's Mission Boarding School.

Before any child was admitted to the Red Lake or Cross Lake Schools, he or she had to be personally examined by a physician and certified as free from incurable infectious or contagious diseases, although this screening program does not seem to have been effective. The health of the students at the Red Lake and Cross Lake Schools was reported on some occasions to be generally good. Efforts were made to reduce the prevalence of diseases such as tuberculosis and trachoma; these efforts were reported to be not very effective.

Defendant has designated ten counties which surround the Red Lake Reservation as a model for purposes of comparison, which it refers to as "North Central Minnesota": Roseau, Beltrami, Clearwater, Cass, Hubbard, Itasca, Koochiching, Lake of the Woods, Marshall, and Pennington. The court accepts defendant's definition as accurate, but recognizes for reasons explained in Plaintiff's Objections to Defendant's Post-trial Proposed Findings of Fact that the designation is less than perfect. The court notes that as the term is used, it may refer to less than ten counties at any given point, since some counties were created during this period. The boundaries of the counties did not remain constant during the period in question, portions of former reservation land are excluded, and substantial numbers of non-Red Lake Indians are included in the model. Nevertheless, the model has relevance based on geographic proximity.

Funding for public education in North Central Minnesota was dependent primarily on county taxes during the relevant period. The ten-county area had a considerably smaller tax base upon which to draw on a per capita basis than the state as a whole, despite higher than average tax rates.

Based on the present county configuration, public high schools did not open in North Central Minnesota until these dates:

| County | School | Opening |
| --- | --- | --- |
| Marshall | Warren | 1895–1896 |
| Hubbard | Park Rabids | 1899–1900 |
| Itasca | Grand Rapids | 1899–1900 |
| Beltrami | Bemidji | 1901–1902 |
| Pennington | Thief River Falls | 1902–1903 |
| Cass | Cass Lake | 1904–1905 |
| Clearwater | Bagley | 1907–1908 |
| Koochiching | International Falls | 1912–1913 |
| Roseau | Roseau | 1916–1917 |
| Lake of the Woods | None until after | 1920 |

The Johnson–O'Malley Act mandated that the states had to provide an adequate education for their resident Indians in the public school systems. Beltrami County took over the Red Lake boarding and day schools that year and the Cross Lake School in 1936. In the 1890's there were no public schools on or near the Red Lake Reservation.

By 1914 a few Red Lake Chippewa children were attending a public school at Redby, Minnesota, a village on the Red Lake Reservation. It was reported at the time by the Red Lake agent that as regards service to Indian pupils, attendance at Government schools was preferable. In 1912, the first public school was established at Red Lake, Minnesota, for the children of Red Lake Reservation employees. It was located in a room of the Red Lake boarding school. Some children of Chippewa employees attended this school. The public school at Red Lake moved out of the boarding school into its own building in 1923. There is no record of expenditures of Nelson Act funds going exclusively to benefit the Red Lake public school up to 1922.

Beginning in 1923, Nelson Act monies were used to pay tuition for Red Lake Chippewa children at the public schools at Redby and Red Lake, Minnesota. Approximately $3,370.88 of Nelson Act monies was spent to construct the public school at Red Lake. The state assumed administration of the Red Lake School beginning in the school year 1934–1935 and the Cross Lake School in 1936–1937.

The legislative history accompanying the Johnson–O'Malley Act expresses a congressional policy of integration of Indian pupils into public schools. Pursuant to the Johnson–O'Malley Act, the United States entered into a contract with the State of Minnesota for the education of Indian children in Minnesota public schools.

Under the first Minnesota Johnson–O'Malley contract, signed on August 13, 1936, the state agreed to provide education for all resident Indian children on the same terms and conditions provided to other state residents; to maintain educational standards not lower than the highest maintained anywhere in the state; and to furnish, if funding allowed, transportation, school lunches, textbooks, and school supplies. In return the United States was to pay initially $44,375 from the Nelson Act fund. Later contracts paid $12,000 annually until 1943. In 1944, $6,000 was paid out of the fund.

In 1935, construction began on the first high school building in Red Lake, Minnesota. In 1937, the first five students graduated from Red Lake High School. Neither party was able to demonstrate whether these were Red Lake Chippewa. In 1916 only two percent of rural Minnesota children completed eighth grade. In 1932, the figure was seven percent. In the early to mid–1930's, of those who completed eighth grade, about one-half went on to high school.

The annual report of the Supervisor of Indian Education in Minnesota for 1937–38 states that the education provided at the Red Lake Public Schools compared favorably with the best schools in the country, although it notes that problems persisted at the schools, particularly overcrowding.

Anecdotal accounts of the period prior to the 1930's indicate that public schools in North Central Minnesota were frequently one-room elementary institutions that the average teacher was a girl who had a year or two of normal school to her credit, and that the teacher would in some cases conduct classes for students of all ages. A report by the Educational Test Bureau ("ETB") in 1934 states that Minnesota farm children attending elementary school were attending schools taught as a rule by a young teacher with limited training and experience.

Anecdotal accounts indicate that prior to the 1920's, public schools in rural northern Minnesota were often one-room log cabins, lacking central heating, using wood stoves, and without indoor plumbing. In 1932 less than 20% of the teachers in rural areas had more than one year of education past high school.

The ETB Report of 1934 stated that, "[t]he turnover in the teaching profession continues very high in the rural schools [of Minnesota]. There are 21% of the rural school teachers who have remained in the same school for three years or more." Marriage, advanced training, the undesirable salaries, and teaching and living conditions of the small towns as compared to the larger urban areas were identified as contributing factors.

Approximate average monthly teacher salaries in the semi-graded and rural schools of North Central Minnesota were:

| Year | Average Salaries |
|------|------------------|
| 1905–1906 (Beltrami Co.) | $40 |
| 1910–1911 (10 county region) | $40–$50 |
| 1925–1926 (10 county region) | $90–120 |

For the most part, the Minnesota legislature gave State or local authorities control over the development of public school curricula. In the mid–1800's, the subjects taught in rural schools were those which the teacher knew.

The Minnesota State Constitution requires that the legislature "establish a general and uniform system of public education." No specific curricula prescriptions were made until the publication in 1908 of the "Course of study for the common schools of Minnesota."

There was little public school attendance beyond the elementary grades in rural Minnesota until the mid-twentieth century. According to U.S. Census data in 1940, 21.2 percent of Minnesota's adult farm population over 25 years of age had any high school education.

A history of Minnesota attributed the low percentage of public high school attendance in rural Minnesota to the need for young people to help on family farms, old world cultural traditions which did not emphasize education beyond elementary levels, and difficulties in traveling over poorly maintained roads, especially in winter.

The congressional policy, embodied in section 7 of the Nelson Act, of establishing schools on the Red Lake Reservation for the Red Lake Chippewa children was implemented in part by permitting a contract school, St. Mary's Mission Boarding School, to be located on the reservation, and subsidized by Nelson Act monies. In 1889, the first log structure was built on the site of the St. Mary's Mission Boarding School. In 1896, attendance at St. Mary's Mission Boarding School was seventy. In 1902, St. Mary's Mission Boarding School with a capacity of eighty students had an enrollment of seventy-one students of which sixty-two were boarding students. The school had eight employees, seven white and one Indian. The school was operated at a cost of $70.73, per capita, to the Mission. In 1905, St. Mary's Mission Boarding School with a capacity of eighty students had an enrollment of eighty-one. An average of sixty-five students were boarders. The school was operated at a cost of $4,325 to the Mission.

In 1891, some of the Red Lake Chippewa Indians petitioned the Secretary to use Nelson Act monies available under section 7 for the construction and maintenance of a Catholic school on the Red Lake Reservation "to accommodate all the children whom their parents might choose to send there ..."

At the turn of the century, the following generally describes St. Mary's Mission Boarding School:

Physical Plant: 5 buildings

Curriculum: academic subjects, farming, gardening, care of stock, dairying, cooking, sewing and laundering

Language: Primarily English

Teaching Staff: Two Sisters of St. Benedict's Convent

Other Staff: Two Sisters of St. Benedict's Convent for cooking, gardening and milking duties

Number of students: 80

Special facilities: farm producing oats, potatoes, turnips, and hay with

Livestock: horses, cattle and chickens.

No Nelson Act monies were disbursed to St. Mary's Mission Boarding School between fiscal years 1902–1914. Between fis-

cal years 1902–1914, St. Mary's Mission Boarding School continued to operate with the support of the Catholic Indian Bureau, Mother Katherine Drexel, donations from St. John's Abbey and from collections at lumber camps.

In the spring of 1914, a group of Red Lake Chippewa Indians went to Washington, D.C., to present a petition urging that section 7 funds be made available to support education at St. Mary's Mission Boarding School.

In 1914, the Secretary decided to consent to enter into a contract with St. Mary's Mission Boarding School to disburse section 7 monies on the condition that a sufficient number of Red Lake Indians would sign a petition each year to renew the contract. Forty-nine Indians signed the petition and twenty-four others signed with the proviso that the total aid per year should not exceed $1,000, but these last signers were disregarded.

A contract was entered into between the Commissioner and the Bureau of Catholic Missions (on behalf of the St. Mary's Mission Boarding School). The contract provided for the support and education of thirty-seven Red Lake Chippewa children for fiscal year 1915.

Some Red Lake Indians petitioned for use by St. Mary's Mission Boarding School of section 7 monies for fiscal years 1900, 1901, 1914, 1915, 1916, 1917, 1918, 1919, 1920, 1921, 1922, 1923, 1937, and 1940. Minutes of the proceedings of the General Council of the Red Lake Band reflect that the council on a number of occasions recommended payment from section 7 funds of tuition for children attending St. Mary's.

In 1938, after almost twenty years of support for St. Mary's, the General Council of the Red Lake Band of Indians notified the Secretary that it objected to the use of section 7 monies to educate children at St. Mary's Mission Boarding School. In response to this protest, section 7 monies were no longer used to contract for Red Lake Chippewa education at the school.

From 1890–1936, Red Lake Chippewa children received an education at the Red Lake and Cross Lake boarding schools. At these schools the Indian service provided facilities of varying quality and adequacy, and a curriculum which was geared toward their perceived future lives in their community.

### K. Oliver Breckner

Mr. Oliver Breckner was the principal of the Cross Lake School at Ponemah, Minnesota, for twenty-six years; his tenure in this capacity ended in 1937. A 1922 investigation report by the Department of the Interior's Indian Field Service, prompted by numerous Indian complaints, concluded that accounts had not always been accurately kept. Improvement was noted in the previous year by the addition of an expert accountant. Accounting practice was deemed "fairly adequate," as to proper disbursing of funds and care of public property.

In November, 1936, the chief clerk of the Red Lake Agency, Mr. J.H. Brott, noted certain irregularities in the accounts and reports submitted by Mr. Breckner. Upon consultation with Superintendent Bitney, an investigation was ordered by the Department of the Interior Division of Investigations. Investigators focused on the years 1932–1936 and concluded the following:

—As principal, Breckner had charge of the educational activities at the Cross Lake School and also performed the duties of a subagent. That is, he devoted considerable time to law and order matters and industrial activities of the Indian; he was charged with all activities at the school and the district immediately surrounding it, where he employed irregular labor for road work and other chores; and he was responsible for government property assigned to the school.

—Mr. Breckner ordered the unauthorized trade of a bull for a beef cow, following the Indian Office's denial of permission to do so. The beef cow was slaughtered and used for the school children's subsistence. While Breckner's actions were considered unauthorized, the

Indian Office didn't require restitution by Breckner for this incident.

—Mr. Breckner loaned a government-owned horse to an Indian, and then paid the Indian for use of a team of horses that included the government-owned horse.

—Mr. Breckner rented an automobile from an Indian employee to transport school children. He then submitted a false time report for work allegedly done by a boy in order to secure payment for the truck.

—Mr. Breckner arranged for government quarters for one employee, but did not note that the employee was occupying such quarters. No deductions were taken from the employee's salary for use of the quarters.

—In numerous cases, Mr. Breckner paid individuals for work that was never completed or for services never rendered (e.g., use of individuals' animals when, in fact, they owned none).

—In numerous cases, Mr. Breckner submitted time sheets, adding days to the actual number of days worked in order to increase the daily wage rate or to make up for alleged past shortages without authority to do so.

—In several other instances, Mr. Breckner submitted time sheets for merchants and others as having performed labor. The money collected was used to pay for supplies and services obtained by him without authority.

—Mr. Breckner oversaw the Cross Lake Dairy, and in the course of operations through 1935, he sold surplus cream to the Blackduck Cooperative Creamery and received the proceeds. Of $439.20 received of the Creamery, Breckner properly deposited only $224.10 to the Red Lake Agency. Breckner admitted that the missing balance was mingled with his personal bank account or other personal monies, and that he kept no records of amounts received or expended. He admitted using the money for unauthorized purposes, knowing that he had no authority to make the expenditures. The investigators noted that absence of accurate expenditures records leaves lit-

tle hope that the money could ever be accounted for, even were an extensive audit performed.

—Mr. Breckner received funds and materials allotted for a specific rehabilitation project for repair of Indian homes. The renovations were never completed, and records are not clear concerning the disposition of the supplies.

—Mr. Breckner received payments once weekly for power sales to a commercial resident. Instead of depositing the money with the Agency, Breckner distributed uncertain cash sums directly to Indians who supplied the power.

—Breckner loaned various government equipment and animal teams to Indians. These loans were in direct violation of instructions.

—Per Indian affidavits, Breckner loaned money to Indians and cashed checks for them.

The investigators failed to establish any personal gain by Breckner in connection with these incidents. However, they believed that a complete and extensive audit would uncover other similar situations, but a definite ascertainment of the amounts involved would be problematical since no definite records were available with respect to the unauthorized supplies, services and time sheet irregularities.

The investigating agents followed up in 1937 with a criminal report as to the possibility of convicting Breckner. Administrative officials recommended no prosecution. Rather, they sought restitution and recommended transfer to another job, or dismissal without prejudice, or transfer at reduced pay if Breckner made restitution estimated at $100, or retirement on disability. When it appeared that restitution would exceed $1000, however, the Secretary permitted Breckner to retire for physical disability if he paid $728.77, which he did. Breckner ultimately made total restitution of $1,145.56 to the United States.

As defendant points out, many of the instances reported in the 1937 investigation involved funds other than Nelson Act mo-

nies; in some cases, it isn't clear which funds were involved.

## L. *Medical Attention*

Defendant expended from Nelson Act funds the sums of $51,463.46 for "Hospitals and Equipment," and $256,947.79 for "medical attention," during the period fiscal year 1890 through 1942.

Prior to 1916 medical attention provided by the BIA on Red Lake was through the agency physician. In 1915, the BIA built, with Nelson Act funds, a hospital and operated it with those same funds thereafter. Defendant paid all or part of the Red Lake physician's salary and expenses with Nelson Act funds.

The 1904 regulations of the Office of Indian Affairs governing physicians made the physicians responsible for treating "all Indians and all agency and Government school employees, with [resident] members of their families ... free of charge"; placed the physicians in "charge of the health and sanitary conditions of the Indians, the agency and the reservation"; directed the physician to treat Indians not only in the office but to "visit them in their homes"; to "give prompt attention to all calls for services"; required the physician to instruct the Indians on how to improve hygiene and sanitary conditions; to report "any defect in the condition of agency and school buildings and grounds"; to "give special attention to sewerage, heating, or ventilation of apartments, and any condition of grounds or water supply which endanger the health of Indians or employees"; to make a "thorough inspection of all matters affecting the health of the Indians and employees" at least once a month, and "more often if necessary"; to "vaccinate all Indians, employees, and other persons residing at the agency," except those already immune; to isolate any person attacked by a contagious disease and maintain a rigid quarantine until the disease is under control; and to give special attention to venereal diseases among Indians. Regulations of the Office of Indian Affairs, 1904, §§ 81–103 *passim.*

In 1890, the Commissioner reported generally with respect to all reservations:

The work of the physicians is without supervision. The average agent, inspector, and special agent has no expert knowledge of medical practice, and the Indians are ignorant and helpless to make complaint either of neglect or malpractice. The physician at an Indian agency, far removed from civilization, having the care of barbarous people beset with the formidable difficulties of his anomalous situation, having no professional associations and with no possibility of gaining either increase of income or reputation by devotion to duty, is under a very strong temptation to slight his work.... The duties devolving upon the physician are very severe. He has the work of a surgeon and physician, with the sanitary oversight of people with whose language he is unfamiliar and who are ignorant, superstitious, and predisposed to a great variety of diseases. He must be his own apothecary; he usually has no hospital and no nurses, and his patients have few of the most ordinary comforts of home, and little, if any, intelligent care in the preparation of their food or the administering of prescribed medicine.

In 1912, the commissioner reported:

Physicians in the Indian Service should be graded as they are in other branches of the Government service and, in the hope of money enough from the Congress to employ them, the entrance requirements in the civil-service examinations should be raised, so that better new men for the service can be secured.

The standards set for admission of physicians and medical personnel to the Indian service was below that of the Public Health Service, and the quality of service delivered was criticized by the Meriam Report as "markedly below the standards maintained by" other federal agencies.

The Report cited as the "fundamental explanation" for these deficiencies a lack of adequate appropriations.

Physicians on Indian reservations were less likely than their private counter-

parts, either because of isolation, lack of interest, or lack of funds, to belong to medical societies, attend medical meetings, read medical literature, or keep up with medical developments.

Low salaries resulted in a lower quality of medical personnel, and greater turnover and job vacancies. Representative Miller of Minnesota stated that

> I have seen many and many a young man go out among the Indians and then remain a short time in a position he did not like, ask for a chance to be transferred, and leave, and all the period of time that was spent there was absolutely wasted, because he did nothing for the Indians except draw his salary. I have seen other physicians of middle life, of middle age. I have watched their work, and I knew that they were a failure in their profession because they made a failure of their work there.

52 Cong.Rec. 886–87 (1915).

Two Red Lake physicians graduated from medical schools the quality of which was found by a 1909 report on the quality of medical schools to be "inadequate."

Dr. Slattery, the Red Lake physician for at least the period 1925–1926, was strongly criticized by a supervising physician for superficial examinations, unsterile procedures, and other serious negligence. The agency superintendent was informed that Slattery could not be transferred at that time for lack of a replacement.

There were other serious criticisms of agency physicians. In October 1925, the BIA Supervisory Physician, whose job it was to visit and report on Red Lake agency medical care, stated:

> Trachoma is just beginning to show an increase at this agency due directly to lack of attention by every agency physician stationed here since 1916. Not one of them has given the matter serious effort, and in view of this the absolute lack of interest shown by the present agency physician is without defense.
>
> Your physician had the opportunity of observing his examinations of pupils. These were conducted by the agency physician without removal of his own topcoat and hat, the left hand alone used for examination while the right recorded the findings. Not a chest was examined, not an eyelid turned, not an arm bared to determine vaccination, a stethoscope applied to none, in fact no real examination at all. The records made are therefore as useless as the pretense at examination. Any other records made by him must have almost equal value.
>
> The nurses advise me that although rubber gloves are always sterilized and placed at his disposal, he practically never uses them in obstetrical work for the protection of either the patient or himself. From common observation of his other methods of procedure, it is not unfair to him to believe that this statement is absolutely true.

The same inspector evaluated the performance of a Dr. Bond, who began work at Red Lake in 1930, as follows:

> [T]he present physician and head nurse accepted and have used their positions with the thought that they have entered on a long vacation with pay.
>
> It is not meant to be hypercritical, but the physician never pretends to get around to his office before 9 or 9:30 in the morning, long after many little things needing his attention rather than that of a nurse, must necessarily have come from and returned to the boarding school. There is only one answer, and that is a strong desire to avoid exertion.
>
> The final statement offered in this connection is, that it has been noted by former Superintendent Burns, the present Superintendent Cavill and myself, there has been at least a seemingly extravagant method of handling the carrying funds available for the maintenance of the hospital and dispensary. Both the doctor and nurse, especially the doctor, have not been open to suggestions as to methods of curtailment of expense. It is true many things are needed, and always necessary, but there are proper means also of reducing the costs of those attained, and avoiding the purchase of many others. That has had

much to do with the poverty of funds now available.

The physician hired in July 1928 was Doctor O'Donnell. At a previous assignment he had been suspected of using drugs illegally. At Red Lake, he used excessive quantities of codeine and alcohol-based drugs. He was charged with dereliction of duty, drunkenness, and use of drugs; he resigned in 1929.

In August 1929, the District Medical Director wrote the Commissioner that "[t]he professional qualifications of physicians in charge during the past three years have not been up to required standards and, therefore, the facilities of the hospital have not been utilized to the best advantage.... I am of the opinion that an entire new personnel, including the physician and two nurses, is desirable for the Red Lake Hospital."

In 1930, the Red Lake Superintendent sought the following clarification from BIA: "We would like your explanation of just what should be done under these two divisions. Occasionally it becomes necessary to enter as patients in a hospital white people who are not employees or a beneficiary of any kind of the United States Government...." There was evidence that physicians at agencies around Red Lake were carrying on a very limited private practice. The only evidence regarding Red Lake concerned Dr. Slattery.

Payrolls for the period show that the salary of Red Lake physicians was paid in part from the fund, "Chippewa in Minnesota, Agency Expense," and part from the fund "Chippewa in Minnesota, Hospital."

The Meriam Report generally criticized the condition and operation of hospitals on Indian reservations. The Red Lake Hospital opened in 1916. The operation of the hospital was criticized from time to time, typically for poor maintenance. The facility itself was more frequently evaluated as excellent, however, or as one of the best in the Indian Service.

There was one report in 1918 stating that a person who was not a patient or employee was given sleeping quarters in the hospital, as well as employees, and at lease one

employee's child. In 1926, it was reported that it had been customary for "a long period" to allow "transients and some permanent employees" to lodge in the hospital.

In the first part of this century, tuberculosis ("TB") was the most serious disease among Indians. Meriam estimated that the death rate in 1925 nationally among Indians was seven times higher than in the general population. The death rate from TB in 1931 was ten times greater among Indians in Minnesota generally than for whites. TB is an infectious, highly contagious disease. Bacilli are transmitted by coughing, spitting, or contact with sputum. It is difficult to prevent contagion to persons in contact with the patient.

In the 1890's, TB was diagnosed by a physical examination, and by a microscopic sputum examination. Treatment then was sanatorium care—separation, rest and good diet—which also helped contain spread of the disease. By 1900, competent physicians would train infected patients in sanitary disposal of sputum.

At the time of the Meriam Report, 1928, a complete health examination would have included either a Pirquet or Mantoux tuberculin test, followed by x-ray examination if the tests were positive. There was no x-ray machine in Red Lake Hospital through at least 1934. There is no direct evidence of either a Mantoux or Pirquet test being given prior to 1936.

The State of Minnesota in 1913 adopted legislation to encourage construction in various counties of TB sanatoria. The advantage of local sanatoria being that patients, white or Indian, preferred to be in a sanatorium near familiar surroundings. By 1919, fourteen sanatoria were in operation in Minnesota. Each was planned to have x-ray equipment and to administer lung collapse therapy. With the spread of county sanatoria, incidence of death from TB declined significantly.

Throughout the records concerning Red Lake Hospital there is a consistent plea for construction of a sanatorium at Red Lake, though none was ever built. In 1924, three Red Lake Indians were admitted to the

Lake Julia Sanatorium at Puposky, a short distance away.

The annual report of the Red Lake agent for 1925 reflects that the amount of TB and trachoma "are about the same as for the past several years," with a possible decrease at Red Lake. At Cross Lake "they have practically no medical attention and there the prevalence is increasing."

Many Indian homes were reported in 1925 to be "quite filthy." At Cross Lake, the agent reported that the number who refused to come to the Red Lake hospital and refused to accept medical attention was "very large," prompting a request for a doctor stationed there. In winter, the road to Red Lake was closed, necessitating travel across Red Lake. Although a new hospital opened at Red Lake in 1916, the facility was never ideally suited for treating TB patients. Isolation was not possible.

In 1924, BIA opened a TB sanatorium for Indians at Onigum, approximately sixty-five miles from Red Lake. Nelson Act monies were used in operating the facility. There are many references to patients from Red Lake being treated at Onigum, although it was apparently a constant difficulty to persuade the Chippewa to leave the reservation to use Onigum.

The Meriam Report describes Indian sanatoria as inadequate in several respects: isolation and distance of travel; incomplete examinations; lack of x-ray equipment; insufficient personnel; lack of bed space; failure to use artificial pneumothorax; poor record keeping; and failure to effectively use therapy. Staff was described as poorly trained, although a notation is made in the Report that the "superintendent at Chippewa is taking a special course in tuberculosis this summer."

The sanatorium at Onigum did not meet the standards set by the state for county sanatoria. It had been the U.S. Indian School at Onigum formerly. It was a fire hazard, difficult to keep clean, it had no x-ray equipment, it was relatively isolated, was poorly laid out, and it had no laboratory for sputum examination. Onigum

had eighty-five beds and had 877 Indian patients. It closed in 1934.

In 1935, a new wing of the state sanatorium was opened, dedicated to treating the Chippewa. There is a report that as of 1930 some patients at Onigum were transported to both Walker General Hospital and the state sanatorium for x-rays. By 1929, there is a report of ten patients receiving artificial pneumothorax treatment at Onigum.

The court accepts as well founded the opinion of Dr. Wilson to the following extent: that the level of medical treatment for TB provided to Red Lake Indians between 1890 and 1935 was much inferior to that available elsewhere in Minnesota, and that as a result of failure to provide the level of diagnosis and treatment which was known to be most successful at the time, more Red Lake Chippewa contracted TB and died from it.

Trachoma is an infectious, highly contagious disease of the eye, which, if untreated, can cause blindness. By 1909 the disease was widespread among the Chippewas, as it was among other Indians. In that year Congress appropriated funds for the investigation, treatment, and prevention of the disease. Act of February 20, 1909, 35 Stat. 642. The disease could not be treated effectively prior to 1938, when it was discovered by an Indian Service physician that it could be cured by using sulfanilamide. Prior to that time, the recommended treatment was segregating healthy persons from those infected. In 1913 the Public Health Service recommended that sick children be segregated from infected ones. The Meriam Report states that this policy was never effectively pursued on Indian reservations, except for creation of two schools in 1927 for trachomatous students.

The earliest government doctors in northern Minnesota in the vicinity of what became Beltrami, Cass, and Clearwater counties were the government physicians attached to the Indian agencies.

Anecdotal evidence from contemporary newspapers and pioneer recollections suggest that medical service was undeveloped

in rural north central Minnesota. Delivery of service was hampered by limited numbers of doctors, some of whom attended mediocre proprietary schools of that era, and by weather, terrain, long distances, and lack of hospitals.

In the years after 1900 public hospitals and other health-related institutions were built in Minnesota, mostly in towns and cities. The most notable was the Mayo Clinic in Rochester, Minnesota, established in 1889.

Defendant introduced inspection reports for the period 1932–1939 for three small hospitals in Roseau, Thief River, and International Falls, Minnesota, which are somewhat critical of the quality of facilities and care.

The Red Lake Hospital, a twenty bed facility on the Red Lake Reservation, opened in 1916 offering medical services to the Red Lake Band. It contained two private wards, one emergency ward, and quarters for hospital employees. The Red Lake Hospital was constructed due to the need of the Red Lake Band to have such a facility on the reservation so that the sick could be treated there instead of by a traveling physician or at an off-reservation hospital. It was described in 1916 as serving well every purpose for which it was intended.

A 1922 inspection of the Red Lake Hospital stated that it was perhaps one of the best medical facilities in the Indian Health Service. In 1923 an inspection report cited ongoing renovations which the author believed would put the hospital into a first-class condition. The hospital's repairs and renovations were commended in a 1927 BIA inspection report which also noted that the "institution is a credit to the service."

The medical staff on the Red Lake Reservation during 1916–1946 typically included at least one physician and several hospital nurses. After 1926, public health nurses from the Chippewa Indian Nursing Service were added. The position of physician was reported as vacant on a number of occasions, however. In 1933, a BIA inspection stated that the Red Lake Hospital staff provided the Red Lake Band with

medical and pediatric services. Contagious diseases such as venereal diseases and TB were treated and occasional surgical services were also provided. The Red Lake Hospital remained the major medical facility on the Reservation into the 1940's.

Reservation officials also obtained assistance on some occasions from local Beltrami County doctors. Beltrami County physicians provided emergency medical and surgical services on occasion to the Red Lake Band in the late 1920's. Beginning at least by 1924 Red Lake Indians had some access to outside medical facilities. These facilities included state and county TB sanatoria, county hospitals, and the University of Minnesota Hospital in Minneapolis, Minnesota. The Indian Health service, with the assistance of the Chippewa Public Health Nurses, expended much energy in their efforts to eradicate venereal diseases among the Indians.

Congress in 1931 appropriated funds for a clinical survey of TB, trachoma and venereal disease. Five thousand dollars was authorized for the survey among Chippewa. In 1931, the United States cooperated with the State of Minnesota to conduct mobile clinics, one at Ponemah, one at Red Lake, both on the Red Lake Reservation, and others at other Indian Reservations.

In 1916 the Minnesota State Department of Health reported that a continuing lack of funds limited rural health center work and that it was difficult to persuade small communities to employ a nurse. In 1916, the United States Indian Service employed medical personnel to treat the Red Lake Chippewas.

As late as 1919, there still were no obstetric nurses in the State of Minnesota. Midwives existed, but by 1923 their numbers were reported to be decreasing by the Division of Child Hygiene of the Minnesota State Department of Health.

The passage in 1921 of the Sheppard–Towner Act, ch. 135, 42 Stat. 224 (1921), along with, in 1922, the State of Minnesota's organization of the Division of Child Hygiene under the State Board of Health,

created an advisory and supervisory program for public health nurses in the state.

The Sheppard–Towner Act provided funds for infant and maternal care. The Social Security Act passed in 1935 provided funds to establish and maintain adequate public health services. The State of Minnesota initiated field work among the Chippewas in 1923 using nurses of Indian descent to win over the confidence of the Indians. This program was initially financed by federal (Sheppard–Towner) funds and matching private gifts to the State. After July 1925, the State increased its own appropriation and Sheppard–Towner funds matched. On June 30, 1929, the federal government ended Sheppard–Towner funds, but the State continued the work on a reduced scale using state funds. In 1929, three BIA field nurses were put under state supervision along with the two state field nurses. A third nurse financed by BIA was added to the state's staff in 1930. In addition, there was a supervisor.

Utilizing Social Security funds, the Minnesota Department of Health organized rural health works by districts. Each district, composed of several counties, was to employ at least a medical director, a public health engineer, an advisory public health nurse, and a clerk. Each county in a district was to employ at least one public health nurse.

In 1923, on recommendation of a special committee appointed by the Secretary, the State of Minnesota evaluated the circumstances of the Minnesota Chippewas and took steps to establish a state system of health care for the Chippewa Indians.

The new Minnesota state policy, together with an investigation of the living conditions among the Chippewas (conducted by Dr. S.J. Crumbine, Director of Public Health Relations for the American Child Health Association), led the State of Minnesota to employ the first Chippewa public health nurses. In 1927, the BIA deployed Indian public health nurses among the Minnesota Chippewas. In 1929, to coordinate the services of federal and state nurses, federal Indian nurses were placed under the supervision of the Minnesota Department of Health. By 1923, seven nurse were employed by the Chippewa Indian Nursing Service (the Joint federal-state public health nursing service), two of whom were assigned to the Red Lake Reservation. The mission of the Chippewa Nursing Service was to work with the Indian Health Service doctors to control communicable diseases, to promote infant and maternal health, and immunize school children against smallpox and diphtheria.

Deaths among children under the age of three declined from twenty-nine deaths out of 1736 Red Lake Indians in 1927 to seventeen deaths out of 1881 Red Lake Indians in 1932. In 1933, Nursing Supervisor Adelia Eggestine noted that all prenatal patients on the Red Lake Reservation were seen periodically and that most women delivered their babies in the hospital.

Although the Red Lake Chippewa were reported generally to be ready and willing to accept medical attention on the reservation, with respect to the control of communicable diseases, public health nurses faced significant difficulties with crowding, lack of sanitation and cleanliness, poor diet, and unhygienic personal habits present in many Indian homes. The work of the public health nurses among Indians generally was commended in the Meriam Report.

By the 1890's the spread of TB was a growing concern in Minnesota, with the state beginning to conduct laboratory tests for diagnosis of the disease in 1894. In 1901, the State of Minnesota created a tuberculosis commission to study the disease. The Minnesota Tuberculosis Commission, using state funds, purchased land and built a TB sanatorium, opening in 1907, in Walker, Cass County, Minnesota. In 1909, the Minnesota State Legislature authorized the creation of county sanatoria commissions to establish county TB sanatoria. The death rate in Minnesota from TB increased from 1900–1909. TB caused over 10% of all deaths in the state in 1909, more than any other communicable disease.

The Minnesota State Board of Health, in a 1909 plan to combat TB (including the issuance of regulations, public education, and establishment of institutions for the

tubercular), forecast that institutional care for tubercular persons was years away and that home care by trained nurses must, therefore, be considered seriously.

The death rate in Minnesota from TB declined in the period 1910–1942 for non-Indians. Indian TB death rates did not drop until the 1930's.

By 1942, the State Sanatorium, in Cass County, had a patient capacity of 480 beds. Two county TB sanatoria served the Minnesota counties of Beltrami, Hubbard, Itasca, Koochiching, Marshall, Pennington and Roseau: the Oakland Park Sanatorium in Pennington County (opened in 1917) and the Lake Julia Sanatorium in Puposky, Beltrami County (opened in 1916).

In 1908 the Commissioner recognized TB as a leading cause of death among Indians and appointed Dr. Joseph A. Murphy, who was described as an expert in the treatment of TB, as Indian Health Service Supervisor. In 1908, the Red Lake Reservation physician (Dr. J.R. Collard), recognizing the severity of TB among the Chippewas and the need for better treatment, advocated the establishment of a good hospital, but cautioned that much time would pass before prejudice among the Indians against such institutional treatment would be overcome.

Some Indians refused to seek or accept such medical treatment at the Red Lake Reservation or at the TB sanatoria run by the Indian Health Service, the State, or the Counties.

The Indian Health Service attempted to deal with TB on the Red Lake Reservation by:

a. providing access to federal, state and county sanatoria;

b. performing medical examinations of students at the boarding school; and

c. providing public education on better living conditions and hygienic habits.

In 1924, the Indian Health Service opened the Onigum Sanatorium which had a capacity of eighty patients. The Minnesota State Department of Health made mention of the U.S. Indian Service medical staff concerning their role in making the sanatorium a success.

The facilities at the Walker State Sanatorium were expanded for the Chippewas in 1935. There are numerous reports that Red Lake Indians did not want to go to Onigum for institutional care, and if sent, might return prematurely.

In 1924, three Red Lake Indian children with TB were treated at the Lake Julia Sanatorium. On one occasion, the BIA obtained approval from the Beltrami County Board of Commissioners for the involuntary medical confinement of a Red Lake Indian. One federal official saw this as a way to establish a precedent for the involuntary institutionalization of uncooperative, infected Indians.

Prior to 1918, no formal program for control of venereal diseases existed in Minnesota. Moreover, the Minnesota Board of Health did not start to recognize syphilis and gonorrhea as diseases requiring government investigation and control until 1909–1911. In 1918, as part of a "war emergency," the Minnesota State Department of Health organized a Division of Venereal Disease. The Department after WWI exposed the previously unsuspected prevalence of the disease.

The venereal disease control programs, utilizing federal funds (the first such funds given to states for a public health program), called for reporting of detected cases, restrictions on infected persons, public health education, epidemiological investigations, and metropolitan treatment clinics.

Following WWI, interest in venereal disease control subsided. In 1922, the United States withdrew federal aid for venereal disease control. Minnesota continued the work through state appropriations with a marked decrease in the volume of work during the depression years. In the late 1930's, federal aid again became available, and by the time of World War II, the venereal disease rate in Minnesota was well below that of most of the United States.

Venereal diseases, specifically syphilis and gonorrhea, were a serious health problem on the Red Lake Reservation through-

out the period in question. In 1915–1916 Red Lake Reservation Superintendent Walter F. Dickens reported two deaths among the Red Lake Band from syphilis and recommended compulsory Wassermann tests for all Indians on the Red Lake Reservation.

In 1930, after consultation with the Red Lake Reservation Superintendent and the Red Lake Reservation Physician, the Indian Health Service conducted a venereal disease clinic at the Red Lake Hospital. Dr. R.R. Sullivan, of the Minnesota Division of Preventable Diseases, pronounced two sessions of the clinic to be a success and an opportunity to accurately determine the extent to which venereal disease afflicted the population. In addition to Red Lake Hospital's venereal diseases clinic, Red Lake Indians were treated at cooperative federal-state mobile clinics, organized in 1930 and 1931.

In the early 1930's, the control of venereal diseases among Chippewa Indians became the focus of the common efforts of the Indian Service, the United States Public Health Service and the State of Minnesota. Despite efforts to the contrary, the rate of venereal disease remained high among Minnesota's Indians. Individual members of the Red Lake Band utilized on occasion federal, state, county, and private medical facilities off the reservation.

The United States Public Health Service in 1913 described trachoma as a "dangerous, contagious disease of the eyes. Under favorable conditions it may spread widely in a community." Surveys in Minnesota revealed a very heavy trachoma infection among the Red Lake Indians and other Chippewa Bands in Minnesota. A health survey in 1903 revealed the prevalence of trachoma among Indians. The Commission, in 1904, directed that: "Eye diseases are to receive proper attention...." Congress appropriated $12,000 "to investigate, heal and prevent trachoma among the Indian population." Act of March 21, 1904, 35 Stat. 642. The investigation turned up evidence of the heavy incidence of the disease.

In 1912, due to fears of the spread of trachoma, the U.S. Public Health Service surveyed the extent of the disease among Minnesota Indians, finding high rates among the Red Lake Band and low rates among non-Indians. At that time, the Service concluded that the high incidence of trachoma was due to the Indians' personal habits, dwelling conditions, and their indifference to treatment.

The 1912 survey revealed that at Red Lake, of 640 Indians, including school children, 18.28% had trachoma. Exclusive of school children, 14.22% at Red Lake had trachoma. The report stated: "The results of the survey point with suspicion to the Indian boarding schools as a factor in the spread of trachoma among the Indian population of the State."

The 1912 survey revealed the following infection rates for trachoma at the three Red Lake boarding schools: Cross Lake—26.09%; Red Lake—30.11% and St. Mary's—31.26%. The survey team concluded: "It is very possible that the intimacies of boarding school life afford excellent opportunity for the spread of infection in the schools; and the subsequent return of these infected children to their homes no doubt contributed still further to the spread of this disease among the Indian population." A final report showed 1,172 Red Lake Indians were examined, 7.5% of whom had trachoma.

In 1913, the Red Lake Reservation Physician Dr. L.L. Culp began treatment of trachoma among the Red Lake Indians. In 1915, Red Lake Reservation Superintendent Walter F. Dickens expressed the hope that progress in treating trachoma in schools might convince adult Indians to seek eye treatment. In the 1920's, the Indian Office endorsed the use of radical surgery on the eyelids, promoted by an ophthamologist at the University of Pennsylvania Medical School, Dr. Webster Fox.

An investigation of health conditions on the Red Lake Reservation, conducted in 1915, reported the existence of fewer cases and regular treatments; it commended the efforts of Dr. L.L. Culp. In 1920, state and U.S. Public Health Service officials began to cooperate with Indian Health Service officials to treat trachoma on the Red Lake

Reservation. In the fall of 1920, the United States Public Health Service surgeon conducted a clinic at Red Lake. An interim report by the Minnesota State Board of Health showed he examined 1,057 Indians and 100 whites, found 87 trachoma cases, and operated on 84. The report reflected that "Dr. Goodwin's operations are saving the eyesight of many Indians."

The rate of trachoma among the Red Lake Band declined in the late 1920's and into the 1930's, but no substantial progress toward a cure was possible until the late 1930's when "cooperative research work carried on by Indian medical service physicians and Columbia University staff determined in 1936 that trachoma was caused by a virus." In 1938, it was determined that "successful treatment of the disease with sulfanilamide" was possible.

## M. *Agricultural Expenditures*

 The Nelson Act permits the expenditure of trust funds for "civilization and self-support" (in appropriations from time to time not exceeding five percent of principal), and during the first five years of the life of the trust to advance monies for the purchase of "live-stock, teams, farming implements, and seed." Based primarily on its review of the vouchers, and in part on the testimony of historian Dr. Thomas Wessel, defendant showed that a substantial effort was undertaken to teach farming techniques to adults through the agency farmer, and by operating a small farm in connection with Red Lake School. Although this effort apparently did not succeed in creating large scale commercial farming, in part at least because the climate and soil were not favorable, the results were referred to often enough to suggest that at a minimum it resulted in small scale commercial farming of row crops, subsistence gardening, and raising of livestock. Plaintiff's primary counter to this evidence is that Red Lake lands left after both cessions were poorly suited to large scale farming. The preponderance of the evidence leads to a finding that the better farm lands were ceded, that relatively small portions of remaining land were well-suited for row crops or gardening, and that

a better use of the land was for grazing and timber farming. Nevertheless, the court will not disallow disbursements for agriculture simply on this basis. Absent a specific showing that the disbursement was in part or whole one for the agency's benefit, the expenditures will be allowed, if proven. It was well within the purposes of the Nelson Act to attempt to make the Indians self-sustaining through agriculture. Even if large-scale farming was not practicable, small-scale farming, gardening and raising of livestock was possible.

From letters and reports for at least the period 1913 through 1917 it appears that there was a position called "agency farmer," the purpose of which was to assist Indians with agricultural pursuits. The Superintendent of the Red Lake Reservation reported to Congress in 1934 that the agency farmer assisted Indian farmers "in the care and handling of livestock," and with plowing and threshing grain. This individual must have performed a function other than teaching at Red Lake School, since there were requests made for a separate position at the school. Apparently, for some period of time both positions were filled, although it is not clear to the court that Nelson Act monies were exclusively used.

 The court has examined each document cited by plaintiff as evidence that the agency farmer position should not be paid from Nelson Act funds. Some of the evidence related to other reservations, and most of the balance were hearsay and anecdotal characterizations. There were, however, three clear instances in which the agency farmer was mentioned as a person who could perform strictly agency tasks (obtaining signatures on petitions from the Indians) and serving as deputy sheriff. In addition, on some payrolls, the agency farmer appears as "farmer and overseer." Defendant's response is not a direct joinder. It does not dispute the examples. It asserts that "it was appropriate for the GAO to charge the salary of the school farmer to 'Education.'" The court agrees. There is no reason to question the utility of that salary, to the extent it was incurred.

However, the court disallows the salary (not expenses) of the "Agency Farmer" as being undifferentiated between agency and Indian benefit. To the extent that the agency farmer's expenses are clearly for agricultural purposes only, they are allowed. If they are compatible with a general agency use, they are disallowed.

## VI. SUMMARY CONCLUSION

What follows is a summary of conclusions and findings. The specific language at the referenced text controls.

1. Plaintiff's motion *in limine*, reasserted in post-trial briefing, is denied. *Supra* at p. 372

2. Defendant has furnished an accounting as to Red Lake disbursements. Defendant is directed to pay a portion of plaintiff's expenses and legal fees. *Supra* at p. 374

3. Defendant' motion to dismiss based on the statute of limitations is granted. *Supra* at pp. 374–78 The following claims are dismissed:

—Expenditures for public school tuition and construction violated state law and the equal protection clause.

—Expenditures for sectarian school tuition violated the establishment clause and the fifth and fourteenth amendments to the Constitution.

—All disbursements for education were improper because the education furnished was inferior.

—All disbursements for medical care were improper because the medical care was inferior.

4. Expenditures from principal were not, with one exception, a violation of the five percent proviso of the Nelson Act, and in any event were generally within Congress' plenary power. They were outside Congress' plenary power and unfair and dishonorable only to the extent they were for agency purposes or otherwise did not benefit the Band, as disallowed on an individual basis. *Supra* at pp. 383–89

5. Use of interest-bearing funds to make per capita payments, though not consistent with the Nelson Act, was a proper exercise of Congress' plenary power and was not unfair and dishonorable. *Supra* at p. 392

6. Plaintiff's proposed education conclusions:

a. Proposed conclusions No. 1, 2 and 11. Rejected as a matter of law based on conclusion 3, above, and as a matter of fact. *Supra* at p. 399

b. Proposed conclusion No. 3. Rejected. *Supra* at p. 399

c. Proposed conclusion No. 4. Salaries of the Red Lake and Cross Lake superintendents are disallowed for the period 1907–1920. *Supra* at p. 399

d. Proposed conclusion No. 5:

—Item 1. $3,370.88 disallowed. Also, one quarter of Red Lake Boarding School expenses for maintenance, supplies, and fuel, between 1911 and 1922 is disallowed. *Supra* at p. 400

—Item 2. One quarter of Cross Lake Boarding School expenses for maintenance and fuel are disallowed. *Supra* at p. 400

—Item 3. Rejected. *Supra* at p. 400

—Item 4. Disbursements for construction operation and maintenance of lighting, water, and sewer systems at Red Lake School prior to 1923 are disallowed.

e. Proposed conclusions No. 6 and 7 are rejected as untimely raised. *Supra* at p. 400

f. Proposed conclusion No. 8. $28,398.48 disallowed. *Supra* at pp. 400–01

g. Proposed conclusion No. 9. All of Breckner's salary is disallowed, along with all cash disbursed or received by him. *Supra* at p. 401

h. Proposed conclusion No. 10. Rejected. *Supra* at p. 402

7. Plaintiff's motion of October 7, 1988 to strike appendices 4 and 5 from defendant's response to plaintiff's proposed findings of fact is granted.

8. Plaintiff's proposed conclusions as to medical attention are rejected, except that the salaries of doctors Slattery, Bond and O'Donnell are disallowed. *Supra* at p. 404

9. Disbursements credited to the following GAO categories are disallowed as agency expenditures (*Supra* at p. 404):
 —"Hardware, glass, oil and paints"
 —"Boats, Docks, etc."
 —"Telephone Lines"
 —"Transportation of Supplies"
 —"Pay of Mechanics"
 —"Agency Buildings and Repairs"
 —"Miscellaneous Agency Expenses"
 —"Miscellaneous Building Materials"
 —"Miscellaneous Employees"
 —"Pay of Indian Police"
 —"Pay of Interpreters"

10. Disbursements credited to the GAO category "Saw and Grist Mills" are disallowed. *Supra* at p. 404

11. Expenditures for education, health or highway purposes will not be disallowed solely on the basis of 25 U.S.C. 70a. *Supra* at pp. 406–07

12. $130.60 paid to Julia Wolcott, and $9.70 paid to an Ottertail Chippewa are disallowed as part of the Red Lake accounting. *Supra* at p. 410

13. $7840.70 attributed to Disbursement Schedule 2 for fiscal year 1899 is disallowed. p. 412 $6.20 paid on account of Nancy Dudley is disallowed. No other per capita payments challenged on the basis of lack of proof of payment or ratification or release are rejected. *Supra* at pp. 410–12

14. Samples. (All omitted samples are disallowed as being for agency purposes.)
 a. Sample 555 (*Supra* at pp. 412–13)
 —555–2 Allowed.
 —555–3 Allowed.
 —555–4 Disallowed as "food, rations or provisions" ("FRP").
 —555–5 Disallowed.
 —555–6 Disallowed.
 —555–7 Allowed.
 b. Sample 556 (*Supra* at pp. 414–15)
 —556–1 Allowed
 —556–3 Allowed
 —556–6 Allowed
 —556–4 Disallowed (FRP)
 —556–9 Disallowed (FRP)
 —556–10 Disallowed (FRP)
 —556–11 Allowed
 —556–14 Disallowed (FRP)
 —556–15 Disallowed
 —556–16 Disallowed
 —556–17 Disallowed (FRP)
 c. Sample 557 (*Supra* at pp. 415–16)
 —557–1 Allowed
 —557–2 Disallowed
 —557–3 Disallowed
 —557–4 Disallowed
 —557–5 Disallowed (FRP)
 —557–6 Disallowed (FRP)
 —557–7 Disallowed (FRP)
 —557–11 Allowed
 —557–12 Allowed
 —557–13 Allowed
 d. Sample 558 (*Supra* at p. 416). Allowed
 e. Sample 559 (*Supra* at pp. 416–18)
 —559–4 Disallowed
 —559–5 Disallowed
 —559–7 Allowed
 —559–9 Disallowed
 —559–11 Disallowed
 —559–15 Disallowed
 —559–16 Disallowed (FRP)
 —559–18 Allowed
 —559–20 Disallowed
 —559–22 Allowed
 —559–24 Disallowed
 —559–25 Disallowed
 —559–26 Disallowed
 —559–27 Disallowed
 —559–28 Disallowed
 —559–29 Disallowed
 —559–30 Disallowed
 —559–31 Disallowed
 —559–33 Disallowed
 —559–36 Disallowed
 —559–40 Disallowed
 —559–42 Disallowed
 —559–43 Disallowed
 —559–45 Disallowed
 f. Sample 560. *Supra* at p. 418
 —560–1—8 Disallowed
 —560–10 Allowed
 g. Sample 561. *Supra* at p. 418
 —561–1 Disallowed (FRP)
 —561–2 Allowed
 —561–3 Allowed
 —561–5 Disallowed (FRP)

—561–6 Disallowed (FRP)
—561–7 Allowed
—561–9 Allowed
—561–10 Allowed
—561–11 Allowed
—561–12 Disallowed (FRP)
—561–13 Allowed
—561–14 Disallowed (FRP)
—561–16 Allowed
—561–17 Allowed